EXHIBIT 5
PART 1



Doc#: 0634644078 Fee: $438.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 12/12/2006 01:04 PM Pg: 1 of 208

*This space reserved for Recorder's use only.*

# PALMER HOUSE HOTEL, CHICAGO, ILLINOIS

## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

**THIS INSTRUMENT WAS PREPARED
BY AND AFTER RECORDING SHOULD
BE RETURNED TO:**

Adam T. Berkoff, Esq.
DLA Piper US LLP
203 North LaSalle Street
Suite 1900
Chicago, Illinois 60601

PIN NUMBERS:
17-15-102-005, 17-15-102-006,
17-15-102--010 and 17-15-102-011

ADDRESSES:
17-27 East Monroe Street,
109-119 South State Street and
106-132 South Wabash Avenue,
Chicago, Illinois

CHGO2\40126644.12

# TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 2 |
| 1.1 | Definitions | 2 |
| 1.2 | Construing Various Words and Phrases | 11 |
| ARTICLE 2 | EASEMENTS BURDENING THE RETAIL PARCEL | 11 |
| 2.1 | In General | 11 |
| 2.2 | Grant of Easements in Favor of the Hotel Owner | 13 |
| 2.3 | Grant of Easements in Favor of the Office/Annex Owner | 16 |
| ARTICLE 3 | EASEMENTS BURDENING THE HOTEL PARCEL | 18 |
| 3.1 | In General | 18 |
| 3.2 | Grant of Easements in Favor of the Retail Parcel | 20 |
| 3.3 | Grant of Easements in Favor of the Office/Annex Parcel | 26 |
| ARTICLE 4 | INTENTIONALLY OMITTED | 28 |
| ARTICLE 5 | EASEMENTS BURDENING THE OFFICE/ANNEX PARCEL | 28 |
| 5.1 | In General | 28 |
| 5.2 | Grant of Easements in Favor of the Hotel Parcel | 29 |
| 5.3 | Grant of Easements in Favor of the Retail Parcel | 32 |
| ARTICLE 6 | INDEMNIFICATION | 35 |
| ARTICLE 7 | SERVICES TO OTHER OWNERS | 36 |
| 7.1 | Services to the Retail Owner by Hotel Owner | 36 |
| 7.2 | Services to the Office/Annex Owner by Hotel Owner | 38 |
| 7.3 | Façade Maintenance and Window Washing | 39 |
| 7.4 | Obligation to Furnish Services | 39 |
| 7.5 | Payment for Services | 40 |
| 7.6 | Failure to Perform Services | 40 |
| 7.7 | Data Unavailable from Metering | 40 |
| 7.8 | Change in Services or Obligations by Hotel Owner | 41 |
| ARTICLE 8 | LIENS; COMPLIANCE WITH LAWS; USE;  SIGNAGE; ENVIRONMENTAL AND ENGINEERING REVIEW | 41 |
| 8.1 | Liens | 41 |
| 8.2 | Compliance With Laws | 42 |

i

CHGO2\40126644.12

Order: 18000031623                                          Page 2 of 203  Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

| | | |
|---|---|---|
| 8.3 | Use | 43 |
| 8.4 | Exterior Signage/Visible Window Treatments/Satellite Dishes and Antennae | 45 |
| 8.5 | Environmental and Engineering Review | 46 |
| ARTICLE 9 | REAL ESTATE TAXES | 46 |
| 9.1 | Separate Real Estate Tax Bills | 46 |
| 9.2 | Payment of Real Estate Tax Bills | 47 |
| ARTICLE 10 | INSURANCE | 48 |
| 10.1 | Insurance Required | 48 |
| 10.2 | Insurance Companies | 50 |
| 10.3 | Insurance Provisions | 50 |
| 10.4 | Limits of Liability | 51 |
| 10.5 | Renewal Policies | 52 |
| 10.6 | Waiver | 52 |
| 10.7 | Supplental Insurance Coverage | 52 |
| 10.8 | Monetary Adjustment (Equivalent Dollars) | 52 |
| ARTICLE 11 | MAINTENANCE AND REPAIR; DAMAGE | 53 |
| 11.1 | Maintenance of Hotel Parcel Improvements, Office/Annex Parcel Improvements and Retail Parcel Improvements; Restoration | 53 |
| 11.2 | Damage Affecting Only One Parcel of the Project | 54 |
| 11.3 | Joint Damage | 55 |
| 11.4 | Cost of Repairs | 57 |
| 11.5 | Deposit of Costs | 57 |
| 11.6 | Excess Insurance Proceeds | 58 |
| 11.7 | Agreement Not to Repair | 58 |
| 11.8 | Cost Defined | 59 |
| 11.9 | Restoration of Improvements on a Parcel Submitted to the Act | 59 |
| 11.10 | Easements for Repair and Reconstruction | 62 |
| 11.11 | Mortgagee Rights to Proceeds | 62 |
| ARTICLE 12 | LIENS, DEBTS, INTEREST AND REMEDIES | 62 |
| 12.1 | Failure to Perform | 62 |
| 12.2 | No Diminution of Lien | 63 |

ii

| | | |
|---|---|---|
| 12.3 | Mortgagee's Subrogation | 64 |
| 12.4 | Interest Rate | 64 |
| 12.5 | Cumulative Remedies | 64 |
| 12.6 | No Set-Off | 64 |
| 12.7 | Period of Limitation | 64 |
| 12.8 | Attorneys' Fees | 64 |
| 12.9 | Self-Help | 64 |
| 12.10 | Subordination | 65 |
| ARTICLE 13 | [INTENTIONALLY OMITTED] | 65 |
| ARTICLE 14 | CONSTRUCTION OBLIGATIONS; indemnity; UNAVOIDABLE DELAYS | 65 |
| 14.1 | Construction Obligations | 65 |
| 14.2 | Indemnity | 65 |
| 14.3 | Cooperation | 65 |
| 14.4 | Unavoidable Delay | 66 |
| 14.5 | Notification | 66 |
| ARTICLE 15 | CONDEMNATION | 66 |
| 15.1 | In General | 66 |
| 15.2 | Payment of Award to Depositary; Temporary Taking Awards | 66 |
| 15.3 | Taking of Only One Parcel of the Project | 67 |
| 15.4 | Repair and Restoration by All Project Owners | 68 |
| 15.5 | Excess Award | 68 |
| 15.6 | Demolition | 69 |
| 15.7 | Allocation of Award | 69 |
| 15.8 | Condominium | 69 |
| 15.9 | Consent of Mortgagee | 69 |
| ARTICLE 16 | ALTERATIONS; ZONING | 69 |
| 16.1 | Permitted Alterations | 69 |
| 16.2 | Notification | 71 |
| 16.3 | Building Permits | 73 |
| 16.4 | No Liens | 73 |
| 16.5 | Alterations Affecting Improvements | 74 |

iii

CHGO2\40126644.12

16.6    Zoning ...................................................................................................... 74

ARTICLE 17    ESTOPPEL CERTIFICATES ................................................... 75

17.1    Estoppel Certificates ............................................................................ 75

ARTICLE 18    DEPOSITARY ......................................................................... 76

18.1    Appointment of Depositary .................................................................. 76

18.2    Liability of Depositary .......................................................................... 77

18.3    Interest on Deposited Funds ................................................................. 77

18.4    Indemnification of Depositary .............................................................. 77

18.5    Resignation of Depositary .................................................................... 78

ARTICLE 19    DISBURSEMENTS OF FUNDS BY DEPOSITARY ................. 78

19.1    Disbursement Requests ......................................................................... 78

19.2    No Lien or Consent by Contractor ........................................................ 79

ARTICLE 20    ARCHITECT ............................................................................ 80

20.1    Appointment of Architect ..................................................................... 80

20.2    Notice of Submission of Dispute to Architect ...................................... 80

20.3    Replacement of Architect ..................................................................... 81

20.4    Architect's Fees .................................................................................... 81

ARTICLE 21    NOTICES AND APPROVALS .................................................. 81

21.1    Notice to Parties .................................................................................... 81

21.2    Multiple Owners ................................................................................... 84

ARTICLE 22    GENERAL ................................................................................ 85

22.1    Cooperation of Owners ......................................................................... 85

22.2    Severability ........................................................................................... 85

22.3    Headings ............................................................................................... 85

22.4    Amendments to Agreement ................................................................... 85

22.5    Perpetuities and Other Invalidity .......................................................... 85

22.6    Condominium Association Acting for Unit Owners .............................. 86

22.7    Abandonment of Easements .................................................................. 87

22.8    Applicable Laws ................................................................................... 87

22.9    Naming Rights ...................................................................................... 87

22.10   No Third-Party Beneficiary ................................................................... 87

22.11   Incorporation ........................................................................................ 87

iv

CHGO2\40126644.12

22.12   Notice to Mortgagees; Rights of Mortgagee.......................................................... 87

22.13   Coordination with Tenants.................................................................................... 89

22.14   Waiver of Mechanic's Liens by Owners ............................................................... 89

22.15   Binding Effect....................................................................................................... 89

22.16   Counterparts.......................................................................................................... 89

22.17   Default Shall Not Permit Termination of Agreement; No Rescission
        Without Unanimous Consent.................................................................................. 89

22.17   No Partnership, Joint Venture or Principal-Agent Relationship........................... 90

ARTICLE 23       LIMITATION OF LIABILITY ...................................................... 90

23.1    Limitation of Liability............................................................................................ 90

23.2    Transfer of Ownership ........................................................................................... 90

ARTICLE 24       91

STRUCTURAL SUPPORT................................................................................................ 91

24.1    Structural Safety and Integrity.............................................................................. 91

24.2    Construction of Support......................................................................................... 91

24.3    Effect of Delay....................................................................................................... 91

v

CHGO2\40126644.12

Order: 18000031623                          Page 6 of 203  Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

## LIST OF EXHIBITS TO
## PALMER HOUSE HOTEL, CHICAGO, ILLINOIS
## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

| EXHIBIT LETTER OR NUMBER | TITLE OR DESCRIPTION |
|---|---|
| 1.1(B) | LEGAL DESCRIPTION OF HOTEL PARCEL |
| 1.1(C) | LEGAL DESCRIPTION OF OFFICE/ANNEX PARCEL |
| 1.1(D) | LEGAL DESCRIPTION OF RETAIL PARCEL |
| 1.1(E) | SITE PLAN |
| 3.2(K) | PLAN IDENTIFYING LOCATION OF ADVERTISING SIGNAGE |
| 7.1(A) | CLOSED LOOP STEAM HEATING SYSTEM AND BOILERS |
| 7.1(B) | [INTENTIONALLY OMITTED] |
| 7.1(C) | [INTENTIONALLY OMITTED] |
| 7.1(D) | ELEVATOR MAINTENANCE |
| 7.1(E) | GAS SERVICE |
| 7.1(F) | STREET LEVEL EXTERIOR MAINTENANCE AND SNOW REMOVAL |
| 7.1(G) | LOADING DOCK, TRASH ROOM, UTILITY AREA AND STAIRWELL MAINTENANCE |
| 7.1(H) | CLOSED LOOP CHILLED WATER SYSTEM AND CHILLERS |
| 7.1(I) | HOT WATER SYSTEM AND BOILERS |
| 7.1(M) | ARCADE LEVEL COMMON AREA MAINTENANCE |
| 7.2(D) | TELEPHONE |
| 7.6 | BILLING AND PAYMENT |
| 18.1 | DEPOSITARY AGREEMENT |
| 22.12 | CONSENT OF MORTGAGE |

vi

CHGO2\40126644.12

## PALMER HOUSE HOTEL
## CHICAGO, ILLINOIS

### RECIPROCAL EASEMENT AND OPERATING AGREEMENT

THIS RECIPROCAL EASEMENT AND OPERATING AGREEMENT (this "*Agreement*") is made and entered into as of the 11th day of December, 2006 by THOR PALMER HOUSE HOTEL & SHOPS LLC, a Delaware limited liability company ("*Thor Hotel*"), THOR PALMER HOUSE OFFICE LLC, a Delaware limited liability company ("*Thor Office*") and THOR PALMER HOUSE RETAIL LLC, a Delaware limited liability company ("*Thor Retail*").

### R E C I T A L S:

A. The terms used in the Recitals, if not otherwise defined in the Recitals or in the immediately foregoing paragraphs, shall have the meanings set forth in ARTICLE 1 of this Agreement.

B. Thor Hotel owns the real property legally described on **EXHIBIT 1.1(B)** (the "*Hotel Parcel*").

C. Thor Office owns the real property legally described on **EXHIBIT 1.1(C)** (the "*Office/Annex Parcel*").

D. Thor Retail owns the real property legally described on **EXHIBIT 1.1(D)** (the "*Retail Parcel*").

E. Thor Hotel is in the process of redeveloping on the Hotel Parcel the Palmer House Hotel (the "*Hotel Project*").

F. The improvements within the Retail Parcel (the "*Retail Project*"), when completed, will be comprised of: (i) rental retail space located within the street level, lobby level, second (2nd) floor and third (3rd) floor of the Hotel Building (defined below); (ii) an underground parking garage (the "*Parking Garage*") located within the basement level of the Hotel Building; and (iii) certain ancillary Facilities (defined below) and improvements in various locations within the Hotel Building.

G. The Office/Annex Parcel contains the Office/Annex Building (defined below) (the "*Office Project*") and may in the future be developed into another use, structure or structures.

H. Since none of the Retail Parcel, the Hotel Parcel nor the Office/Annex Parcel will be functionally independent of the other and each will depend upon the other, to some extent, for one or more of structural support, enclosure, ingress and egress, and other facilities and components necessary to the efficient operation and intended use of the Retail Parcel, the Hotel Parcel and the Office/Annex Parcel, Thor Hotel, Thor Office and Thor Retail intend to provide for the efficient operation of each respective portion, estate and interest in the Property, and to

CHGO2\40126644.12

ensure the harmonious relationship of the Owners of each such respective portion, estate or interest in the Property, and to protect the respective values of each such portion, estate and interest in the Property, by providing for and creating certain easements, covenants, conditions and restrictions against and affecting the Retail Parcel, the Hotel Parcel and the Office/Annex Parcel which will be binding upon each present and future respective Owner of such Parcels, or of any portion thereof or interest or estate therein, and which will inure to the benefit of each of the other Owners.

NOW, **THEREFORE**, in consideration of the Recitals and the covenants contained herein, as of the Effective Date of this Agreement, Thor Hotel, Thor Office and Thor Retail, intending to be legally bound, agree and declare that the Property and any part thereof is and shall be owned, held, mortgaged, leased or otherwise encumbered, transferred, assigned, sold, conveyed and accepted subject to this Agreement, and agree and declare that each of the following easements, covenants, conditions, restrictions, burdens, uses, privileges and charges created hereunder shall exist at all times hereafter amongst, and be binding upon and inure, to the extent provided herein, to the benefit of all parties having or acquiring any right, title or interest in or to any portion of, or interest or estate in, the Property, and each of the foregoing shall run with the land subjected to this Agreement.

## ARTICLE 1

## DEFINITIONS

1.1    **Definitions**.  Whenever used in this Agreement, the following terms shall have the respective meanings specified below:

(a)    "*Act*" - The Condominium Property Act of the State of Illinois in effect as of the date hereof, as the same may be amended from time to time.

(b)    "*Adjuster*" – As defined in **Section 11.3(e)**.

(c)    "*Affiliate*"  - Any Person controlling, under common control with or controlled by the Person in question.  For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or actions of a Person, whether through ownership of voting securities, by contract or otherwise.

(d)    "*Alterations*" - As defined in **Section 16.1(a)**.

(e)    "*Altering Owner*" - As defined in **Section 16.1(a)**.

(f)    "*Applicable Percentage*"  – As defined in Paragraph 7 of **EXHIBIT 7.6**.

(g)    "*Applicable Project Owner's Share*" – As defined in **Section 11.3(e)**.

(h)    "*Approved Division*"  - The division of any costs, expenses or other monetary obligation under this Agreement as between the Owners in the following

2

CHGO2\40126644.12

percentages: the Hotel Owner shall bear eighty-seven and seven tenths percent (87.7%) of such costs, expenses or monetary obligations; the Office/Annex Owner shall bear four and five tenths percent (4.5%) of such costs, expenses or monetary obligations; the Retail Owner shall bear seven and eight tenths percent (7.8%) of such costs, expenses or monetary obligations.

(i)     "*Architect*" - As defined in <u>**Section 20.1**</u>.

(j)     "*Assessor*" - As defined in <u>**Section 9.1**</u>.

(k)     "*Award*" - As defined in <u>**Section 15.1**</u>.

(l)     "*Benefited Owner*" - As defined in <u>Paragraph 2</u> of <u>**EXHIBIT 7.6**</u>.

(m)     "*Building Loan Agreement*" - That certain Building Loan Agreement dated as of December ___, 2006, between Anglo Irish Bank Corporation PLC, a limited public company organized under the laws of the Republic of Ireland, having its principal place of business at 18/21 St. Stephen's Green, Dublin 2, Ireland, and an address at 222 East 41st Street, 24th Floor, New York, New York 10017, and Thor Palmer House Hotel & Shops, LLC, a Delaware limited liability company, having an office at 139 Fifth Avenue, New York, New York 10010.

(n)     "*Buildings*" - The buildings and related Improvements located on the Parcels, along with any additions or alterations thereto or replacements thereof. References to the "Building" or "Buildings" shall be a collective reference to the Hotel Building and the Office/Annex Building.

(o)     "*City*" - The City of Chicago, Illinois, a municipal corporation.

(p)     "*Common Walls, Floors And Ceilings*" - All common structural and partition walls, columns, floor and ceiling slabs situated on or adjoining two Parcels, or located on one Parcel but forming the walls, columns, or floor or ceiling slabs of an adjoining Parcel. Each Owner shall be deemed to own the floor/ceiling slab constituting a Common Floor and Ceiling located directly below such Owner's Parcel and located directly above an adjacent Parcel. Any Common Wall located between two Owners' Parcels shall be deemed to be a "party wall", owned 50%/50% by each adjoining Owner.

(q)     "*Condominium Association*" - If and when a Parcel or any portion thereof is submitted to the Act, and legally becomes condominium property pursuant to the Act, then an Illinois not-for-profit corporation to be formed for the purpose of administering the respective portion(s) of the Parcel pursuant to the Act.

(r)     "*Condominium Declaration*" - Any Declaration of Condominium Ownership and Easements, Restrictions, Covenants and By-Laws by which any portion of the Property is submitted to the Act and legally becomes condominium property pursuant to the Act.

3

(s)    *"Condominium Owner"* - The Person or Persons (excluding occupants or tenants and the holders of any mortgage) whose estates or interests, individually or collectively, aggregate, from time to time, fee simple ownership of any portion of a Parcel submitted to the Act. If and so long as a Parcel or any portion thereof has been submitted to and remains subject to the provisions of the Act, the Condominium Owner shall mean collectively all of the Unit Owners in the portion of such Parcel as has been submitted to the Act, as represented by the Condominium Association for such Parcel.

(t)    *"Condominium Property"* – That portion of the Property submitted to the Act, for so long as such Condominium Property remains subject to the Act.

(u)    *"Consumer Price Index"* - As defined in **Section 10.8**.

(v)    *"Contributing Party"* - As defined in <u>Paragraph 1(a)</u> of **EXHIBIT 7.6**.

(w)    *"Creditor Owner"* - An Owner (i) to whom payment of money or other duty or obligation is owed under this Agreement by another Owner who has failed to make such payment or to perform such duty or obligation as and when required by this Agreement or (ii) who has exercised any self-help remedy provided for in this Agreement. An Owner may be a Creditor Owner notwithstanding that the term "Creditor Owner" is not specifically stated in a particular provision of this Agreement.

(x)    *"Default Amount"* - As defined in **Section 12.1**.

(y)    *"Defaulting Owner"* - An Owner who has failed to perform any of its duties or obligations as and when required under this Agreement or to make payment of money owed under this Agreement to another Owner. An Owner may be a Defaulting Owner notwithstanding that the term "*Defaulting Owner*" is not specifically stated in a particular provision of this Agreement.

(z)    *"Depositary"* - The person or entity, from time to time acting pursuant to **ARTICLE 18**.

(aa)    *"Easements"* - All easements declared, granted or created pursuant to the terms and provisions of this Agreement.

(bb)    *"Effective Date"* - The date specified in the PREAMBLE on Page 1 of this Agreement.

(cc)    *"Emergency Situation"* - A situation (i) impairing or imminently likely to impair structural support of any of the Parcels or any Improvements constructed thereon; (ii) causing or imminently likely to cause bodily injury to persons or substantial physical damage to any of the Improvements constructed on any portion of the Property, or any property in, on, under, within, upon or about the Property; (iii) causing or imminently likely to cause substantial economic loss to an Owner, directly or indirectly (including, without limitation, the issuance of a building, health, fire or other code or Law compliance violation); or (iv) disrupting or imminently likely to disrupt business

4

operations in the Retail Parcel or the Office/Annex Parcel, or the habitability of a guest room in the Hotel Parcel as a Hotel guest room. The duration of an Emergency Situation shall be deemed to include the time reasonably necessary to remedy the Emergency Situation.

(dd) *"Estoppel Certificate"* - As defined in **Section 17.1**.

(ee) *"Façade"* - The exterior walls of the Hotel Parcel Improvements, the Office/Annex Parcel Improvements and/or the Retail Parcel Improvements, as the context may dictate, from the street level up to the roofs of the Buildings, consisting of the brick and other facing materials and the cornice at the top of the Building covering or attached to the structural supports forming the curtain wall of the Building, window frames, window systems, joints and seals, but excluding (i) the Building roof and the roof structure, membrane, flashings and seals over the cornice; and (ii) the structural supports for the exterior wall of the Buildings.

(ff) *"Facilities"* - Any facilities, fixtures, machinery and equipment, including without limitation, annunciators, antennae, boilers, boxes, brackets, cabinets, cables, chillers, closets (for facilities and risers) coils, computers, conduits, controls, control centers, condensers, cooling towers, couplers, devices, ducts, equipment (including, without limitation, heating, ventilating, air conditioning and plumbing equipment), fans, fixtures, generators, hangers, heat traces, indicators, junctions, lines, light fixtures, machines, meters, motors, outlets, panels, pipes, pumps, radiators, risers, sprinklers, starters, steam heating systems (including hot water supply and return risers) switches, switchboards, systems, tanks, telecommunication equipment, transformers, vacuum pipe valves, wiring, and the like used in providing services from time to time in any part of a Parcel, including, without limitation, air conditioning, alarm, antenna, circulation, cleaning, communication, cooling, electric, elevator, exhaust, heating, lightning protection, natural gas, plumbing, radio, recording, sanitary, security, sensing, storm water drainage, telephone, television, transportation, ventilation and water service, and any replacements of or additions to any of the items described in this paragraph. A reference to "Facilities" shall be deemed to include a reference to the Owned Facilities.

(gg) *"Hazardous Materials"* - Any hazardous substance, pollutant, contaminant, or waste regulated under the Comprehensive Environmental Response Compensation and Liability Act, as amended (42 U.S.C. §9601 et seq.); asbestos and asbestos-containing materials: oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas, and synthetic gas usable for fuel; pesticides regulated under the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. §136 et seq.); PCBs and other substances regulated under the Toxic Substances Control Act, as amended (7 U.S.C. §136 et seq.); source material, special nuclear material, byproduct materials, and any other radioactive materials or radioactive wastes however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act; chemicals subject to the Occupational Safety and Health Act Hazard Communication Standard, as amended (29 C.F.R. §1910.1200 et seq.); industrial process and pollution control wastes whether or not hazardous within the meaning of the Resource Conservation and Recovery

5

CHGO2\40126644.12

Order: 18000031623
Doc: 634644078 EAS 12-12-2006                    Page 12 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

Act, as amended (42 U.S.C. §6901 et seq.); and other substances and materials regulated under Laws relating to environmental quality, health, safety, contamination and clean-up.

(hh)    *"Hotel"* - The hotel operated from time to time within the Hotel Building, along with all amenities serving or associated with such hotel (except those hotel amenities located within the Retail Parcel).

(ii)    *"Hotel Building"* - The building commonly known as the "Palmer House Hotel" and containing the Hotel Property and the Retail Property.

(jj)    *"Hotel Owned Facilities"* - Facilities owned by the Hotel Owner and now located (or which may, pursuant to this Agreement or other agreement of the Owners, hereafter be located) in the Office/Annex Parcel or the Retail Parcel.

(kk)    *"Hotel Owner"* – The Owner, from time to time, of the Hotel Parcel (which shall include, at such time as any portion of the Hotel Parcel is submitted to the Act, the Condominium Owner with respect to such portion as has been submitted to the Act).

(ll)    *"Hotel Parcel"* – As defined in Recital B above.

(mm)    *"Hotel Parcel Improvements"* - All improvements constructed upon and within the Hotel Parcel and not constituting Office/Annex Owned Facilities or Retail Owned Facilities.

(nn)    *"Hotel Property"* – As defined in **Section 11.9(c)**.

(oo)    *"Hotel Renovation Plans"* -- Collectively, the final plans, drawings and specifications for the performance of the capital improvements to be performed on or for the benefit of the existing Hotel Parcel Improvements in accordance with the Plans, as defined in the Building Loan Agreement, including, without limitation, capital improvements performed in connection with the renovation of the Hotel Parcel Improvements (i) components of which serve and/or are located in (or will serve and/or be located in) the Retail Parcel or the Office Parcel, or (ii) which relate to any building systems, including, without limitation any HVAC, plumbing, electrical and fire safety systems, serving both the Hotel Parcel, or any portion thereof, and any portion of the Retail Parcel or the Office Parcel.

(pp)    *"Hotel Renovations"* - The initial renovation work within the Hotel Property to be performed by the Hotel Owner pursuant to the Hotel Renovation Plans.

(qq)    *"Impacted Owner"* - As defined in **Section 8.1**.

(rr)    *"Improvements"* - any or all, as the context may dictate, of the Hotel Parcel Improvements, the Office/Annex Parcel Improvements or the Retail Parcel Improvements.

6

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 13 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM

(ss)    "*Indemnifying Owner*" - As defined in **Section 6.1**.

(tt)    "*Indemnitee*" - As defined in **Section 6.1**.

(uu)    "*Inspecting Owner*" - As defined in **Section 8.6**.

(vv)    "*Land*" - The Hotel Parcel, the Office/Annex Parcel and the Retail Parcel, collectively.

(ww)    "*Law*" or "*Laws*" - All laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen and unforeseen, ordinary or extraordinary, which now or at any later time may be applicable to the Property, or any parts thereof.

(xx)    "*Liening Owner*" - As defined in **Section 8.2**.

(yy)    "*Maintenance*" - Operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, clearing, landscaping, painting, installation, restoration, reconstruction and replacement when necessary or desirable, including without limitation, services to be provided pursuant to **ARTICLE 7**.

(zz)    "*Mechanics' Lien Act*" - As defined in **Section 16.4(a)**.

(aaa)    "*Mortgage*" - As defined in **Section 22.12(a)**.

(bbb)    "*Mortgagee*" - As defined in **Section 22.12(a)**.

(ccc)    "*Net Capitalized Cost Of Replacement*" - As defined in Paragraph 7 of **EXHIBIT 7.6**.

(ddd)    "*Net Salvage Value Of The Capital Item Being Replaced*" - As defined in Paragraph 7 of **EXHIBIT 7.6**.

(eee)    "*Non-Performing Owner*" - As defined in **Section 14.2**.

(fff)    "*Occupant*" - Any Person from time to time entitled to the use and occupancy of any portion of any Parcel as an Owner or as a tenant, subtenant, licensee, concessionaire or other party under any other occupancy agreement.

(ggg)    "*Office/Annex Building*" - A collective reference to the buildings presently located on the Office Annex Parcel, and containing the Office/Annex Property.

(hhh)    "*Office/Annex Owned Facilities*" - Facilities owned by the Office/Annex Owner and now located (or which may, pursuant to this Agreement or other agreement of the Owners, hereafter be located) in the Hotel Parcel or the Retail Parcel.

7

CHGO2\40126644.12

Order: 18000031623    Page 14 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

(iii) **"Office/Annex Owner"** - The Owner, from time to time, of the Office/Annex Parcel (which shall include, at such time as any portion of the Office/Annex Parcel may be submitted to the Act, the Condominium Owner with respect to such portion as has been submitted to the Act).

(jjj) **"Office/Annex Parcel"** – As defined in Recital C above.

(kkk) **"Office/Annex Parcel Improvements"** - All improvements constructed upon and within the Office/Annex Parcel and not constituting Hotel Owned Facilities or Retail Owned Facilities.

(lll) **"Office/Annex Property"** – A collective reference to the Office/Annex Parcel and the Office/Annex Parcel Improvements.

(mmm) **"Operating Expenses"** - As defined in Paragraph 7 of **EXHIBIT 7.6**.

(nnn) **"Operating Owner"** - As defined in Paragraph 2 of **EXHIBIT 7.6**.

(ooo) **"Owned Facilities"** - A collective reference to the Hotel Owned Facilities, the Retail Owned Facilities and the Office/Annex Owned Facilities.

(ppp) **"Owner(s)"** or **"Project Owner(s)"** - The owner or owners, as the context may dictate, of the Hotel Parcel, of the Office/Annex Parcel, or of the Retail Parcel, and which additionally shall include, at such time as any portion of a Parcel is submitted to the Act, the Condominium Owner with respect to such portion of such Parcel.

(qqq) **"Parcel(s)"** - As the context may dictate, the Hotel Parcel, the Office/Annex Parcel or the Retail Parcel, or any of them.

(rrr) **"Parking Garage"** - The underground parking garage structure comprising a portion of the Retail Parcel.

(sss) **"Permittees"** - All Occupants and the officers, directors, members, employees, agents, contractors, customers, vendors, suppliers, visitors, guests, invitees, licensees, tenants, subtenants and concessionaires of the Parcel Owner in question and such Occupants insofar as their activities relate to the intended development, use or occupancy of the Hotel Parcel, the Office/Annex Parcel or the Retail Parcel and all Mortgagees holding Mortgages encumbering the Parcel in question.

(ttt) **"Person"** - Any individual, partnership, firm, association, corporation, limited liability company, trust, land trust or any other form of business or not-for-profit organization or governmental entity.

(uuu) **"Pipes"** - All pipes, fittings, ducts, conduits, lines, braces, collars and other supporting elements serving a Parcel.

(vvv) **"Prior Lien"** - As defined in **Section 12.1**.

8

(www) *"Progress Payment"* - As defined in Paragraph 2 of **EXHIBIT 7.6**.

(xxx) *"Project"* or *"Property"* - A collective reference to the Hotel Parcel together with the Hotel Parcel Improvements, the Office/Annex Parcel together with the Office/Annex Parcel Improvements and the Retail Parcel together with the Retail Parcel Improvements.

(yyy) *"Projection Notice"* - As defined in Paragraph 2(a) of **EXHIBIT 7.6**.

(zzz) *"Projections"* - As defined in Paragraph 2(a) of **EXHIBIT 7.6**.

(aaaa) *"Recorder"* - The Recorder of Deeds of Cook County, Illinois.

(bbbb) *"Renovation Easement Termination Date"* — As used with respect to the performance of the Retail Renovations and the Hotel Renovations, the date upon which the easements granted herein for the performance of the Renovations terminates after completion of the performance of the Retail Renovations or the Hotel Renovations, respectively, such termination being evidenced by either the issuance of a final Certificate of Occupancy by the City of Chicago or the certification by the Hotel Owner's architect (with respect to the Hotel Renovations) or the Retail Owner's architect (with respect to the Retail Renovations) that the applicable Renovations, including any "punchlist" items, are complete in accordance with the Hotel Renovation Plans or the Retail Renovation Plans, respectively. The Renovation Easement Termination Date may differ with respect to the Retail Renovations and the Hotel Renovations.

(cccc) *"Renovation Plans"* - A collective reference to the Hotel Renovation Plans and the Retail Renovation Plans.

(dddd) *"Renovations"* - The initial renovation work within the Property pursuant to the Hotel Renovation Plans and the Retail Renovation Plans. The term "Renovations" shall mean a collective reference to the Hotel Renovations and the Retail Renovations.

(eeee) *"Replacing Party"* - As defined in Paragraph 1(a) of **EXHIBIT 7.6**.

(ffff) *"Retail Owned Facilities"* - Facilities owned by the Retail Owner and now located (or which may, pursuant to this Agreement or other agreement of the Owners, hereafter be located) in the Office/Annex Parcel or the Hotel Parcel.

(gggg) *"Retail Owner"* - The Owner, from time to time, of the Retail Parcel.

(hhhh) *"Retail Parcel"* — As defined in Recital D above.

(iiii) *"Retail Parcel Façade"* - That portion of the Façade located on the exterior portion of the Building immediately adjacent to the Retail Property.

9

(jjjj)    *"Retail Parcel Improvements"* - All improvements constructed upon and within the Retail Parcel and not constituting Hotel Owned Facilities or Office/Annex Owned Facilities.

(kkkk) *"Retail Property"* – A collective reference to the Retail Parcel and the Retail Parcel Improvements.

(llll)    *"Retail Renovation Plans"* -- Collectively, the final plans, drawings and specifications, including, without limitation, the architectural and structural plans and specifications therefor prepared or to be prepared by the Architect, as defined in the Building Loan Agreement, for the performance of the capital improvements to be performed on or for the benefit of the existing Retail Parcel Improvements, including, without limitation, capital improvements performed in connection with the renovation of the Retail Parcel Improvements components of which serve and/or are located in (or will serve and/or be located in) the Hotel Parcel or the Office Parcel. The Retail Renovation Plans will provide for renovation of the Retail Property with the intention that such spaces will be built out to a level to enable such spaces to be leased to a high quality tenant mix consistent with other high quality hotel/retail properties in Chicago and on State Street.

(mmmm)    *"Retail Renovations"* - The initial renovation work within the Retail Property to be performed by the Retail Owner pursuant to the Retail Renovation Plans.

(nnnn) *"Review"* - As defined in **Section 8.6**.

(oooo) *"Site Plan"* - The Site Plan attached hereto as **EXHIBIT 1.1(E)** identifying various areas within the Property pursuant to which easements or other rights and obligations have been granted or reserved under this Declaration.

(pppp) *"Statement"* - As defined in Paragraph 2 of **EXHIBIT 7.6**.

(qqqq) *"Structural Supports"* - All construction elements (including, without limitation, structural members, footings or foundations, slabs, caissons, columns, beams, braces and trusses) which are load bearing or which are necessary for the structural integrity of any portion of the Hotel Parcel Improvements, the Office/Annex Parcel Improvements or the Retail Parcel Improvements.

(rrrr)    *"Surveyor"* – Gremley & Biedermann.

(ssss) *"Trash Room"* - The trash room and dumpster facilities located adjacent to the loading dock area and located within the street level portion of the Hotel Parcel.

(tttt)    *"2006 Equivalent Dollars"* - As defined in **Section 10.8**.

(uuuu) *"Unavoidable Delay"* - As defined in **Section 14.1**.

10

(vvvv) *"Unit"* - Any part of any Parcel described as a "Unit" in any Condominium Declaration.

(wwww)    *"Unit Owner"* - The person or persons, entity or entities whose estates or interests, individually or collectively, aggregate fee simple ownership of a Unit Ownership.

(xxxx) *"Unit Ownership"* - Any part of a Parcel which has been submitted to the Act consisting of one (1) Unit and the undivided interest in the common elements attributable thereto.

(yyyy) *"Utility Company"* - Any Person, including governmental bodies, furnishing Utility Services to or from one or more Parcels.

(zzzz) *"Utility Facilities"* - Any Facility used for providing Utility Services.

(aaaaa)*"Utility Service"* or *"Utility Services"* - Any utility service provided to or from a Parcel, including domestic (City) water supply, chilled water, electricity, storm sewer, sanitary sewer, gas, steam, telephone or network television, cable television, satellite equipment and microwave signals or internet service or other services or materials generally known as utilities.

(bbbbb)    *"Work"* - As defined in **Section 19.1(a)**.

1.2    **Construing Various Words and Phrases**.    Wherever it is provided in this Agreement that a party "may" perform an act or do anything, it shall be construed that party "may, but shall not be obligated to," so perform or so do.  The following words and phrases shall be construed as follows:  (a) "At any time" shall be construed as "at any time or from time to time;"  (b) "Any" shall be construed as "any and all;"  (c) "Including" shall be construed as "including but not limited to;" and (d) "Will" and "shall" shall each be construed as mandatory. Except as otherwise specifically indicated, all references to Article or Section numbers or letters shall refer to Articles and Sections of this Agreement and all references to Exhibits or Appendices shall refer to the Exhibits and Appendices attached to this Agreement.  The words "herein," hereof," hereunder," "hereinafter" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or subsection.  Forms of words in the singular, plural, masculine, feminine or neuter shall be construed to include the other forms as context may require.  Captions and the index are used in his Agreement for convenience only and shall not be used to construe the meaning of any part of this Agreement.

## ARTICLE 2

## EASEMENTS BURDENING THE RETAIL PARCEL

2.1    **In General**.  For the purposes of this **ARTICLE 2**, the following shall apply:

(a)    The Retail Owner has granted, reserved, declared and created the Easements described in this **ARTICLE 2**.  The term "Granted" or "granted" as hereinafter

11

CHGO2\40126644.12

Order: 18000031623                    Page 18 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

used in this **ARTICLE 2** describing Easements shall be deemed to mean "granted, reserved, declared and created". The Easements in this **ARTICLE 2** shall bind and be enforceable against the Retail Owner and, as applicable, its successors, grantees and assigns.

(b)    The Easements granted by this **ARTICLE 2** shall, as applicable, bind and burden the Retail Parcel, which shall for the purpose of this **ARTICLE 2** be deemed to be the servient tenement. Where only a portion of the Retail Parcel is bound and burdened by the Easement, only that portion shall be deemed to be the servient tenement.

(c)    To the extent the Easements granted by this **ARTICLE 2** are appurtenant to and benefit the Hotel Parcel or the Office/Annex Parcel, the Hotel Parcel and the Office/Annex Parcel shall, for the purpose of this **ARTICLE 2** with respect to such Easement, be deemed to be the dominant tenement.

(d)    Notwithstanding anything to the contrary contained herein, (i) in exercising an Easement granted under this **ARTICLE 2**, the Owner benefited by the Easement (and its Permittees) shall: (A) have the right to ingress and egress over, through and upon such portions of the Parcel burdened by such Easement to the extent necessary to exercise the rights granted by such Easement; and (B) make reasonable efforts to minimize the impact of its exercise on the Owner and Occupants of the Retail Parcel, taking into consideration the impact of any disruption on the Owner and such Occupants; provided that (x) in connection with any work not necessitated by an Emergency Situation, Hotel Owner shall provide Retail Owner with at least two (2) weeks advance written notice (which notice right may be waived by the Retail Owner from time to time in its sole and absolute discretion) with regard to the need to enter into the Retail Parcel to perform any such work, and shall in such notice provide a reasonably detailed explanation of the anticipated nature, extent and duration of such work, (y) in connection with any work necessitated by an Emergency Situation, Hotel Owner shall provide Retail Owner with as much advance notice in such detail as is possible under the circumstances, and (z) with respect to the work being performed under either subparagraphs (x) or (y) above, (I) Retail Owner shall have the right to accompany Hotel Owner and any of its contractors, subcontractors, agents, employees or other representatives in connection with the performance of such work, (II) except in an Emergency Situation the Hotel Owner shall use commercially reasonable efforts to perform such work outside normal operating hours of any business operating within any space which Hotel Owner must access in order to perform such work, (III) Hotel Owner shall use commercially reasonable efforts to cause such work to be performed in accordance with the rights of any tenants or Occupants under any lease or other occupancy agreement for any such area which must be accessed to perform such work, (IV) any damage to the Retail Property shall be promptly restored by the Hotel Owner as near as possible to the condition that existed prior to the performance of such work (and if such restoration is not promptly performed Retail Owner shall have the right to perform such work itself and to charge Hotel Owner for the costs and expenses related thereto), and (V) without limiting the provisions set forth in **ARTICLE 6** hereof, Hotel Owner shall reimburse Retail Owner for, and shall indemnify and hold Retail Owner harmless from and against, any loss or claim arising in

12

CHGO2\40126644.12

Order: 18000031623                                    Page 19 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

connection with any such tenant's or Occupant's rights to set off or abate rent or other fees, to cease operations or any similar rights; and (ii) in the event that any access, use, repair, Maintenance or other right pursuant to which an Easement is granted under this **ARTICLE 2** may be effectively exercised without entering the Parcel burdened by the Easement, or conducting any invasive procedures within the burdened Parcel, or otherwise disrupting the use, operation or Occupant rights within the burdened Parcel, the party benefited by such Easement shall use commercially reasonable efforts to exercise such rights without entering into, conducting any invasive procedures within or otherwise disrupting the use of the burdened Parcel or its Owner or Occupants (for example, and in no way limiting the foregoing, if a Utility Facility may be accessed either from the burdened Parcel or the benefited Parcel, the party performing the work requiring such access shall perform such work, and utilize such access, from the benefited Parcel).

(e)     The Retail Owner may, (i) in connection with the Maintenance of the Retail Parcel upon not less than forty-eight (48) hours notice to the affected Owner(s), (ii) in an Emergency Situation or (iii) to prevent a dedication of, or an accruing of rights by, the public in and to the use of the Retail Parcel: temporarily prevent, close off or restrict the ingress, egress or use in, over, on, across and through any of the Easements, but only to the minimal extent and for the shortest time period reasonably necessary under the circumstances in order to minimize the effect on the user of such Easement.

2.2     **Grant of Easements in Favor of the Hotel Owner**. The following Easements in, to, under, over, upon and through the Retail Parcel in favor of the Hotel Owner and its Permittees and the Hotel Parcel are hereby granted (and all references herein to Hotel Owner shall include its Permittees).

(a)     **Ingress and Egress**. A non-exclusive easement for ingress and egress only for Persons, material and equipment in, over, on, across and through such portions of the Retail Parcel as are reasonably necessary or desirable to: (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Hotel Parcel, including, without limitation, the Hotel Owned Facilities, (ii) permit the Hotel Owner to provide to the Retail Parcel those services to be performed by the Hotel Owner as described in **ARTICLE 7** of this Agreement or (iii) perform (x) all Hotel Renovations in accordance with the Hotel Renovation Plans (pursuant to the Renovation easement rights set forth in **Section 2.2(l)** below), including but not limited to all work pursuant to change orders, warranties, and "punchlists" (provided that such Renovation easement rights shall terminate on the applicable Renovation Easement Termination Date) (y) Alterations, pursuant to Article 16 hereof, and (z) restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof. Notwithstanding the above, the Hotel Owner shall completely remove any and all scaffolding, construction canopies, and any similar or related support or construction materials from the Façade facing the portion of the Property fronting on State Street, Wabash Avenue and Monroe Street, or any other construction-related obstruction of or interference with the Retail Parcel (including, without limitation, any construction-related equipment, materials or staging), on or before the following dates: (1) as it relates to the scaffolding and other obstructions adjacent to

13

State Street and Wabash Avenue, all such scaffolding and obstructions shall be removed on or before November 15, 2007; and (2) as it relates to the scaffolding and other obstructions adjacent to Monroe Street, all such scaffolding and obstructions shall be removed on or before July 1, 2008.

(b)   **Use and Maintenance of Pipes, Facilities, Conduits, Mechanical and Electric Rooms, Risers and Chases**.  A non-exclusive easement for Persons, material and equipment over, on, across and through such portions of the Retail Parcel as are reasonably necessary for the intended use and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of all Pipes, Facilities, conduits, mechanical and electric rooms, risers and chases which are (i) located in the Retail Parcel (including Hotel Owned Facilities), and (ii) connected to Pipes, Facilities, conduits, mechanical or electric rooms, risers or chases located in the Hotel Parcel which provide or are reasonably necessary to provide the Hotel Parcel with any Utility Service or other service reasonably necessary or desirable to the operation of the Hotel Parcel. The foregoing easement rights include the right to ingress, egress and access over, upon, across and through such portions of the Retail Parcel as may be necessary or appropriate to perform any of the Maintenance and other work contemplated in this Section.

(c)   **Common Walls, Floors and Ceilings**.  A non-exclusive easement for support, enclosure, use and Maintenance with respect to Common Walls, Floors and Ceilings existing or constructed in and along the common boundaries of the Retail Parcel and the Hotel Parcel.

(d)   **Utility Services**.  A non-exclusive easement (and if requested by the applicable Utility Company, a non-exclusive easement to such Utility Company) for Utility Service purposes required by the Hotel Parcel and the Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of Utility Facilities in those areas of the Retail Parcel where such Utility Facilities are currently located or are to be located as part of the Hotel Parcel Improvements and Retail Parcel Improvements (including, without limitation, access to the basement levels of the Building for such purposes). If, at any time, it becomes necessary for the operation of the Hotel Parcel to relocate or add to utility easements (including installation of Utility Facilities) other than where located or to be located as part of the Hotel Parcel Improvements and Retail Parcel Improvements in order to provide or upgrade required Utility Service to the Hotel Parcel, the Retail Owner agrees to grant such additional or relocated utility easements (at such location mutually agreed to by the Hotel Owner and the Retail Owner), provided (1) such easements do not interfere with the use and enjoyment of the Retail Parcel for the purposes for which the Retail Parcel is used and do not unduly inconvenience the Owner or Occupant(s) of, or cause any business interruption within (as determined by the Retail Owner), the Retail Parcel, and (2) the Hotel Owner shall pay the reasonable costs and expenses incurred by the Retail Owner in connection with granting such easement.  Retail Owner may relocate the utility easements granted herein at its sole cost and expense provided that (i) such relocation shall not cause any unreasonable interruption of Utility Services to the Hotel Parcel, increase the cost of Utility Services to the Hotel Parcel, or otherwise unreasonably

14

adversely affect the Utility Services to the Hotel Parcel, (ii) Retail Owner shall not change any points of easements and any pipes or connection with the Utility Facilities located on the Hotel Parcel unless Retail Owner pays all costs of relocating such connection points that are incurred by Hotel Owner and (iii) Retail Owner shall promptly apprise the Hotel Owner regarding the new location of any easements and provide the Hotel Owner at least 10 days written notice prior to relocating any utility easements.

(e)    **Structural Support**.  A non-exclusive easement in all Structural Supports located in or constituting a part of the Retail Parcel Improvements for the support of the Hotel Parcel Improvements and Hotel Owned Facilities and the Maintenance of such Structural Supports and Hotel Owned Facilities; provided that the Hotel Owner shall not do or permit to be done any act that would adversely affect the structural safety or integrity of Structural Supports or any portion of the Retail Parcel Improvements.

(f)    **Encroachments**.  An easement permitting the existence of encroachments of 6 inches or less if such encroachments result from the construction of any of the Hotel Parcel Improvements or the Hotel Renovations or if, by reason of settlement or shifting of the Hotel Parcel Improvements, any part of the Hotel Parcel Improvements or Hotel Owned Facilities encroaches or shall hereafter encroach upon any part of the Retail Parcel.  This Easement shall exist only so long as the encroaching portion of the Hotel Parcel or such Hotel Owned Facilities continues to exist, or replacements are made in the same location that do not materially enlarge the encroachment.  No such encroachment shall be placed where such encroachment is not permitted or did not previously exist or is deliberately, materially enlarged.

(g)    **Hotel Owned Facilities**.  To and for the benefit of the Hotel Parcel and the Hotel Owner, an easement permitting the existence, attachment, use and Maintenance of Hotel Owned Facilities in the Retail Parcel in locations now or hereafter in the Retail Parcel mutually acceptable to the Hotel Owner and Retail Owner or otherwise specified or depicted in the Renovation Plans.

(h)    **Use of Hoist Shafts**.  A temporary exclusive easement on, over, across and through the hoist shafts, rails, equipment and other components related thereto, located within the Retail Parcel and on, over, across and through such portions of the Retail Parcel as are reasonably necessary for the use, operation, Maintenance, inspection, repair, installation and replacement of the temporary construction hoist, cab, motors, cables, components and equipment relating to such hoist serving the Hotel Parcel during the initial stages of construction.  Notwithstanding anything to the contrary contained in this Agreement, the hoist shaft Easement right granted in this **Section 2.2(h)** shall automatically terminate on the applicable Renovation Easement Termination Date without any further action by any of the parties hereto.

(i)    **Hotel Kitchen Exhaust, Make-Up-Air and Other Conduits and Duct Work**.  An exclusive easement for the existence, Maintenance, removal and replacement of black iron kitchen exhaust, make-up-air and all other duct work and conduits serving the Hotel kitchen and located within and penetrating through portions of the Retail parcel,

15

CHGO2\40126644.12

Order: 18000031623                                Page 22 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

as well as a non-exclusive easement for ingress, egress and access over, upon, through and across such portions of the Retail Parcel, as may be necessary or appropriate to perform the work contemplated in this Section.

(j) **Waiting Area for Vehicle Retrieval**.  A non-exclusive easement for ingress, egress, access and use by the Hotel Owner and its Permittees over, upon, across and through an area at the Basement 1 level of the Hotel Building identified on the Site Plan as the "Waiting Area" and the corridor providing access to and from the Waiting Area from and to the portion of the Hotel Parcel located on the Basement 1 level of the Hotel Building. The Waiting Area may be used by the Hotel Owner and its Permittees as a waiting area while vehicles are parked and retrieved within the Parking Garage.

(k) **Retail Emergency Egress Corridor and Stairwell at Street Level and Basement 1 Level**.  A non-exclusive easement for emergency ingress and egress to and from the Hotel Parcel on, over, across and through the Retail emergency egress corridors and stairwell located within the Retail Parcel at the street level and Basement 1 level of the Hotel Building (as identified on the Site Plan) from and to the Hotel Parcel to and from State Street, Monroe Street, Wabash Avenue and other portions of the Hotel Parcel, including, without limitation, the right to use any entrances and exits to and from such public thoroughfares.

(l) **Renovation Easement**.  A non-exclusive easement for the benefit of the Hotel Owner and all of its architects, engineers, contractors, subcontractors, agents, employees, representatives and Permittees for the performance of all Hotel Renovations in accordance with the Hotel Renovation Plans on, over, across and through the Retail Parcel (in such locations as are identified in the Hotel Renovation Plans), as well as access to such areas within the Retail Parcel as are necessary or appropriate in order to complete the Hotel Renovations. The foregoing easement rights shall include the right to stage materials, perform work within the Retail Parcel as may be necessary to complete the Hotel Renovations, deliver and dispatch materials, equipment and debris and to perform such other work as is necessary or appropriate in order to complete the Hotel Renovations, provided that the Hotel Owner shall use reasonable efforts to minimize interference with the use and operation of the Retail Property.  The Hotel Renovation easement rights set forth herein shall be temporary and shall automatically terminate upon the applicable Renovation Easement Termination Date.

2.3    **Grant of Easements in Favor of the Office/Annex Owner**.  The following Easements in, to, under, over, upon and through the Retail Parcel in favor of the Office/Annex Owner and the Office/Annex Parcel are hereby granted.

(a) **Ingress and Egress**.  A non-exclusive easement for ingress and egress only for Persons, vehicles, material and equipment in, over, on, across and through such portions of the Retail Parcel as are reasonably necessary to: (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Office/Annex Parcel, including, without limitation, the Office/Annex Owned Facilities or (ii) perform (y) Alterations, pursuant to Article 16

16

hereof, and (z) restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof.

(b) **Use and Maintenance of Pipes and Facilities**.  A non-exclusive easement for the intended use and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of all Pipes and Facilities, if any, which are (i) located in the Retail Parcel (including Office/Annex Owned Facilities), and (ii) connect to Pipes or Facilities located in the Office/Annex Parcel which provide or are reasonably necessary to provide the Office/Annex Parcel with any Utility Service or other connection reasonably necessary to the operation of the Office/Annex Parcel.

(c) **Common Walls, Floors and Ceilings**.  A non-exclusive easement for support, enclosure, use and Maintenance with respect to Common Walls, Floors and Ceilings existing or constructed in and along the common boundaries of the Retail Parcel and the Office/Annex Parcel.

(d) **Utility Services**.  A non-exclusive easement (and if requested by the applicable Utility Company, a non-exclusive easement to such Utility Company) for Utility Service purposes required by the Office/Annex Parcel and the Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of Utility Facilities in those areas of the Retail Parcel where such Utility Facilities are to be located as part of the Office/Annex Parcel Improvements and Retail Parcel Improvements.  If, at any time, it becomes necessary for the operation of the Office/Annex Parcel to relocate or add to utility easements (including installation of Utility Facilities) other than where located or to be located as part of the Office/Annex Parcel Improvements and Retail Parcel Improvements in order to provide or upgrade required Utility Service to the Office/Annex Parcel, the Retail Owner agrees to grant such additional or relocated utility easements (at such location mutually agreed to by the Office/Annex Owner and the Retail Owner), provided (1) such easements do not interfere with the use and enjoyment of the Retail Parcel for the purposes for which the Retail Parcel is used and do not unduly inconvenience the Owner or Occupant(s) of, or cause any business interruption (as determined by the Retail Owner) within, the Retail Parcel, and (2) the Office/Annex Owner shall pay the reasonable costs and expenses incurred by the Retail Owner in connection with granting such easement, provided that the Retail Owner shall not be deemed unreasonable if it fails to grant a relocation of an existing Easement or a new Easement, if (x) prohibited by the terms of any lease or other occupancy agreement of the Retail Parcel or any portion thereof then in effect, or (y) would entitle any Occupant to any right to abate or setoff rent or any other fees, or to terminate or cease business operations under the terms of any lease, sublease, license, concession agreement or other occupancy agreement.  Retail Owner may relocate the utility easements granted herein at its sole cost and expense provided that (i) such relocation shall not cause any interruption of Utility Services to the Office/Annex Parcel, (ii) Retail Owner shall not change any points of connection with the Utility Facilities located on the Office/Annex Parcel unless Retail Owner pays all costs of relocating such connection points that are incurred by Office/Annex Owner and (iii) Retail Owner shall promptly apprise the Office/Annex Owner regarding the new location of any easements.

17

(e)    **Structural Support**.  A non-exclusive easement in all Structural Supports located in or constituting a part of the Retail Parcel Improvements for the support of the Office/Annex Parcel Improvements and Office/Annex Owned Facilities and the Maintenance of such Structural Supports and Office/Annex Owned Facilities; provided that the Office/Annex Owner shall not do or permit to be done any act that would adversely affect the structural safety or integrity of Structural Supports or any portion of the Retail Parcel Improvements.

(f)    **Encroachments**.  An easement permitting the existence of encroachments of 6 inches or less if such encroachments result from the construction of any of the Office/Annex Parcel Improvements or the permitted renovation of the Office/Annex Parcel Improvements or if, by reason of settlement or shifting of the Office/Annex Parcel Improvements, any part of the Office/Annex Parcel Improvements or Office/Annex Owned Facilities encroaches or shall hereafter encroach upon any part of the Retail Parcel.  This Easement shall exist only so long as the encroaching portion of the Office/Annex Parcel Improvements or such Office/Annex Owned Facilities continues to exist, or replacements are made in the same location that do not materially enlarge the encroachment.  No such encroachment shall be placed where such encroachment is not permitted or did not previously exist or is deliberately, materially enlarged.

(g)    **Office/Annex Owned Facilities**.    To and for the benefit of the Office/Annex Parcel and the Office/Annex Owner, an easement permitting the existence, attachment, use and Maintenance of Office/Annex Owned Facilities in the Retail Parcel in locations now or hereafter in the Retail Parcel mutually acceptable to the Office/Annex Owner and Retail Owner.

## ARTICLE 3

## EASEMENTS BURDENING THE HOTEL PARCEL

3.1    **In General**.  For the purposes of this **ARTICLE 3**, the following shall apply:

(a)    The Hotel Owner has granted, reserved, declared and created the Easements described in this **ARTICLE 3**.  The term "Granted" or "granted" as hereinafter used in this **ARTICLE 3** describing Easements shall be deemed to mean "granted, reserved, declared and created".  The Easements in this **ARTICLE 3** shall bind and be enforceable against the Hotel Owner and, as applicable, its successors, grantees and assigns (including, without limitation, the Condominium Owner).

(b)    The Easements granted by this **ARTICLE 3** shall, as applicable, bind and burden the Hotel Parcel, which shall for the purpose of this **ARTICLE 3** be deemed to be the servient tenement.  Where only a portion of the Hotel Parcel is bound and burdened by the Easement, only that portion shall be deemed to be the servient tenement.

18

(c)    To the extent the Easements granted by this **ARTICLE 3** are appurtenant to and benefit the Retail Parcel or the Office/Annex Parcel, the Retail Parcel and the Office/Annex Parcel shall, for the purpose of this **ARTICLE 3** with respect to such Easements, be deemed to be the dominant tenement.

(d)    Notwithstanding anything to the contrary contained herein, (i) in exercising an Easement granted under this **ARTICLE 2**, the Owner benefited by the Easement shall: (A) have the right to ingress and egress over, through and upon such portions of the Parcel burdened by such Easement to the extent necessary to exercise the rights granted by such Easement; and (B) make reasonable efforts to minimize the impact of its exercise on the Owner and Occupants of the Hotel Parcel, taking into consideration the impact of any disruption on the Owner and such Occupants; provided that (x) in connection with any work not necessitated by an Emergency Situation, Retail Owner shall provide Hotel Owner with at least two (2) weeks advance written notice (which notice right may be waived by the Hotel Owner from time to time in its sole and absolute discretion) with regard to the need to enter into the Hotel Parcel to perform any such work, and shall in such notice provide a reasonably detailed explanation of the anticipated nature, extent and duration of such work, (y) in connection with any work necessitated by an Emergency Situation, Retail Owner shall provide Hotel Owner with as much advance notice in such detail as is possible under the circumstances, and (z) with respect to the work being performed under either subparagraphs (x) or (y) above, (I) Hotel Owner shall have the right to accompany Retail Owner and any of its contractors, subcontractors, agents, employees or other representatives in connection with the performance of such work, (II) except in an Emergency Situation the Retail Owner shall use commercially reasonable efforts to perform such work outside normal operating hours of any business operating within any space which Retail Owner must access in order to perform such work (or, as it relates to accessing hotel rooms, coordinating with Hotel Owner access to rooms when such rooms are not in use by guests, if possible under the circumstances), (III) Retail Owner shall use commercially reasonable efforts to cause such work to be performed in accordance with the rights of any tenants or Occupants under any lease or other occupancy agreement for any such area which must be accessed to perform such work, (IV) any damage to the Hotel Property shall be promptly restored by the Retail Owner as near as possible to the condition that existed prior to the performance of such work (and if such restoration is not promptly performed Hotel Owner shall have the right to perform such work itself and to charge Retail Owner for the costs and expenses related thereto), and (V) without limiting the provisions set forth in **ARTICLE 6** hereof, Retail Owner shall reimburse Hotel Owner for, and shall indemnify and hold Hotel Owner harmless from and against, any loss or claim arising in connection with any such tenant's or Occupant's rights to set off or abate rent or other fees, to cease operations or any similar rights; and (ii) in the event that any access, use, repair, Maintenance or other right pursuant to which an Easement is granted under this **ARTICLE 2** may be effectively exercised without entering the Parcel burdened by the Easement, or conducting any invasive procedures within the burdened Parcel, or otherwise disrupting the use, operation or Occupant rights within the burdened Parcel, the party benefited by such Easement shall use commercially reasonable efforts to exercise such rights without entering into, conducting any invasive procedures within or otherwise

19

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 26 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM

disrupting the use of the burdened Parcel or its Owner or Occupants (for example, and in no way limiting the foregoing, if a Utility Facility may be accessed either from the burdened Parcel or the benefited Parcel, the party performing the work requiring such access shall perform such work, and utilize such access, from the benefited Parcel).

(e)    The Hotel Owner may, (i) in connection with the Maintenance of the Hotel Parcel upon not less than forty-eight (48) hours notice to the affected Owner(s), (ii) in an Emergency Situation or (iii) to prevent a dedication of, or an accruing of rights by, the public in and to the use of the Hotel Parcel: temporarily prevent, close off or restrict the ingress, egress or use in, over, on, across and through any of the Easements, subject to the other provisions hereof and only to the minimal extent and for the shortest time period reasonably necessary under the circumstances in order to minimize the effect on the user of such Easement.

(f)    If and to the extent that any of the Easement rights set forth in Section 3.2 below require access to areas other than the street level or lobby level of the Buildings, such Easement rights shall be deemed to include Easement rights to use the elevators and stairwells to access the roof(s) of the Buildings and such other areas of the Buildings as are reasonably necessary to exercise such Easement rights.

3.2    **Grant of Easements in Favor of the Retail Parcel**.  The following Easements in, to, under, over, upon and through the Hotel Parcel are hereby granted in favor of the Retail Owner and its Permittees and the Retail Parcel:

(a)    **Ingress and Egress**.  A non-exclusive easement for ingress and egress only for Persons, vehicles, material and equipment in, over, on, across and through such portions of the Hotel Parcel as are reasonably necessary to:  (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Retail Parcel, including, without limitation, the Retail Owned Facilities and those portions of the Hotel Parcel containing the access pathways to and from the Retail Parcel and the loading dock, freight elevator, Trash Room and garbage dumpster referenced in **Section 3.2(c)** below, (ii) permit the Retail Owner to provide to the Hotel Parcel those services to be performed by the Retail Owner as described in **ARTICLE 7** of this Agreement or (iii) perform (x) all Retail Renovations in accordance with the Retail Renovation Plans (pursuant to the Renovation easement rights set forth in **Section 3.2(o)** below), including but not limited to all work pursuant to change orders, warranties, and "punchlists" (provided that such Renovation easement rights shall terminate on the applicable Renovation Easement Termination Date), (y) Alterations, pursuant to Article 16 hereof, and (z) restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof.

(b)    **Use and Maintenance of Pipes, Facilities, Mechanical and Electric Rooms, Switch Gear Rooms and Rooftop Fan Coils, Chimneys and Equipment**.  A non-exclusive easement for the intended use and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of all Pipes and Facilities (as well as any rooftop fan coils, chimneys, equipment and Facilities), mechanical rooms,

20

electric rooms and switch gear rooms which are (i) located in the Hotel Parcel (including Retail Owned Facilities), and (ii) connect to Pipes, conduits or Facilities located in the Retail Parcel which provide or are reasonably necessary to provide the Retail Parcel with any Utility Service or other connection reasonably necessary to the operation of the Retail Parcel. The foregoing easement rights shall include the right to: (A) use and Maintain any rooftop fan coils, chimneys, equipment and Facilities, any mechanical, electric and switch gear rooms serving or located within the Retail Parcel and any Pipes, chases and conduits connecting such mechanical rooms, electric rooms or Facilities to the Retail Parcel, and to replace or upgrade any or all of such fan coils, chimneys equipment, Facilities, conduits, chases and Pipes; and (B) ingress, egress and access over, upon, across and through such portions of the Hotel Parcel as may be necessary or appropriate to perform any of the Maintenance and other work contemplated in this Section.

(c)    **Loading Docks and Garbage Dumpster.** A non-exclusive easement to use the loading docks and garbage dumpster located within the Trash Room. The Hotel Owner grants to the Retail Owner non-exclusive use of the loading dock berths and space for a garbage dumpster within the Trash Room, which Trash Room is to be shared with the Hotel Parcel and the Office/Annex Parcel. The Retail Owner shall have the right to access such loading dock area and Trash Room (and to deliver, dispatch and transport trash, materials, goods and inventory) over, upon, across and through the interior corridor connecting the Retail Parcel and the Hotel Parcel to and from the Retail Parcel from and to such loading dock area and Trash Room. The Hotel Owner may modify the location of the easement granted herein at its sole cost and expense provided that (i) such relocation shall not cause any interruption of or diminution in the easement rights granted to the Retail Owner herein or be unduly burdensome and (ii) the Hotel Owner shall promptly apprise the Retail Owner regarding the new location of any such easement area. The Hotel Owner shall have the right to coordinate the use of the loading docks by the Owners and their respective Occupants and Permittees, provided that the Retail Owner and the Office/Annex Owner, and their respective Occupants and Permittees, shall have access to the loading dock area and Trash Room, and the right to exercise the Easement rights granted herein, twenty-four (24) hours a day, seven (7) days a week.

(d)    **Utility Services.** A non-exclusive easement (and if requested by the applicable Utility Company, a non-exclusive easement to such Utility Company) for Utility Service purposes required by the Retail Parcel and the Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of Utility Facilities in those areas of the Hotel Parcel where such Utility Facilities are to be located as part of the Retail Parcel Improvements and Hotel Parcel Improvements. If, at any time, it becomes necessary for the operation of the Retail Parcel to relocate or add to utility easements (including installation of Utility Facilities) other than where located or to be located as part of the Retail Parcel Improvements and Hotel Parcel Improvements in order to provide or upgrade required Utility Service to the Retail Parcel, the Hotel Owner agrees to grant such additional or relocated utility easements (at such location mutually agreed to by the Retail Owner and the Hotel Owner), provided (1) such easements do not unreasonably interfere with the reasonable use and enjoyment of the Hotel Parcel for the purposes for which the Hotel Parcel is used, or if such use and enjoyment would be

21

disturbed, no reasonable alternative is available, and do not unduly inconvenience the Owner or Occupant(s) of the Hotel Parcel, and (2) the Retail Owner shall pay the reasonable costs and expenses incurred by the Hotel Owner in connection with granting such easement. Hotel Owner may relocate the utility easements granted herein at its sole cost and expense provided that (i) such relocation shall not cause any interruption of Utility Services to the Retail Parcel, (ii) Hotel Owner shall not change any points of connection with the Utility Facilities located on the Retail Parcel unless Hotel Owner pays all costs of relocating such connection points that are incurred by Retail Owner and (iii) Hotel Owner shall promptly apprise the Retail Owner regarding the new location of any easements.

(e)    **Encroachments**. An easement permitting the existence of encroachments of 6 inches or less if such encroachments result from the construction of any of the Retail Parcel Improvements or the Retail Renovations or if, by reason of settlement or shifting of the Retail Parcel Improvements, any part of the Retail Parcel Improvements or Retail Owned Facilities encroaches or shall hereafter encroach upon any part of the Hotel Parcel. This Easement shall exist only so long as the encroaching portion of the Retail Parcel Improvements or such Retail Owned Facilities continues to exist, or replacements are made in the same location that do not materially enlarge the encroachment. No such encroachment shall be placed where such encroachment is not permitted or did not previously exist or is deliberately, materially enlarged.

(f)    **Structural Support**. A non-exclusive easement in all Structural Supports located in or constituting a part of the Hotel Parcel Improvements for the support of the Retail Parcel Improvements and Retail Owned Facilities and the Maintenance of such Structural Supports and Retail Owned Facilities; provided that the Retail Owner shall not do or permit to be done any act that would adversely affect the structural safety or integrity of Structural Supports or any portion of the Hotel Parcel Improvements.

(g)    **Emergency Egress**. A non-exclusive easement for pedestrian egress in an Emergency Situation only from the Retail Parcel on, over, across and through the stairwells and corridors located within the Hotel Parcel and on, over, across and through such other portions of the Hotel Parcel as are reasonably necessary to utilize the emergency exit(s) from the Building in closest proximity to such stairwell(s).

(h)    **Retail Owned Facilities**. To and for the benefit of the Retail Parcel and the Retail Owner, an easement permitting the existence, attachment, use and Maintenance of Retail Owned Facilities in the Hotel Parcel in locations now or hereafter in the Hotel Parcel mutually acceptable to the Hotel Owner and Retail Owner.

(i)    **Elevator Service**. To and for the benefit of the Retail Parcel, the Retail Owner and its Permittees, a non-exclusive easement for service elevator use for "Elevator 34" as identified on the Site Plan as necessary or desirable for the Retail Owner and its Permittees (1) to access the roof to install and service equipment which Retail Owner has the right to so install and Maintain pursuant to this Agreement (or pursuant to separate rights or agreements), (2) for use between the different levels of the Retail Parcel, (3) in

22

CHGO2\40126644.12

Order: 18000031623                                     Page 29 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

an Emergency for emergency egress, and (4) for such other purposes as may be appropriate or reasonable. Notwithstanding anything to the contrary contained herein, the Retail Owner and its Permittees shall have the right to utilize such service elevator service at all times for the purposes described herein during which the businesses located within the Retail Parcel are operating, including times during which such businesses are closed to the general public (such as reasonable periods of time in the morning prior to opening for business, in the evening after closing for business and on weekends and holidays).

(j)    **Escalator Service**. To and for the benefit of the Retail Parcel, the Retail Owner and its Permittees, a non-exclusive easement for use of the Escalators located within the Street Level concourse and the Lobby Level of the Hotel Building as necessary or desirable for the Retail Owner and its Permittees to access the Hotel and the Retail Parcel via the escalators. Notwithstanding anything to the contrary contained herein, the Retail Owner and its Permittees shall have the right to utilize such escalators at all times for the purposes described herein during which the businesses located within the Retail Parcel are operating, including times during which such businesses are closed to the general public (such as reasonable periods of time in the morning prior to opening for business, in the evening after closing for business and on weekends and holidays).

(k)    **Retail Communication and Antenna Facilities**. To and for the benefit of the Retail Parcel and the Retail Owner (and any Utility Company, if required), a non-exclusive easement for the installation, use, Maintenance, repair and replacement of antennas, cellular phone antennas, microwave dishes, satellite dishes, broadband Facilities and/or another type of communications equipment on the roof of the Building serving the communications needs of any Retail Parcel Permittee (including, without limitation, the Retail Parcel Owner and the tenants occupying space within the Retail Parcel) and through the Hotel Parcel (in such locations as are mutually acceptable to the Hotel Owner and the Retail Owner) and Utilities serving the same and for the installation, use, Maintenance, repair and replacement of Facilities in the Hotel Parcel necessary to serve any antennae or other communications devices or equipment on the roof of the Building (or which connect such rooftop antennae or communications devices or equipment with the Retail Parcel) which are currently available or which become available through technological advances subject in all events to compliance with all other provisions of this Agreement and subject to the Hotel Owners right to install, use, maintenance, of similar facilities. The Hotel Owner and the Retail Owner shall in good faith mutually agree on a rooftop plan which identifies the location and alignment of all rooftop equipment and Facilities permitted by this Agreement in such a manner that (1) allows for the reception and transmission of necessary signals without interference by other rooftop Facilities or Improvements and (2) preserves the aesthetic integrity of the Building. The Retail Owner shall not be permitted to install rooftop telecommunications equipment for purposes of generating revenues (such as revenue generating cell phone towers) other than payments received as lease rental or other lease payments in connection with the exercise by tenants of the rights set forth in this subsection (k).

23

(l)    **Signage Easement**.  To and for the benefit of the Retail Parcel and the Retail Owner, in compliance with applicable Laws (including, without limitation, restrictions imposed on signage in connection with the Property's Class L Landmarks designation), the following easement rights to install, affix, repair, replace and Maintain the following signage: (i) identification, directional and trade signage for occupants of the Retail Parcel, including all exterior Building signage, if any, to be used for such purpose (such signage to be located on the Retail Parcel Façade), (ii) exterior advertising or trade signage located on the sign band of the Building and inside the windows of the Retail Property in the location identified in the diagram attached hereto as **Exhibit 3.2(k)** and (iii) signage on any bridge scaffolding erected adjacent to the Building.  The easement rights reserved in the immediately preceding sentence shall be perpetual and exclusive and shall include all necessary easement rights to install, connect, repair, Maintain and replace any and all necessary cables, pipes, lines, conduits and other facilities necessary for the supply of power to any signage being installed pursuant to this Section.  The foregoing easement rights shall include the right to: (A) enter upon the Property, the Building and all components thereof (including, without limitation, the exterior walls of the Building and scaffolding erected adjacent to the Building), to Maintain, repair, or replace such signage facilities, or to modify or change such signage, from time to time, as well as the right to construct scaffolding or other apparatus necessary or appropriate to exercise the foregoing rights; and (B) as it relates to any advertising signage, (1) lease or license any such advertising signage to a third party outdoor advertising sign company and (2) receive any and all revenues generated from the display of such signage or the lease or license of such signage rights to a third party outdoor signage company, or any other revenues related to such signage.  Subject to Hotel Owner's reasonable approval right as to exterior Building signage, the Retail Owner shall have sole and absolute discretion over the size, location, type, style, content, appearance and design of the signage contemplated in this Section, provided that such signage shall comply with the requirements of this Agreement and all applicable Laws.  The Retail Owner, at its sole cost and expense, shall maintain the signage allowed by this Section in good condition and repair, shall pay for all utilities consumed in connection therewith and shall comply with all Laws applicable thereto, including obtaining and maintaining all permits and licenses.  The Owner to whose Parcel such signage is affixed may temporarily remove the signage during any period it is cleaning, repairing, Maintaining and/or replacing the Façade, all in accordance with the terms and conditions of this Agreement; provided, however, that such Owner shall: (I) not be permitted to remove such signage unless such removal is necessary in order to perform cleaning, repair, Maintenance or replacement work required under this Agreement; (II) provide prior written notice of such removal to the Owner whose signage is being temporarily removed; (III) use reasonable efforts not to disturb such signage during any such cleaning, repair, Maintenance and/or replacement of the Façade, (IV) such Owner shall use reasonable efforts to limit the duration of such disruption to the shortest practicable period of time; (V) promptly reattach such signage upon completion of any such work; and (VI) repair any damage suffered by such signage (and, to the extent necessary, replace such signage) as a result of any such cleaning, repair, Maintenance and/or replacement work, at its sole cost and expense upon completion of any such cleaning, repair, Maintenance or replacement work.  The

24

foregoing signage Easement rights shall not be deemed to include a right for the Retail Owner to drill or bore into any portion of the Office/Annex Parcel Improvements or any portion of the Hotel Parcel Improvements for purposes of connecting electrical service or conduits to such signage without the prior written consent of the Office/Owner or the Hotel Owner, as the case may be, such consent not to be unreasonably withheld, conditioned or delayed.   Notwithstanding anything to the contrary contained herein, unless (1) required by applicable Law or (2) required in order to perform Maintenance, repair or replacement work consistent with standards and customs for a prudent owner of a mixed-use hotel and retail development in Chicago, Illinois in order to provide for the health, safety and welfare for its unit owners or the general public, in no event shall any scaffolding or other apparatus be erected which blocks, obstructs or otherwise obscures the view of any signage permitted by this **Section 3.2(k)**, and if any scaffolding or other apparatus permitted under the terms of this Agreement is erected, such scaffolding or other apparatus shall be erected in a manner that preserves the ability to view such signage from all angles at street level; provided, however, that the foregoing requirement shall not apply to the erection of the scaffolding in connection with the performance of the initial construction work pursuant to the Renovation Plans (further provided that such scaffolding is erected in accordance with the scaffolding plans provided by Thor Hotel to Thor Retail).

    (m)    **Intentionally Omitted**.

    (n)    **Street Level Concourse and Entrances/Exits at Street Level**.   To and for the benefit of the Retail Parcel and the Retail Owner, and the Retail Owner's Permitees, a non-exclusive easement for ingress, egress and access for Persons in, over, across and through the street level concourse of the Hotel Building from and to State Street, Monroe Street and Wabash Avenue, including, without limitation, the right to use any entrances and exits to and from such public thoroughfares.

    (o)    **Renovation Easement**.   A non-exclusive easement for the benefit of the Retail Owner and all of its architects, engineers, contractors, subcontractors, agents, employees, representatives and Permitees for the performance of all Retail Renovations in accordance with the Retail Renovation Plans on, over, across and through the Hotel Parcel (in such locations as are identified in the Retail Renovation Plans), as well as access to such areas within the Hotel Parcel as are necessary or appropriate in order to complete the Retail Renovations. The foregoing easement rights shall include the right to stage materials, perform work within the Hotel Parcel as may be necessary to complete the Retail Renovations, deliver and dispatch materials, equipment and debris and to perform such other work as is necessary or appropriate in order to complete the Retail Renovations, provided that the Retail Owner shall use reasonable efforts to minimize interference with the use and operation of the Hotel. The Renovation easement rights set forth herein shall be temporary and shall automatically terminate upon the applicable Renovation Easement Termination Date.

25

3.3     **Grant of Easements in Favor of the Office/Annex Parcel**.   The following Easements in, to, under, over, upon and through the Hotel Parcel are hereby granted in favor of the Office/Annex Owner and the Office/Annex Parcel:

(a)     **Ingress and Egress**.   A non-exclusive easement for ingress and egress only for Persons, vehicles, material and equipment in, over, on, across and through such portions of the Hotel Parcel as are reasonably necessary to:  (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Office/Annex Parcel, including, without limitation, the Office/Annex Owned Facilities and those portions of the Hotel Parcel containing the access pathways to and from the Office/Annex Parcel and the loading dock, freight elevator, Trash Room and garbage dumpster referenced in **Section 3.3(d)** below, or (ii) perform (y) Alterations, pursuant to Article 16 hereof, and (z) restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof.

(b)     **Use and Maintenance of Pipes and Facilities**.   A non-exclusive easement for the intended use and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of all Pipes and Facilities, if any, which are (i) located in the Hotel Parcel (including Office/Annex Owned Facilities), and (ii) connect to Pipes or Facilities located in the Office/Annex Parcel which provide or are reasonably necessary to provide the Office/Annex Parcel with any Utility Service or other connection reasonably necessary to the operation of the Office/Annex Parcel.

(c)     **Common Walls, Floors and Ceilings**.   A non-exclusive easement for support, enclosure, use and Maintenance with respect to Common Walls, Floors and Ceilings existing or constructed in and along the common boundaries of the Hotel Parcel and the Office/Annex Parcel.

(d)     **Loading Docks and Garbage Dumpster**.   A non-exclusive easement to use the loading docks and garbage dumpster located within the Trash Room.  The Hotel Owner grants to the Office/Annex Owner non-exclusive use of a loading dock berth and space for a garbage dumpster within the Trash Room, which Trash Room is to be shared with the Hotel Parcel and the Retail Parcel.  The Office/Annex Owner shall have the right to access such loading dock area and Trash Room (and to deliver, dispatch and transport trash, materials, goods and inventory) over, upon, across and through the freight elevator and interior corridors connecting the Office/Annex Parcel and the Hotel Parcel.  The location of this easement may not be modified or altered without the written consent of the Office/Annex Owner, which consent shall not be unreasonably withheld, conditioned or delayed.  The Hotel Owner shall have the right to coordinate the use of the loading docks by the Owners and their respective Occupants and Permittees, provided that the Retail Owner and the Office/Annex Owner, and their respective Occupants and Permittees, shall have access to the loading dock area and Trash Room, and the right to exercise the Easement rights granted herein, twenty-four (24) hours a day, seven (7) days a week.

26

CHGO2\40126644.12

Order: 18000031623
Doc: 634644078 EAS 12-12-2006                    Page 33 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM

(e)    **Utility Services**.  A non-exclusive easement (and if requested by the applicable Utility Company, a non-exclusive easement to such Utility Company) for Utility Service purposes required by the Office/Annex Parcel and the Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of Utility Facilities in those areas of the Hotel Parcel where such Utility Facilities are to be located as part of the Office/Annex Parcel Improvements and Hotel Parcel Improvements.    If, at any time, it becomes necessary for the operation of the Office/Annex Parcel to relocate or add to utility easements (including installation of Utility Facilities) other than where located or to be located as part of the Office/Annex Parcel Improvements and Hotel Parcel Improvements in order to provide or upgrade required Utility Service to the Office/Annex Parcel, the Hotel Owner agrees to grant such additional or relocated utility easements (at such location mutually agreed to by the Office/Annex Owner and the Hotel Owner), provided (1) such easements do not unreasonably interfere with the reasonable use and enjoyment of the Hotel Parcel for the purposes for which the Hotel Parcel is used, or if such use and enjoyment would be disturbed, no reasonable alternative is available, and do not unduly inconvenience the Owner or Occupant(s) of the Hotel Parcel, and (2) the Office/Annex Owner shall pay the reasonable costs and expenses incurred by the Hotel Owner in connection with granting such easement.  Hotel Owner may relocate the utility easements granted herein at its sole cost and expense provided that (i) such relocation shall not cause any interruption of Utility Services to the Office/Annex Parcel, (ii) Hotel Owner shall not change any points of connection with the Utility Facilities located on the Office/Annex Parcel unless Hotel Owner pays all costs of relocating such connection points that are incurred by Office/Annex Owner and (iii) Hotel Owner shall promptly apprise the Office/Annex Owner regarding the new location of any easements.

(f)    **Encroachments**.  An easement permitting the existence of encroachments of 6 inches or less if such encroachments result from the construction of any of the Office/Annex Parcel Improvements or the permitted renovation of the Office/Annex Parcel Improvements or if, by reason of settlement or shifting of the Office/Annex Parcel Improvements, any part of the Office/Annex Parcel Improvements or Office/Annex Owned Facilities encroaches or shall hereafter encroach upon any part of the Hotel Parcel.    This Easement shall exist only so long as the encroaching portion of the Office/Annex Parcel Improvements or such Office/Annex Owned Facilities continues to exist, or replacements are made in the same location that do not materially enlarge the encroachment.  No such encroachment shall be placed where such encroachment is not permitted or did not previously exist or is deliberately, materially enlarged.

(g)    **Structural Support**.  A non-exclusive easement in all Structural Supports located in or constituting a part of the Hotel Parcel Improvements for the support of the Office/Annex Parcel Improvements and Office/Annex Owned Facilities and the Maintenance of such Structural Supports and Office/Annex Owned Facilities; provided that the Office/Annex Owner shall not do or permit to be done any act that would adversely affect the structural safety or integrity of Structural Supports or any portion of the Hotel Parcel Improvements.

27

(h)    **Office/Annex Owned Facilities**.    To and for the benefit of the Office/Annex Parcel and the Office/Annex Owner, an easement permitting the existence, attachment, use and Maintenance of Office/Annex Owned Facilities in the Hotel Parcel in locations now or hereafter in the Hotel Parcel mutually acceptable to the Hotel Owner and Office/Annex Owner.

## ARTICLE 4

## INTENTIONALLY OMITTED

## ARTICLE 5

## EASEMENTS BURDENING THE OFFICE/ANNEX PARCEL

5.1    **In General**.  For the purposes of this ARTICLE 5, the following shall apply:

(a)    The Office/Annex Owner has granted, reserved, declared and created the Easements described in this ARTICLE 5.  The term "Granted" or "granted" as hereinafter used in this ARTICLE 5 describing Easements shall be deemed to mean "granted, reserved, declared and created".  The Easements in this ARTICLE 5 shall bind and be enforceable against the Office/Annex Owner and, as applicable, its successors, grantees and assigns.

(b)    The Easements granted by this ARTICLE 5 shall, as applicable, bind and burden the Office/Annex Parcel, which shall for the purpose of this ARTICLE 5 be deemed to be the servient tenement.

(c)    To the extent the Easements granted by this ARTICLE 5 are appurtenant to and benefit the Retail Parcel or the Hotel Parcel, the Retail Parcel and the Hotel Parcel shall, for the purpose of this ARTICLE 5 with respect to such Easement, be deemed to be the dominant tenement.

(d)    In exercising an Easement granted under this ARTICLE 5, the Owner benefited by the Easement shall: (i) have the right to ingress and egress over, through and upon the Parcel burdened by such Easement to the extent necessary to exercise the rights granted by such Easement; and (ii) make reasonable efforts to minimize the impact of its exercise on the Owner and Occupants of the Office/Annex Parcel, taking into consideration the impact of any disruption on the Owner and such Occupants. Notwithstanding anything to the contrary contained herein, in the event that any access, use, repair, Maintenance or other right pursuant to which an Easement is granted under this ARTICLE 5 may be effectively exercised without entering the Parcel burdened by the Easement, or conducting any invasive procedures within the burdened Parcel, or otherwise disrupting the use, operation or Occupant rights within the burdened Parcel, the party benefited by such Easement shall use commercially reasonable efforts to exercise such rights without entering into, conducting any invasive procedures within or otherwise disrupting the use of the burdened Parcel or its Owner or Occupants (for example, and in

28

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

no way limiting the foregoing, if a Utility Facility may be accessed either from the burdened Parcel or the benefited Parcel, the party performing the work requiring such access shall perform such work, and utilize such access, from the benefited Parcel).

(e)    The Office/Annex Owner may, (i) in connection with the Maintenance of the Office/Annex Parcel, (ii) in an Emergency Situation or (iii) to prevent a dedication of, or an accruing of rights by, the public in and to the use of the Office/Annex Parcel: temporarily prevent, close off or restrict the ingress, egress or use in, over, on, across and through any of the Easements, subject to the other provisions hereof and only to the minimal extent and for the shortest time period reasonably necessary under the circumstances in order to minimize the effect on the user of such Easement.

5.2    **Grant of Easements in Favor of the Hotel Parcel**. The following Easements in, to, under, over, upon and through the Office/Annex Parcel are hereby granted in favor of the Hotel Owner and its Permittees and the Hotel Parcel:

(a)    **Ingress and Egress**. A non-exclusive easement for ingress and egress only for Persons, material and equipment in, over, on, across and through such portions of the Office/Annex Parcel as are reasonably necessary or desirable to: (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Hotel Parcel, including, without limitation, the Hotel Owned Facilities, (ii) permit the Hotel Owner to provide to the Office/Annex Parcel those services to be performed by the Hotel Owner as described in **ARTICLE 7** of this Agreement or (iii) perform (x) all Hotel Renovations in accordance with the Hotel Renovation Plans (pursuant to the Renovation easement rights set forth in **Section 5.2(l)** below), including but not limited to all work pursuant to change orders, warranties, and "punchlists" (provided that such Renovation easement rights shall terminate on the applicable Renovation Easement Termination Date) (y) Alterations, pursuant to Article 16 hereof, and (z) restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof. Notwithstanding the above, the Hotel Owner shall completely remove any and all scaffolding, construction canopies, and any similar or related support or construction materials from the Façade facing the portion of the Property fronting on State Street, Wabash Avenue and Monroe Street, or any other construction-related obstruction of or interference with the Office/Annex Parcel (including, without limitation, any construction-related equipment, materials or staging), on or before the following dates: (1) as it relates to the scaffolding and other obstructions adjacent to State Street and Wabash Avenue, all such scaffolding and obstructions shall be removed on or before November 15, 2007; and (2) as it relates to the scaffolding and other obstructions adjacent to Monroe Street, all such scaffolding and obstructions shall be removed on or before July 1, 2008.

(b)    **Use and Maintenance of Pipes and Facilities**. A non-exclusive easement for Persons, material and equipment over, on, across and through such portion of the Office/Annex Parcel as are reasonably necessary for the intended use and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of all Pipes and Facilities, if any, which are (i) located in the Office/Annex

29

Order: 18000031623                                    Page 36 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

Parcel (including Hotel Owned Facilities), and (ii) connected to Pipes or Facilities located in the Hotel Parcel and/or provide or are reasonably necessary to provide the Hotel Parcel with any Utility Service or other service reasonably necessary or desirable to the operation of the Hotel Parcel.

(c)     **Common Walls, Floors and Ceilings**.  A non-exclusive easement for support, enclosure, use and Maintenance with respect to Common Walls, Floors and Ceilings existing or constructed in and along the common boundaries of the Office/Annex Parcel and the Hotel Parcel.

(d)     **Utility Services**.  A non-exclusive easement (and if requested by the applicable Utility Company, a non-exclusive easement to such Utility Company) for Utility Service purposes required by the Hotel Parcel and the Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of Utility Facilities in those areas of the Office/Annex Parcel where such Utility Facilities are currently located or are to be located as part of the Hotel Parcel Improvements and Office/Annex Parcel Improvements.  If, at any time, it becomes necessary for the operation of the Hotel Parcel to relocate or add to utility easements (including installation of Utility Facilities) other than where located or to be located as part of the Hotel Parcel Improvements and Office/Annex Parcel Improvements in order to provide or upgrade required Utility Service to the Hotel Parcel, the Office/Annex Owner agrees to grant such additional or relocated utility easements (at such location mutually agreed to by the Hotel Owner and the Office/Annex Owner), provided (1) such easements do not unreasonably interfere with the reasonable use and enjoyment of the Office/Annex Parcel for the purposes for which the Office/Annex Parcel is used, or if such use and enjoyment would be disturbed, no reasonable alternative is available, and do not unduly inconvenience the Owner or Occupant(s) of, or otherwise cause any business interruption within, the Office/Annex Parcel, and (2) the Hotel Owner shall pay the reasonable costs and expenses incurred by the Office/Annex Owner in connection with granting such easement.  Office/Annex Owner may relocate the utility easements granted herein at its sole cost and expense provided that (i) such relocation shall not cause any interruption of Utility Services to the Hotel Parcel, increase the cost of Utility Services to the Hotel Parcel, or otherwise adversely affect the Utility Services to the Hotel Parcel, (ii) Office/Annex Owner shall not change any points of connection with the Utility Facilities located on the Hotel Parcel unless Office/Annex Owner pays all costs of relocating such connection points that are incurred by Hotel Owner and (iii) Office/Annex Owner shall promptly apprise the Hotel Owner regarding the new location of any easements and provide the Hotel Owner at least 10 days written notice prior to relocated any utility easements.

(e)     **Encroachments**.  An easement permitting the existence of encroachments of 6 inches or less if such encroachments result from the construction of any of the Hotel Parcel Improvements or the permitted renovation of the Hotel Parcel Improvements or if, by reason of settlement or shifting of the Hotel Parcel Improvements, any part of the Hotel Parcel Improvements or Hotel Owned Facilities encroaches or shall hereafter encroach upon any part of the Office/Annex Parcel.  This Easement shall exist only so

30

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

long as the encroaching portion of the Hotel Parcel Improvements or such Hotel Owned Facilities continues to exist, or replacements are made in the same location that do not materially enlarge the encroachment. No such encroachment shall be placed where such encroachment is not permitted or did not previously exist or is deliberately, materially enlarged.

(f)     **Structural Support**. A non-exclusive easement in all Structural Supports located in or constituting a part of the Office/Annex Parcel Improvements for the support of the Hotel Parcel Improvements and Hotel Owned Facilities and the Maintenance of such Structural Supports and Hotel Owned Facilities; provided that the Hotel Owner shall not do or permit to be done any act that would adversely affect the structural safety or integrity of Structural Supports or any portion of the Office/Annex Parcel Improvements. The foregoing easement rights include the rights to the existence, Maintenance, removal and replacement of caissons, structural members and other support elements providing structural support to the Office/Annex Parcel Improvements and located in whole or in part within the Office/Annex Parcel.

(g)     **Hotel Owned Facilities**. To and for the benefit of the Hotel Parcel and the Hotel Owner, an easement permitting the existence, attachment, use and Maintenance of Hotel Owned Facilities in the Office/Annex Parcel in locations now or hereafter in the Office/Annex Parcel mutually acceptable to the Hotel Owner and Office/Annex Owner or otherwise specified or depicted in the Renovation Plans.

(h)     **Intentionally Omitted**.

(i)     **Intentionally Omitted**.

(j)     **Booster Station and Communication Facilities**. To and for the benefit of the Hotel Parcel and the Hotel Owner (and any Utility Company, if required), a non-exclusive easement for the installation, use, Maintenance, repair and replacement of the Nextel/Sprint booster station and all related antennas, cellular phone antennas, microwave dishes, satellite dishes, broadband Facilities and/or another type of communications equipment on the roof of the Office/Annex Building serving the communications needs of any Hotel Parcel Permittee (including, without limitation, the Hotel Parcel Owner and the Permittees occupying space within the Hotel Parcel) and through the Hotel Parcel (in such locations as are mutually acceptable to the Hotel Owner and the Office/Annex Owner) and Utilities serving the same and for the installation, use, Maintenance, repair and replacement of Facilities in the Office/Annex Parcel necessary to serve any antennae or other communications devices or equipment on the roof of the Office/Annex Building (or which connect such rooftop antennae or communications devices or equipment with the Hotel Parcel) which are currently available or which become available through technological advances subject in all events to compliance with all other provisions of this Agreement and subject to the Office/Annex Owner's right to install, use, maintenance, of similar facilities. The Hotel Owner and the Office/Annex Owner shall in good faith mutually agree on a rooftop plan which identifies the location and alignment of all rooftop equipment and Facilities permitted by this Agreement in

31

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

such a manner that (1) allows for the reception and transmission of necessary signals without interference by other rooftop Facilities or Improvements and (2) preserves the aesthetic integrity of the Building.

(k)    **Chillers, Chiller Pipes and Air Shaft**.  To and for the benefit of the Hotel Parcel and for the Hotel Owner, an exclusive easement on, over, across and through the areas identified on the Site Plan as the "Chiller Room" and, at the street level, the "Easement for Hotel Chillers" within the Office/Annex Parcel for the use, operation, installation, Maintenance, removal and replacement of the chillers, chiller Pipes, the air shaft serving the chillers and chiller Pipes and related equipment and Facilities located within the Chiller Room and the area identified on the Site Plan as the "Easement for Hotel Chillers".  The foregoing easement right shall include a non-exclusive easement for ingress, egress and access over, across and through the Office/Annex Parcel for Persons and equipment to perform any work as may be necessary or appropriate for the use, operation, installation, Maintenance, removal, replacement and other work related to the chillers, chiller Pipes, air shafts serving the chillers and chiller Pipes and related equipment located within the Chiller Room and the area identified on the Site Plan as the "Easement for Hotel Chillers".

(l)    **Renovation Easement**.  A non-exclusive easement for the benefit of the Hotel Owner and all of its architects, engineers, contractors, subcontractors, agents, employees, representatives and Permittees for the performance of all Hotel Renovations in accordance with the Hotel Renovation Plans on, over, across and through the Office/Annex Parcel (in such locations as are identified in the Hotel Renovation Plans), as well as access to such areas within the Office/Annex Parcel as are necessary or appropriate in order to complete the Hotel Renovations.  The foregoing easement rights shall include the right to stage materials, perform work within the Office/Annex Parcel as may be necessary to complete the Hotel Renovations, deliver and dispatch materials, equipment and debris and to perform such other work as is necessary or appropriate in order to complete the Hotel Renovations.  The Renovation easement rights set forth herein shall be temporary and shall automatically terminate upon the applicable Renovation Easement Termination Date.

5.3    **Grant of Easements in Favor of the Retail Parcel**.  The following Easements in, to, under, over, upon and through the Office/Annex Parcel are hereby granted in favor of the Retail Owner and its Permittees and the Retail Parcel:

(a)    **Ingress and Egress**.  A non-exclusive easement for ingress and egress only for Persons, vehicles, material and equipment in, over, on, across and through such portions of the Office/Annex Parcel as are reasonably necessary to:  (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Retail Parcel, including, without limitation, the Retail Owned Facilities, (ii) permit the Retail Owner to provide to the Office/Annex Parcel those services to be performed by the Retail Owner as described in **ARTICLE 7** of this Agreement or (iii) perform (y) Alterations, pursuant to Article 16 hereof, and (z)

32

restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof.

(b)    **Use and Maintenance of Pipes and Facilities**.    A non-exclusive easement for the intended use and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of all Pipes and Facilities, if any, which are (i) located in the Office/Annex Parcel (including Retail Owned Facilities), and (ii) connect to Pipes or Facilities located in the Retail Parcel which provide or are reasonably necessary to provide the Retail Parcel with any Utility Service or other connection reasonably necessary to the operation of the Retail Parcel. The foregoing easement rights shall include the right to use and Maintenance of any rooftop HVAC Facilities and any Pipes connecting such Facilities to the Retail Parcel, and to replace or upgrade any or all of such HVAC Facilities and Pipes.

(c)    **Common Walls, Floors and Ceilings**.    A non-exclusive easement for support, enclosure, use and Maintenance with respect to Common Walls, Floors and Ceilings existing or constructed in and along the common boundaries of the Office/Annex Parcel and the Retail Parcel.

(d)    **Utility Services**.    A non-exclusive easement (and if requested by the applicable Utility Company, a non-exclusive easement to such Utility Company) for Utility Service purposes required by the Retail Parcel and the Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of Utility Facilities in those areas of the Office/Annex Parcel where such Utility Facilities are to be located as part of the Retail Parcel Improvements and Office/Annex Parcel Improvements. If, at any time, it becomes necessary for the operation of the Retail Parcel to relocate or add to utility easements (including installation of Utility Facilities) other than where located or to be located as part of the Retail Parcel Improvements and Office/Annex Parcel Improvements in order to provide or upgrade required Utility Service to the Retail Parcel, the Office/Annex Owner agrees to grant such additional or relocated utility easements (at such location mutually agreed to by the Retail Owner and the Office/Annex Owner), provided (1) such easements do not unreasonably interfere with the reasonable use and enjoyment of the Office/Annex Parcel for the purposes for which the Office/Annex Parcel is used, or if such use and enjoyment would be disturbed, no reasonable alternative is available, and do not unduly inconvenience the Owner or Occupant(s) of, or otherwise cause any business interruption within, the Office/Annex Parcel, and (2) the Retail Owner shall pay the reasonable costs and expenses incurred by the Office/Annex Owner in connection with granting such easement.    Office/Annex Owner may relocate the utility easements granted herein at its sole cost and expense provided that (i) such relocation shall not cause any interruption of Utility Services to the Retail Parcel, (ii) Office/Annex Owner shall not change any points of connection with the Utility Facilities located on the Retail Parcel unless Office/Annex Owner pays all costs of relocating such connection points that are incurred by Retail Owner and (iii) Office/Annex Owner shall promptly apprise the Retail Owner regarding the new location of any easements.

33

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 40 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

(e)    **Encroachments**.  An easement permitting the existence of encroachments of 6 inches or less if such encroachments result from the construction of any of the Retail Parcel Improvements or the permitted renovation of the Retail Parcel Improvements or if, by reason of settlement or shifting of the Retail Parcel Improvements, any part of the Retail Parcel Improvements or Retail Owned Facilities encroaches or shall hereafter encroach upon any part of the Office/Annex Parcel.  This Easement shall exist only so long as the encroaching portion of the Retail Parcel Improvements or such Retail Owned Facilities continues to exist, or replacements are made in the same location that do not materially enlarge the encroachment.  No such encroachment shall be placed where such encroachment is not permitted or did not previously exist or is deliberately, materially enlarged.

(f)    **Structural Support**.  A non-exclusive easement in all Structural Supports located in or constituting a part of the Office/Annex Parcel Improvements for the support of the Retail Parcel Improvements and Retail Owned Facilities and the Maintenance of such Structural Supports and Retail Owned Facilities; provided that the Retail Owner shall not do or permit to be done any act that would adversely affect the structural safety or integrity of Structural Supports or any portion of the Office/Annex Parcel Improvements.

(g)    **Retail Owned Facilities**.  To and for the benefit of the Retail Parcel and the Retail Owner, an easement permitting the existence, attachment, use and Maintenance of Retail Owned Facilities in the Office/Annex Parcel in locations now or hereafter in the Office/Annex Parcel mutually acceptable to the Office/Annex Owner and Retail Owner.

(h)    **Parking Garage Ramp and Related Facilities**.  To and for the benefit of the Retail Parcel, the Retail Owner and its Permittees, an exclusive easement permitting the existence, attachment, use and Maintenance of the Parking Garage ramp and related Facilities and equipment serving the Parking Garage (including, without limitation, all ramps, driveways, gates, garage doors, stairways, elevators and other related Facilities and appurtenances thereto) to the extent such ramp and related Facilities and equipment are located within the Office/Annex Parcel.  The foregoing easement rights include the right to: (A) pedestrian and vehicular traffic on, over, across and through such ramps, driveways and other areas located within the Office/Annex Parcel; and (B) the right to access such portions of the Office/Annex Property as may be necessary or appropriate to perform any desired or required Maintenance, improvements, installation, removal, rehabilitation or other work on such ramps, driveways, gates, garage doors, stairways, elevators and other related Facilities or appurtenances as may be necessary or appropriate, in the sole and absolute discretion of the Retail Owner.  Office/Annex Owner may relocate the Parking Garage ramp easements granted herein (provided that such relocation must be performed together with the relocation of the Parking Garage ramp and associated Facilities) at its sole cost and expense in connection with the development or redevelopment of the Office/Annex Parcel, provided that (i) such relocation shall not cause any interruption of the use of the Parking Garage ramp by the Retail Parcel, increase the costs to the Retail Parcel, or otherwise adversely affect the use of the Parking Garage by the Retail Parcel, (ii) Office/Annex Owner shall provide the

34

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Retail Owner at least one hundred twenty (120) days prior written notice regarding the proposed new location of the Parking Garage ramp prior to its proposed relocation of the Parking Garage Ramp, and such one hundred twenty (120) day notice shall include all required deliveries in connection with the performance of an Alteration pursuant to **Article 16** hereof, (iii) Retail Owner consents to such relocation, which consent may be withheld in the sole and absolute discretion of the Retail Owner, and (iv) such relocation shall constitute an "Alteration" pursuant to **Article 16** hereof, with Office/Annex Owner being the "Altering Owner", and such Alteration shall be performed in accordance with all of the obligations on the Altering Owner as set forth in **Article 16** hereof.

(i)    **Renovation Easement**.  A non-exclusive easement for the benefit of the Retail Owner and all of its architects, engineers, contractors, subcontractors, agents, employees, representatives and Permittees for the performance of all Retail Renovations in accordance with the Retail Renovation Plans (including, without limitation, the parking ramp to be located within the Office/Annex Parcel) on, over, across and through the Office/Annex Parcel (in such locations as are identified in the Retail Renovation Plans), as well as access to such areas within the Office/Annex Parcel as are necessary or appropriate in order to complete the Retail Renovations.  The foregoing easement rights shall include the right to stage materials, perform work within the Office/Annex Parcel as may be necessary to complete the Retail Renovations, deliver and dispatch materials, equipment and debris and to perform such other work as is necessary or appropriate in order to complete the Retail Renovations.  The Renovation easement rights set forth herein shall be temporary and shall automatically terminate upon the applicable Renovation Easement Termination Date.

## ARTICLE 6

## INDEMNIFICATION

Without limiting any other provision hereof, but subject to the provisions of **Section 23.1** hereof, each Owner (hereinafter in this Article 6, the "Indemnifying Owner") covenants and agrees, at its sole cost and expense, to indemnify, defend and hold harmless each other Owner and such other Owner's partners, beneficiaries, stockholders, directors, officers, agents, employees and attorneys and the respective successors and assigns of all such partners and parties and any Mortgagees (hereinafter in this Article 6, collectively, the "Indemnitee") for losses, liabilities, damages, judgments, reasonable costs and expenses including, without limitation, reasonable legal fees incurred by Indemnitee arising out of any claim and any deductibles required to be paid under applicable insurance policies, including any actions or proceedings against Indemnitee by or on behalf of any person, firm, corporation or governmental authority, other than any Indemnitee, arising out of (i) the Indemnifying Owner's or its Permittees' use, possession, Maintenance, or operation of the Indemnifying Owner's portion of the Property or the Indemnifying Owner's Owned Facilities, or activities therein, (ii) the Indemnifying Owner's use, exercise or enjoyment of an Easement or Facility (shared or otherwise) or (iii) the Indemnifying Owner's failure to perform its Maintenance or other obligations hereunder.  In no event shall the Indemnifying Owner have any indemnification obligation to the Indemnitee to the extent occasioned by the negligent or wrongful acts or omissions of any Indemnitee or its

35

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 42 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

Permittees. The indemnification obligations of the Indemnifying Owner hereunder shall not include or be deemed to extend to the Permittees of the Indemnitee; provided, however, that this provision shall not limit the obligation of the Indemnifying Owner with respect to any claims made against an Indemnitee by any such Permitees. If any action or proceeding is brought against any Indemnitee by reason of any such claim, Indemnifying Owner, upon notice from such Indemnitee, covenants to resist or defend such action or proceeding with attorneys reasonably satisfactory to such Indemnitee. Any counsel for the insurance company providing insurance against such claim, action or proceeding shall be deemed to be reasonably satisfactory to such Indemnitee. The Indemnitee shall cooperate with the Indemnifying Owner in the defense of such matter, at the Indemnifying Owner's expense. The Indemnitee shall not enter into any agreement or settlement with respect to such matters while the Indemnifying Owner is defending or contesting such actions, without the Indemnifying Owner's prior written approval, which approval shall not be unreasonably withheld. Any such agreement or settlement without the Indemnifying Owner's approval shall release the Indemnifying Owner from its obligation to indemnify the Indemnitee with respect to such matter. In the event of a final and non-appealable determination of any Indemnitee's negligence or wrongful acts, the Indemnifying Owner shall be entitled to receive indemnification and repayment for all actual out-of-pocket costs and expenses (including, without limitation, attorneys' fees and disbursements) associated with defending an action resulting from an Inndemnitee's negligence or wrongful acts or otherwise paid to the Indemnitee.

## ARTICLE 7

### SERVICES TO OTHER OWNERS

7.1    **Services to the Retail Owner by Hotel Owner**. From and after the substantial completion of the Retail Parcel Improvements, the Hotel Owner shall furnish or cause to be furnished the following services to the Retail Owner when, as, and if required or requested by the Retail Owner:

(a)    **Heating**. Maintenance of Facilities providing steam heating services to the Retail Property (including, without limitation, the closed loop four pipe system and related Facilities serving the Property, as well as the boilers located within the Hotel Property), as well as supplying steam heat, upon the terms and conditions set forth in **EXHIBIT 7.1(A)**.

(b)    **Fire Pump and Combination Standpipe System**. Maintenance of Facilities providing the fire pump and combination standpipe system, upon the terms and conditions set forth in **EXHIBIT 7.1(B)**.

(c)    **Storm Water Drainage**. Maintenance of Facilities providing storm water drainage, upon the terms and conditions set forth in **EXHIBIT 7.1(C)**.

36

CHGO2\40126644.12

Order: 18000031623                                Page 43 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

(d)    **Fire and Life-Safety System Central Monitoring Panel**.  Maintenance of Facilities providing the fire and life-safety system central monitoring panel, upon the terms and conditions set forth in **EXHIBIT 7.1(D)**.

(e)    **Gas Service**.  Maintenance of Facilities providing gas service, upon the terms and conditions set forth in **EXHIBIT 7.1(E)**.

(f)    **Street Level Exterior Maintenance and Snow Removal**.  Street Level exterior maintenance and snow removal, upon the terms and conditions set forth in **EXHIBIT 7.1(F)**.

(g)    **Loading Dock, Trash Room, Utility Areas, Mechanical Rooms and Stairwells**.  Maintenance of the Loading Dock, Trash Room, utility areas, mechanical rooms, electrical rooms, telephone rooms, common service corridors and all shared Facilities, as well as all stairwells within the Hotel Parcel, upon the terms and conditions set forth on **EXHIBIT 7.1(G)**.

(h)    **Cooling**.  Maintenance of Facilities providing chilled water to the Retail Property (including, without limitation, the closed loop four pipe system and related Facilities serving the Property, as well as the chillers located within the Office/Annex Property), as well as supplying chilled water, upon the terms and conditions set forth in **EXHIBIT 7.1(H)**.

(i)    **Hot Water**.  Maintenance of Facilities providing hot water services to the Retail Property (including, without limitation, the boilers located within the Hotel Property), as well as supplying hot water, upon the terms and conditions set forth in **EXHIBIT 7.1(I)**.

(j)    **Emergency Generator**.  Maintenance of the emergency generator serving the Property.  The Operating Expenses and Net Capitalized Cost of Replacement for the emergency generator and associated fuel storage, transfer switches and related electrical distribution shall be shared in accordance with the Approved Division.

(k)    **Sewage Ejector Pumps**.  Maintenance of the sewage ejector pumps serving the Property at the sole cost and expense of the Hotel Owner.

(l)    **Kitchen Waste and Grease Disposal System**.  Maintenance of the kitchen waste and grease disposal system serving the Property at the sole cost and expense of the Hotel Owner.

(m)    **Arcade Level Common Area Maintenance**.  Arcade Level common area Maintenance, upon the terms and conditions set forth in **EXHIBIT 7.1(M)**.

(n)    **Other Services**.  The Hotel Owner shall furnish or cause to be furnished other services to the Retail Owner reasonably required or requested by the Retail Owner for normal business operations of the Retail Parcel, on terms and conditions mutually acceptable to the Hotel Owner and the Retail Owner, provided that each party agrees not

37

CHGO2\40126644.12

Order: 18000031623                                                Page 44 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

to unreasonably withhold, condition or delay its consent to such terms and conditions. Once determined, the Hotel Owner and the Retail Owner may amend this Agreement to incorporate the terms and conditions agreed to by such Owners regarding these services.

Notwithstanding the above, the Retail Owner may, at its sole cost and expense, supplement the services then being provided by the Hotel Owner; provided, however, that any such supplementing of services by the Retail Owner shall be performed in a manner so as not to unreasonably interfere with the services being provided by the Hotel Owner, shall be provided at the sole expense of the Retail Owner and the provision of any such supplemental services by the Retail Owner which involve any Alterations shall be subject to the provisions of **ARTICLE 16** hereof.

7.2    **Services to the Office/Annex Owner by Hotel Owner**. From and after the substantial completion of the Office/Annex Parcel Improvements, the Hotel Owner shall furnish or cause to be furnished the following services to the Office/Annex Owner when, as, and if required or requested by the Office/Annex Owner:

(a)    **Heating**. Maintenance of Facilities providing steam heating services to the Retail Property (including, without limitation, the closed loop four pipe system and related Facilities serving the Property, as well as the boilers located within the Hotel Property), as well as supplying steam heat, upon the terms and conditions set forth in **EXHIBIT 7.1(A)**.

(b)    **Fire Pump and Combination Standpipe System**. Maintenance of Facilities providing the fire pump and combination standpipe system, upon the terms and conditions set forth in **EXHIBIT 7.1(B)**.

(c)    **Fire and Life-Safety System Central Monitoring Panel**. Maintenance of Facilities providing the fire and life-safety system central monitoring panel, upon the terms and conditions set forth in **EXHIBIT 7.1(D)**.

(d)    **Telephone Service**. Maintenance of Facilities providing telephone service, upon the terms and conditions set forth in **EXHIBIT 7.2(D)**.

(e)    **Street Level Exterior Maintenance and Snow Removal**. Street Level exterior maintenance and snow removal, upon the terms and conditions set forth in **EXHIBIT 7.1(F)**.

(f)    **Loading Dock, Trash Room, Utility Areas, Mechanical Rooms and Stairwells**. Maintenance of the Loading Dock, Trash Room, utility areas, mechanical rooms, electrical rooms, telephone rooms, common service corridors and all shared Facilities, as well as all stairwells within the Hotel Parcel, upon the terms and conditions set forth on **EXHIBIT 7.1(G)**.

(g)    **Hot Water**. Maintenance of Facilities providing hot water services to the Office/Annex Property (including, without limitation, the boilers located within the Hotel

38

Property), as well as supplying hot water, upon the terms and conditions set forth in **Exhibit 7.1(I)**.

(h)    **Emergency Generator**. Maintenance of the emergency generator serving the Property. The Operating Expenses and Net Capitalized Cost of Replacement for the emergency generator and associated fuel storage, transfer switches and related electrical distribution shall be shared in accordance with the Approved Division.

(i)    **Elevator Maintenance**. For so long as elevator Maintenance for the Hotel Property and the Office/Annex Property is performed pursuant to a joint elevator service agreement covering elevators in both the Hotel Property and the Office/Annex Property, the Hotel Owner shall cause to be performed all Maintenance of the Elevators located within the Hotel Parcel Improvements and the Office/Annex Parcel Improvements in accordance with **Exhibit 7.1(D)**.

(j)    **Other Services**. The Hotel Owner shall furnish or cause to be furnished other services to the Office/Annex Owner reasonably required or requested by the Office/Annex Owner for normal business operations of the Office/Annex Parcel, on terms and conditions mutually acceptable to the Hotel Owner and the Office/Annex Owner. Once determined, the Hotel Owner and the Office/Annex Owner may amend this Agreement to incorporate the terms and conditions agreed to by such Owners regarding these services.

Notwithstanding the above, the Office/Annex Owner may, at its sole cost and expense, supplement the services then being provided by the Hotel Owner; provided, however, that any such supplementing of services by the Office/Annex Owner shall be performed in a manner so as not to unreasonably interfere with the services being provided by the Hotel Owner be provided at the sole expense of the Office/Annex Owner and the provision of any such supplemental services by the Office/Annex Owner which involve any Alterations shall be subject to the provisions of **Article 16** hereof.

7.3    **Façade Maintenance and Window Washing**. Each Owner shall be obligated to perform, at such Owner's sole cost and expense, all Façade Maintenance and window washing (no less than two (2) times annually) for each such Owner's Property.

7.4    **Obligation to Furnish Services**. The Owners responsible for furnishing services hereunder shall furnish all services required under this **Article 7** in a manner consistent with the intended respective use of the Property as a Class A "first class" mixed-use office, retail and Hotel property with parking facilities, to the level of operation and management of comparable properties in downtown Chicago, Illinois, and in a manner consistent with the standards for Maintenance established in **Section 11.1** hereof. Each such Owner shall use reasonable diligence in performing the services required as set forth in this **Article 7** but shall only be liable under this **Article 7** for interruption or inadequacy of service and loss or damage to property or business (including any consequential damages) arising out of such interruption or inadequacy if such interruption or inadequacy results from its gross negligence or willful misconduct in performing such services. Each Owner reserves the right to curtail or halt the

CHGO2\40126644.12

performance of any service hereunder at any time in reasonable respects upon reasonable advance notice under the circumstances (except in an Emergency Situation) and for a reasonable period of time to perform Maintenance or in an Emergency Situation.

7.5 **Payment for Services**. Payment for services rendered pursuant to this **ARTICLE 7** and other charges and fees related to such services, including overhead and supervision fees, shall be made in accordance with the terms and provisions of **EXHIBIT 7.6** attached hereto and made a part hereof. Notwithstanding the foregoing, in the event that a shared utility Facility must be upgraded to accommodate the increased capacity needs of any Owner, such Owner shall pay the full costs of such upgrade.

7.6 **Failure to Perform Services**.

If an Owner shall fail to perform as required by the terms and conditions of this **ARTICLE 7** (except when such failure is caused by another Owner or by Unavoidable Delay) and such failure shall continue for a period of ten (10) days after receipt of written notice thereof to the Defaulting Owner from the Creditor Owner, the Creditor Owner shall have the right to perform the same (without limiting any other rights or remedies of such Owner) until such time as the Defaulting Owner cures its failure to perform. Notwithstanding the foregoing, if an Owner fails to perform the services it is required to provide in this **ARTICLE 7** in an Emergency Situation, the Creditor Owner shall have the right to perform such services immediately until such time as the Owner responsible for providing such services provides the same.

7.7 **Data Unavailable from Metering**. Where the allocation of the cost of a service under **ARTICLE 7** is based on usage recorded by meters, and if at any time the actual allocation of cost of service based on an Owner's usage recorded by meters cannot be determined because the meters or system for recording metered information are not installed or operative, then for such period when the usage data from meters is unavailable, the Owner performing such service shall in good faith make such reasonable determination of costs based on historical data and usage, using such experts or systems as such Owner may consider helpful to achieve an estimate of usage. Such Owner shall notify the other Owner in detail of its determination of estimated usage and the method for such determination at the time such Owner sends a Projection Notice or Statement (as such terms are defined in **EXHIBIT 7.6**) or statement of Net Capitalized Cost of Replacement under **EXHIBIT 7.6** relating to such service. If, within thirty (30) days after receipt of such notice, the Owner receiving such notice does not, in good faith, dispute that estimated usage has been determined reasonably, such determination of usage shall be final and conclusive upon the parties for such period; provided further, however, if the Owner receiving such notice, in good faith, disputes that the estimated usage has been determined reasonably, such Owner shall so notify the other Owner. If the Owners fail to agree concerning the method of estimating usage within thirty (30) days after receipt of the disputing Owner's notice, then either Owner may submit the question to the Architect or other expert agreed to by the parties for its advice. The Architect or other expert agreed to by the parties shall advise the Owners concerning a resolution of the question within a reasonable period of time after the dispute has been submitted to the Architect or other expert.

40

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 47 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

7.8    **Change in Services or Obligations by Hotel Owner**.    At the time this Agreement is recorded, the Project has not been substantially completed.    If an Owner consistently fails to provide the types and level of performance required under **ARTICLE 7**, then upon written notice to the Defaulting Owner by an Owner for whose benefit a service is to be performed, such Owner may, but shall not be obligated, to assume any or all of the obligations of the Defaulting Owner under **ARTICLE 7** and to relieve the Defaulting Owner of those obligations.    If an Owner does in fact assume any or all of the obligations of the Defaulting Owner under **ARTICLE 7**, the Owner so electing to perform such obligations shall perform such obligations to the same standards as set forth under **ARTICLE 7**.    In no event shall the assumption of the obligations of the Defaulting Owner by another Owner constitute a waiver of any claims or remedies such Owner may have against the Defaulting Owner as a result of the failure to perform any such service(s).

## ARTICLE 8

## LIENS; COMPLIANCE WITH LAWS; USE; SIGNAGE; ENVIRONMENTAL AND ENGINEERING REVIEW

8.1    **Liens**.

(a)    Every Owner (the "*Liening Owner*") shall remove, within thirty (30) days after the filing thereof by a third party that is not an Owner, any mechanics', materialmen's, manager's or broker's or any other similar lien arising by reason of the acts of the Liening Owner, its agents and contractors or any work or materials or services for which the Liening Owner or its agents or contractors has contracted (i) against any other Owner's portion of the Land, or (ii) against its own portion of the Land, if the existence or foreclosure of such lien against its own portion of the Land, would adversely affect any other Owner (such other Owner in (i) or (ii) being the "*Impacted Owner*").

(b)    The Liening Owner shall not be required to remove such lien within thirty (30) days after its filing if within said thirty (30) day period,

(i)    such lien cannot be foreclosed, and

(ii)    the Liening Owner:

(A)    shall in good faith diligently proceed to contest the same by appropriate actions or proceedings and shall give written notice to the Impacted Owner of its intention to contest the validity or amount of such lien and

(B)    shall deliver to the Impacted Owner either:  (1) cash or a surety bond from a responsible surety company reasonably acceptable to the Impacted Owner in an amount equal to one hundred fifty percent (150%) of the lien claim and all interest and penalties then accrued thereon or such greater amount as may reasonably be required to assure payment

41

Order: 18000031623
Doc: 634644078 EAS 12-12-2006
Page 48 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

in full of the amount claimed plus all penalties, interest and costs which may thereafter accrue by reason of such lien claim or (2) other security or indemnity reasonably acceptable to the Impacted Owner's title insurance company and the Impacted Owner. An endorsement by the Impacted Owner's title insurance company over such lien claim to the Impacted Owner's title insurance policy shall be deemed an indemnity reasonably acceptable to the Impacted Owner, and shall satisfy the requirements of clause (2) above.

(c) In any event, a Liening Owner must remove or release such lien prior to entry of a final judgment of foreclosure on the Parcel or Owned Facilities of an Impacted Owner. If the Liening Owner fails to comply with the foregoing provisions of this **Section 8.1**, thereby becoming a Defaulting Owner, the Impacted Owner, thereby becoming a Creditor Owner, may take such action as the Creditor Owner may deem necessary to defend against or remove such lien. The Creditor Owner shall be entitled to payment from the Defaulting Owner for all costs and expenses (including reasonable attorneys' fees and litigation expenses, including appeals of any judgment or order) paid or incurred by the Creditor Owner in defending against, removing or attempting to remove or defend against such lien and may use any security delivered to the Creditor Owner for such purposes and for any other damages from Defaulting Owner's breach under **Section 8.1**.

8.2   **Compliance With Laws**.

(a) Each Owner, their respective Parcels and Improvements (including any and all exterior signage on any portion of the Property) shall comply at all times with all applicable Laws, including any obligation to maintain vault or sidewalk permits or licenses or any other permits or licenses. Each Owner shall be responsible for, and shall at all times maintain at its sole cost and expense, any and all vault and sidewalk permits or licenses related to any vault located immediately adjacent to and serving such Owner's Property, and each such Owner shall have the sole and exclusive right to use of any such underground vault areas located immediately adjacent to and serving such Owner's Property. The Retail Owner may seek to obtain, at its sole cost and expense, a permit or license for use of the sidewalk on the street level adjacent to the Property for an outdoor café or similar Retail Parcel operations.

(b) Each Project Owner shall comply with all rules, regulations and requirements of any insurance rating bureau having jurisdiction of the Project, or any portion thereof, or the requirements of any insurance coverage on any other Project Owner's portion of the Project if noncompliance by it with respect to its respective portion of the Project or any portion thereof would:

(i) Increase the premiums of any policy of insurance maintained by any of the other Project Owners or the premiums of any policy of insurance maintained by all Project Owners (unless the non-complying Project Owner pays all such increases), or

42

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

(ii)    render any other Project Owner's portion of the Project uninsurable, or

(iii)    create a valid defense to any other Project Owner's right to collect insurance proceeds under policies insuring such other Project Owner's portion of the Project; and

(c)    Each Owner shall deliver to the other Owners, within ten (10) business days after receipt, a copy of any written report, citation or notice affecting or relating to compliance of the Property with Laws to the extent such report, citation or notice will have an impact on another Owner's Parcel.

8.3    **Use.**

(a)    The Hotel Parcel shall be used only for a hotel project containing hotel guest rooms and/or commercial and office space, restaurants, gift shops, lobby spaces, conference centers, ballrooms, retail space and other hotel and ancillary uses, provided that the Hotel Parcel shall be maintained at all times in a first-class manner and such use within the Hotel Parcel shall be at all times consistent with uses within other first class mid-rise Hotel/office/retail projects in the City of Chicago.

(b)    The and the Parking Garage shall be used only as a parking area for parking of passenger vehicles and motorcycles and may be used as a public parking facility.

(c)    The Office/Annex Parcel shall be used only for lawful office uses and lawful retail uses.

(d)    The Retail Parcel shall be used for any lawful retail use.

(e)    Notwithstanding the foregoing, no portion of the Property shall be used for: (1) maintenance of any gambling or gaming activities; (2) the sale of guns or ammunition; (3) the sale or rental of any obscene or pornographic material (other than incidental sales of mainstream publications such as "Playboy Magazine" and in-room "adult" pay-per-view services) or drug-related paraphernalia; (4) any obscene, nude, or semi-nude live performances or nude modeling, or operation of a sex club of any sort; (5) any mortuary or funeral home; (6) a welfare office; (7) a walk-in health clinic (provided that this shall not limit the ability to operate a doctor's office or dental office); (8) a "99¢" or "Dollar" store; (9) a convenience store (i.e., "7/11"); (10) a repair shop; (11) a massage parlor or sex club; (12) a warehouse or storage facility; (13) a so-called "off-track betting" facility; (14) an abortion clinic; (15) a laundromat; or (16) a flea market.

(f)    Leases to any retail tenant (including retail tenants in the Retail Property, the Hotel Property and the Office/Annex Property) shall include tenant restrictions substantially similar to the following restrictions:

43

Order: 18000031623                                    Page 50 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

(i)    Tenant acknowledges Landlord's legitimate interest in preventing solicitation from and around the Premises and in, from and around the Property. Tenant agrees not to solicit or permit customer solicitation, canvassing or peddling by any persons stationed in or near the entrance to the Premises, in any Property lobby or common area, or otherwise in the immediate vicinity of the Property.

(ii)    Tenant must not obstruct or encumber any areas of the Property outside Tenants's Premises, nor use them for any purpose other than entering and leaving the Premises, except as may be expressly permitted by Landlord.

(iii)    Tenant must not cover or obstruct the sashes, sash doors, windows and doors that reflect or admit light into areas of the Property outside Tenant's Premises, nor shall Tenant place or permit parcels, bottles or other articles on the window sills. Tenant must not throw anything out of the doors or windows of the Premises.

(iv)    Tenant must not in any way deface any part of the Premises or the Property.

(v)    No bicycles, vehicles, animals, birds or fish shall be permitted in the Premises, except aids for the disabled.

(vi)    Landlord reserves the right to designate entrances and exits to the Property for use by Tenant's employees. Tenant's employees are required to leave the Property at their earliest convenience following the end of their work day. For security reasons, if they are leaving with a package, personal or otherwise, they must have a package pass from Tenant identifying the items being removed. From time to time, Property security may conduct random searches of packages.

(vii)    For health and safety reasons and to comply with applicable laws, smoking is prohibited in various areas of the Property. Tenant's employees are not permitted to smoke within those areas or within the Premises.

(viii)    Employees must cooperate with Property security personnel who are making inquiries or conducting inspections. They must be aware of and must report to Tenant or to Property security any person or activity that looks suspicious such as smoke or fire, vandalism, loitering or fighting.

(ix)    Landlord reserves the right to bar any of Tenant's employees from the Property for any of the following behavior:

(A)    Fighting or gambling on the Property grounds.

(B)    Drunkenness or drinking while on duty.

44

CHGO2\40126644.12

(C)    Consumption, possession or sale of illegal drugs while on duty.

(D)    Carrying a gun or other concealed weapon on Property grounds, unless licensed to do so under applicable law.

(E)    Failure to obey any published Property parking regulations.

(F)    Racial, sexual or other forms of harassment while on Property grounds.

8.4    **Exterior Signage/Visible Window Treatments/Satellite Dishes and Antennae**.

(a)    Retail Owner may install, Maintain, repair and replace all necessary or desirable tenant trade signage on the Retail Parcel Façade, provided that such signage shall at all times comply with the Signage Criteria (defined below). In addition, the Retail Owner shall be permitted to install, Maintain, repair and replace the exterior advertising signage referred to in **Sections 3.2(l)** (in accordance with the terms and conditions set forth in such Section). The Retail Owner or its tenants shall pay for and obtain and maintain in effect all permits and licenses necessary to install, permit and use such signs pursuant to this **Section 8.4(a)**.

(b)    Hotel Owner, Office/Annex Owner and Retail Owner shall discuss directional and informational signage at the Parking Garage entrance, as well as signage identifying the Hotel, provided that such signage shall at all times comply with the Signage Criteria, and further provided that, subject to Hotel Owner's reasonable approval right as to exterior Building signage, the Retail Owner shall make all determinations as to exterior signage for the Property. The Hotel Owner or its tenants shall pay for and obtain and maintain in effect all permits and licenses necessary to install, permit and use such signs pursuant to this **Section 8.4(b)**.

(c)    The Office/Annex Owner may install, maintain and operate signs on the Office/Annex Parcel Façade, provided that such signage shall at all times comply with the Signage Criteria. The Office/Annex Owner or its Permittees shall pay for and obtain and maintain in effect all permits and licenses necessary to install, permit and use such signs pursuant to this **Section 8.4(c)**. The Hotel Owner may temporarily remove such signs during any period it is cleaning, repairing, painting, replacing or otherwise maintaining the Façade (provided that the duration of such removal shall not exceed seventy-two (72) hours, and further provided that the Hotel Owner shall provide at least forty-eight (48) hours advance notice to the Retail Owner prior to removing any such signage), or if ordered to remove such signs by the City or any other governmental or quasi-governmental agency or authority having apparent authority to order such removal.

(d)    The Hotel Owner may install, Maintain and operate signs on the Hotel Parcel Façade, provided that such signage shall at all times comply with the Signage Criteria. The Hotel Owner or its Permittees shall pay for and obtain and maintain in

45

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 52 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

effect all permits and licenses necessary to install and operate any such signage permitted by this **Section 8.4(d)**.

(e)    Any and all signage permitted by this **Section 8.4**, must also comply with the following requirements (the "*Signage Criteria*"):

(i)    all exterior Building signs and awnings must comply with applicable Law;

(ii)    all signs and awnings must be installed, maintained and operated in a first-class manner; and

(iii)    all signs and awnings must be professionally installed, designed and fabricated.

8.5    **Environmental and Engineering Review**.  Each Project Owner ("*Inspecting Owner*") shall have the right in certain instances listed below to obtain from an environmental engineer or an inspecting architect or engineer of the Inspecting Owner's choice and at the Inspecting Owner's own cost and expense, an audit, review, assessment or report (each referred to as a "*Review*") relating to any or all of the Project, which Review may include tests or inspections of the other Project Owner's Parcel, as part of such Review.  The Inspecting Owner shall use reasonable efforts to minimize the disruption of the other Project Owners' operation of business or use in its Parcel and shall repair any damage to property of the other Project Owners caused by a Review.  The instances when a Project Owner may obtain a Review necessitating tests or inspections of the other Project Owner's portion of the Project are:

(a)    if the Inspecting Owner has entered into or will enter into a contract to sell, lease, finance or refinance its Parcel (or any direct or indirect interest therein) in which a requirement of said contract is a Review; or

(b)    if the Inspecting Owner's then current Mortgagee has requested a Review; or

(c)    if a Review is required by Laws; or

(d)    if the Inspecting Owner, in good faith believes that the another Project Owner may have breached the provisions of **Section 8.2** as it relates to the matters which could be disclosed by a Review or that the Inspecting Owner may be adversely affected or subject to liability, as a result of matters which could be disclosed by a Review.

## ARTICLE 9

## REAL ESTATE TAXES

9.1    **Separate Real Estate Tax Bills**.  The Hotel Owner, the Retail Owner and the Office/Annex Owner will obtain from the Assessor separate real estate tax parcel identification numbers and separate real estate tax bills for the Hotel Parcel, the Retail Parcel and the

46

Office/Annex Parcel. The cost of performing such division (including all legal and consulting fees associated therewith) shall be divided between the Hotel Owner, the Retail Owner and the Office/Annex Owner in accordance with the Approved Division. If the Assessor or any other Owner requests information or advice from an Owner to allocate the assessed valuation for land or improvements (other than information relating to income or expenses of an Owner's property) such Owner shall so notify the other Owners, and the Owners shall consult and reasonably cooperate with one another regarding such information and advice to be furnished to the Assessor.

9.2   **Payment of Real Estate Tax Bills.**

(a)   **Allocation of Real Estate Taxes.** At any time separate real estate tax bills are issued for the Hotel Parcel, the Retail Parcel and the Office/Annex Parcel, each of the Owners shall pay the tax bill or bills allocable to such Owner's Property before delinquent. It is acknowledged by all of the Owners that the Office/Annex Property is currently separately assessed and taxed and that the Office/Annex Owner shall pay all real estate taxes allocable to the Office/Annex Property before such amounts become delinquent. Until the Hotel Property and the Retail Property are separately assessed and taxed, each of the Hotel Owner and the Retail Owner shall pay a percentage of the total real estate taxes and special assessments levied by the Cook County Collector against the Hotel Property and the Retail Property before delinquent in accordance with the following percentages: (i) Hotel Owner, 91.8%; and (ii) Retail Owner, 8.2%.

(b)   **Payments of Taxes.** Until the Hotel Property and the Retail Property are separately assessed and taxed, each of the Hotel Owner and the Retail Owner shall pay its percentage of the total real estate taxes and special assessment, assessed and levied against the Property determined as provided in **Section 9.2(a)** above, as follows. If Retail Owner receives a tax bill, Retail Owner shall forward same immediately to the Hotel Owner. The Hotel Owner shall notify the Retail Owner of the amount owed by the Retail Owner on account of real estate taxes, calculated pursuant to **Section 9.2(a)** above. Within fifteen (15) days after receipt of such tax bills, the Retail Owner shall deliver to the Hotel Owner a check made payable to the Cook County Collector (in accordance with all requirements of the Cook County Collector in terms of form of payment) for its allocable share, as set forth in the foregoing paragraph, of all tax bills levied against the Hotel Property and Retail Property. The Hotel Owner shall forward such checks together with payment of the Hotel Owner's allocable share of such tax bills to the Cook County Collector and shall forward a copy of the paid receipt to the Retail Owner when received.

(c)   **Tax Protests.** Until separate tax bills are obtained, the Hotel Owner may, and upon the reasonable good faith request of the Retail Owner or the Office/Annex Owner shall, in good faith and with reasonable diligence, attempt to obtain a reduced assessed valuation of the Property, protest taxes or take other action for the purpose of reducing real estate taxes thereon with respect to any period that the Hotel Property and the Retail Property and the Office/Annex Property are not separately assessed and taxed. The Hotel Owner agrees to consult with the Retail Owner and the Office/Annex Owner in this regard. In such event, the Retail Owner and the Office/Annex Owner shall

47

CHGO2\40126644.12

reasonably cooperate with the Hotel Owner in such attempt and shall share in the costs (including attorneys' fees) incurred in proportion to its share of the real estate taxes calculated as provided in **Section 9.2(a)** above. If it is anticipated that the Hotel Owner will bear any fees of attorneys, appraisal fees or tax consultants, the fee arrangements in connection with the tax protest shall be subject to the written approval of the Retail Owner and the Office/Annex Owner, which approval shall not be unreasonably withheld. Any tax refund received as a result of such action shall be apportioned between the Owners based on the reduction in assessed valuations obtained or other equitable allocation. Each Owner shall have the independent right to protest taxes and other charges to the extent the same affect only such Owner's portion of the Property, at any time such portions of the Property are separately assessed and taxed.

(d)    **Failure to Pay Real Estate Taxes**. If any Owner shall fail to pay any tax or other charge, or share thereof, which is due and which such Defaulting Owner is obligated to pay pursuant to this ARTICLE 9, and the failure to pay same results in the imposition of a lien on, or forfeiture or foreclosure of, any other Owner's portion of the Property, or subjects any other Owner to personal liability for this obligation, then the Creditor Owners may, after at least ten (10) days written notice to the Defaulting Owner, pay such tax or charge, or share thereof, together with any interest and penalties thereon, and the Defaulting Owner shall, upon demand, reimburse the Creditor Owners for the amount of such payment, including the amount of any interest or penalty payments thereon, with interest thereon as hereinafter provided, and the Creditor Owners shall also have a lien against the Defaulting Owner's portion of the Property in accordance with ARTICLE 12 hereof.

(e)    **Reference to Taxes in Leases or Contracts**. For purposes of this Agreement and any documents or instruments, such as leases for space in the Retail Property or the Office/Annex Property or unit purchase contracts with prospective purchasers buying units in a Condominium referring to the allocation of real estate taxes pursuant to this Agreement, the real estate taxes allocated to a portion of the Building shall mean those taxes assessed and payable with respect to such portion of the Building, as provided in this ARTICLE 9.

## ARTICLE 10

## INSURANCE

10.1    **Insurance Required**. The Hotel Owner shall procure and shall at all times maintain the insurance prescribed by this ARTICLE 10.

(a)    **Real and Personal Property**.

(i)    The Hotel Owner shall keep the Project and Facilities insured for no less than "all risk" or "special form" coverage for an amount not less than one hundred percent (100%) of the insurable replacement cost thereof. In addition, at the discretion of Office/Annex Owner and the Retail Owner, such coverage shall

48

exclude from such insurance improvements or betterments and personal property owned by tenants or others. Such coverage may be procured by Hotel Owner as part of a blanket insurance policy insuring the Property and additional property owned by Hotel Owner or one of its Affiliates.

(ii)    Initially, the costs of such coverage shall be allocated in accordance with the Approved Division among the Hotel Parcel, the Office/Annex Parcel and the Retail Parcel by the Owners together with the provider of the insurance. The Office/Annex Owner shall pay the portion of the insurance premium allocated to the Office/Annex Parcel. The Hotel Owner shall pay the portion of the insurance premium allocated to the Hotel Parcel. The Retail Owner shall pay the portion of the insurance premium allocated to the Retail Parcel.

(b)    **Public Liability**. Hotel Owner shall:

(i)    insure against public liability claims and losses on a commercial general liability form of insurance with broad form coverage endorsements covering claims for personal and bodily injury, or property damage occurring in, on, under, within, upon or about the Project, or as a result of operations thereon (including contractual liability covering obligations created by this Agreement including, but not limited to, indemnity obligations contained herein, if any), in all events for limits, as to each Owner and its portion of the Project, of not less than $5,000,000 combined single limit for personal and bodily injury or property damage and with an amount of not less than $5,000,000 of umbrella coverage (such coverage may be procured by Hotel Owner as part of a blanket liability insurance policy held by Hotel Owner or one of its Affiliates), and

(ii)    maintain automobile liability insurance for owned, non-owned and hired vehicles, each coverage in such amounts as may be required by Law and as may from time to time be carried by prudent owners of first-class mixed use buildings in the City of Chicago, Illinois, but in all events for limits, as to each Owner and its portion of the Project, of not less than $5,000,000 combined single limit for personal and bodily injury or property damage and with an amount of not less than $5,000,000 of umbrella coverage (such coverage may be procured by Hotel Owner as part of a blanket automobile liability insurance policy held by Hotel Owner or one of its Affiliates).

(iii)    The share of the costs of the insurance set forth in clause (i) above for each Project Owner shall be divided in accordance with the Approved Division; provided, however, if an Owner's use of such Owner's Parcel is such that the cost of insurance related to any portion of the such Owner's Parcel is greater than the cost related to the other Parcels, such Owner shall also pay the incremental difference allocable to the higher insurance cost related to such Owner's Parcel. The cost of the insurance set forth in clause (ii) above shall be borne by the Hotel Owner alone.

49

(c)    **Boiler and Machinery**  To the extent any of the following comprise any of the Hotel Parcel Improvements, Hotel Owned Facilities, Office/Annex Parcel Improvements, Office/Annex Owned Facilities, Retail Parcel Improvements or Retail Owned Facilities, Hotel Owner shall insure boiler and machinery risks, on a comprehensive, blanket basis covering the Hotel Parcel, Hotel Parcel Improvements, Hotel Owned Facilities, Office/Annex Parcel, Office/Annex Parcel Improvements, Office/Annex Owned Facilities, Retail Parcel, Retail Parcel Improvements and Retail Owned Facilities, respectively, and all equipment, machinery and apparatus consisting of, but not limited to, boilers, heating apparatus, fired and unfired pressure vessels, air conditioning equipment, miscellaneous electrical apparatus and their appurtenant equipment on a repair or replacement basis in and for an amount reasonably determined from time to time by the Hotel Owner, Office/Annex Owner and Retail Owner.

(d)    **Flood and Earthquake**.  Hotel Owner may, in addition to "all risk" property insurance required under **Section 10.1(a)** above, insure the Project against earthquake and flood risks in an amount equal to the replacement cost thereof or such lesser amount as then may be reasonably available in the insurance market; both subject, however, to deductibles available and reasonable for such types of insurance.

(e)    **Additional Insurance Requirements**.  Each Owner shall also procure any other insurance required by such Owner's Mortgagee, provided that the Owner whose Mortgagee requires such insurance shall bear one hundred percent (100%) of the cost of such insurance.

10.2    **Insurance Companies**.  Insurance policies required by **Section 10.1** hereof shall be purchased from reputable and financially responsible insurance companies, taking into consideration the nature and amount of insurance required, who shall hold a current Policyholder's Alphabetic and Financial Size Category Rating of not less than A/XIV according to Best's Insurance Reports or a substantially equivalent rating from a nationally-recognized insurance rating service.

10.3    **Insurance Provisions**.  Each policy described in **Section 10.1** hereof:

(a)    shall provide that the knowledge or acts or omissions of any insured party shall not invalidate the policy as against any other insured party or otherwise adversely affect the rights of any other insured party under any such policy;

(b)    shall insure as "additional named insureds" each of the other Project Owners and their respective Mortgagees;

(c)    shall provide (except for liability insurance described in **Section 10.1(b)**, for which it is inapplicable) by endorsement or otherwise, that the insurance shall not be invalidated should any of the insureds under the policy waive in writing prior to a loss any or all rights of recovery against any party, for loss occurring to the property insured under the policy, if such provisions or endorsements are available and provided that such waiver by the insureds does not invalidate the policy or diminish or impair the insured's

50

ability to collect under the policy, or unreasonably increase the premiums for such policy unless the party to be benefited by such endorsement or provision pays such increase;

(d)    shall provide, except for liability insurance required by **Section 10.1(b)**, that all losses payable thereunder shall be paid to the Depositary (to be disbursed to each Owner or its Mortgagee pursuant to the terms of this Agreement) in accordance with the terms of **ARTICLE 18** hereof, unless the Project Owners otherwise agree, subject to the consent of each Mortgagee with respect to losses payable its borrower Owner;

(e)    shall provide for a minimum of thirty (30) days' advance written notice of the cancellation, nonrenewal or material modification thereof to Mortgagees and all insureds thereunder;

(f)    shall include a standard mortgagee endorsement and loss payable clause in favor of the Mortgagees reasonably satisfactory to them;

(g)    shall not include a co-insurance clause;

(h)    shall provide coverage on an occurrence basis, rather than a claims made basis; and

(i)    may be maintained in whole or part in the form of a blanket policy covering other locations provided that such insurance must be made specifically applicable to the Parcel and/or Improvements to be insured on a per location basis and must otherwise comply in all respects with the provisions of this **Section 10.3**.

10.4    **Limits of Liability.**  Insurance specified in this **ARTICLE 10** or carried by the Hotel Owner shall be jointly reviewed by the Project Owners periodically at the request of any Project Owner, but no review will be required more often than annually to determine if such limits, deductible amounts and types of insurance are reasonable and prudent in view of the type, place and amount of risk to be covered and the financial responsibility of the insurers, and to determine whether such limits, deductible amounts and types of insurance comply with the requirements of all applicable statutes, laws, ordinances, codes, rules, regulations, or orders and whether on a risk management basis, additional types of insurance or endorsements against special risks should be carried or whether required coverages or endorsements should be deleted. Initially, deductible amounts for insurance required under **Section 10.1(a)** and **Section 10.1(c)** shall not exceed $50,000 (in 2006 Equivalent Dollars, as hereinafter defined). Deductible amounts for insurance required under **Section 10.1(b)** shall not be more than is reasonable considering the financial responsibility of the insured. Such limits shall be increased or decreased, deductible amounts increased or decreased or types of insurance shall be modified, if justified, based upon said review, and upon any such increase, decrease or modification, the Project Owners shall, at any Project Owner's election, execute an instrument in recordable form confirming such increase, decrease or modification, which any Project Owner may record with the Recorder as a supplement to this Agreement; provided, that no agreement regarding a decrease in limits of liability, increase in deductible amounts or elimination of any types of coverages shall be effective without the written consent of all of the Project Owners and their

51

respective Mortgagees. With the consent of all Project Owners, the Project Owners may employ an insurance consultant or the Adjuster (as defined below) to perform such review on their behalf or to administer insurance-related matters, and the cost of employing any such consultant (or the Adjuster) shall be shared by the Project Owners in the ratio their annual insurance premiums for joint policies of insurance required hereunder bear to each other.

10.5    **Renewal Policies**.    Copies of all renewal insurance policies or binders with summaries of coverages afforded and evidencing renewal shall be delivered by Hotel Owner to the other Project Owners and to the Mortgagees at least ten (10) days prior to the expiration date of any such expiring insurance policy. Binders shall be replaced with certified full copies of the actual renewal policies as soon as reasonably possible. Should Hotel Owner fail to provide and maintain any policy of insurance required under this **ARTICLE 10** or should any Project Owner fail to pay its share of the premiums or other costs for any joint policies, then the other Project Owners may purchase such policy and the costs thereof (or the Defaulting Owner's share of such costs) shall be due from the Defaulting Owner within ten (10) days after the Creditor Owners' written demand therefor.

10.6    **Waiver**.    Provided that such a waiver does not invalidate the respective policy or policies or diminish or impair the insured's ability to collect under such policy or policies or unreasonably increase the premiums for such policy or policies unless the party to be benefited by such waiver pays such increase, and without limiting any release or waiver of liability or recovery contained elsewhere in this Agreement, each Project Owner hereby waives all claims for recovery from the other Project Owners for any loss or damage to any of its property insured (or required hereunder to be insured) under valid and collectible insurance policies to the extent of any recovery collectible (or which would have been collectible had such insurance required hereunder been obtained) under such insurance policies; provided any deductible amounts shall be borne by the Project Owner whose act or omission caused the event out of which the claim arose, and if no fault can be attributed, then any deductible shall be shared in accordance with the Approved Division.

10.7    **Supplental Insurance Coverage**.    Notwithstanding anything to the contrary contained herein, each Owner shall be permitted to obtain at its sole cost and expense supplemental or additional insurance coverage above and beyond the limits specified in this Agreement.

10.8    **Monetary Adjustment (Equivalent Dollars)**.    For purposes of this Agreement, "*2006 Equivalent Dollars*" means the equivalent purchasing power at any time of the value of the same number of U.S. Dollars in calendar year 2006. The 2006 Equivalent Dollars of any amount shall be determined by multiplying said amount by one (1) plus a fraction (expressed as a percentage, but not less than zero), the numerator of which is the difference obtained by subtracting (i) the Consumer Price Index for January, 2006 from (ii) the monthly Consumer Price Index (as hereinafter defined) last published prior to the date of such determination, and the denominator of which is the Consumer Price Index for January, 2006. As used herein, the term "*Consumer Price Index*" shall mean the Consumer Price Index for Urban Wage Earners and Clerical Workers, Chicago, Gary, Lake County, IL-IN-WI All Items (Base Year 1982-4 = 100) for the applicable month published by the Bureau of Labor Statistics of the United States

52

Department of Labor or similar index agreed to by the Owners if such index is no longer available.

## ARTICLE 11

## MAINTENANCE AND REPAIR; DAMAGE

11.1 **Maintenance of Hotel Parcel Improvements, Office/Annex Parcel Improvements and Retail Parcel Improvements; Restoration**.

(a)     Except as expressly provided in **ARTICLE 7** hereof (and related Exhibits) relating to Maintenance of certain Facilities and areas of the Hotel Parcel, Retail Parcel and Office/Annex Parcel, or hereinafter in this **ARTICLE 11**, the Hotel Owner, Retail Owner and Office/Annex Owner shall, at their respective sole cost and expense, maintain and keep their respective Parcels and Improvements, including all Facilities located in their respective Parcels and Improvements and all Owned Facilities owned by such Owners, respectively, in good order and condition, comparable to other Class A "first class" mixed-use hotel projects with associated parking in downtown Chicago, and shall make all repairs or replacements of, in, on, under, within, upon or about such property, whether said repairs or replacements are to the interior or exterior thereof, or structural or non-structural components thereof, or involve ordinary or extraordinary repairs or replacements, necessary to keep the same in Class A "first class" order and condition, howsoever the necessity or desirability thereof may arise, and whether or not necessitated by wear, tear, obsolescence, defects or otherwise. Each Owner further agrees that it shall not suffer or commit, and shall use all reasonable precautions to prevent waste to its respective Parcels or Improvements. In the event that any Law or any governmental or quasi-governmental agency requires Façade or party wall Maintenance, repair or replacement, and if any Owner fails to perform any such required Maintenance, repair or replacement and another Owner exercises its Self-Help rights pursuant to Section 12.9 below to perform such Façade or party wall Maintenance, repair or replacement, the performing owner shall be entitled to receive from such non-performing Owner a ten percent (10%) surcharge on the cost incurred by such performing Owner of the Façade or party wall Maintenance, repair or replacement work necessary to comply with any such Law or requirement of any such governmental or quasi-governmental authority. Notwithstanding anything to the contrary contained herein: (1) the costs allocable to the Property for Maintenance, repair or replacement of the party wall or any portion thereof (whether affecting only one Parcel or more than one Parcel) shall be shared between the Owners bounding any such party wall on a 50%/50% basis; and (2) the Hotel Owner shall perform, and shall bear one hundred percent (100%) of the costs and expenses related to, all Maintenance, repair and replacement of the roof of the Building; provided, however, that if the Retail Owner causes any damage to the roof of the Building in connection with any exercise of its easement rights under this Agreement, the Retail Owner shall indemnify, defend and hold harmless the Hotel Owner for any costs and expenses in connection with the repair and restoration of the portion of the roof so damaged; and further provided that if in the performance of any roof Maintenance, repair

CHGO2\40126644.12

or replacement work the Hotel Owner is required to access roof areas that require the temporary removal of any antennas, signage, utility Facilities or any other rooftop Facilities or equipment installed by or through the Retail Owner pursuant to an easement right granted in this Agreement, the Hotel Owner shall (A) provide ten (10) business days advance notice to the Retail Owner, (B) provide an alternate location on the roof for the temporary relocation of such Facilities during such work (unless such work is of the nature that temporary relocation is not feasible-such as removal of the entire Building roof-in which case the Hotel Owner shall provide a location for the safe storage of such antennas, signage, utility Facilities or other rooftop Facilities or equipment), (C) promptly upon completion of any such Maintenance, repair or replacement work notify the Retail Owner such that the Retail Owner may reinstall any such Facilities or equipment in the same location and to the same standards and specifications to which such Facilities and equipment were originally installed and (D) if the Hotel Owner causes any damage to such Facilities or equipment in connection with any such work, the Hotel Owner shall indemnify, defend and hold harmless the Retail Owner for any costs and expenses in connection with the repair and restoration of the Facilities or equipment so damaged.

(b)    In the event of damage by fire or other casualty in which the Project Owner or Project Owners, as the case may be, elects or elect to repair and restore the Project in accordance with the provisions of this **ARTICLE 11**, such repair and restoration shall be conducted so as to repair and restore the Project as nearly identical to the Project as constructed prior to such damage as commercially practicable and substantially according to the Renovation Plans.   Any material deviation from the condition and specifications existing as of the date of this Agreement shall be deemed an "Alteration" governed by the provisions of **ARTICLE 16**.

11.2    <u>**Damage Affecting Only One Parcel of the Project**</u>.

(a)    If any one Parcel of the Project is damaged by fire or other casualty and such damage occurs within the Improvements of such Parcel only and does not affect any other Parcel of the Project or the Improvements thereon (or any Owned Facilities located within the damaged Parcel), then any such damage shall be repaired and restored by the Project Owner of such damaged Improvements in as timely a manner as practicable under the circumstances, and if such Parcel is then encumbered by a Mortgage, the insurance proceeds will be delivered to the Mortgagee (if and to the extent required in such Mortgage) to be disbursed in accordance with the Mortgage (and, if not required to be delivered to Mortgagee pursuant to any such Mortgage, such proceeds will be delivered to the Depositary, in which event such Project Owner shall, in accordance with and subject to the provisions of **ARTICLE 19** hereof, be entitled to withdraw any insurance proceeds (including deductible amounts and self-insurance amounts) held by the Depositary by reason of any such damage, for application to the cost and expense of the repair and restoration of any such damage).

If any Parcel of the Project is substantially damaged by fire or other casualty, the Owner of the damaged Parcel shall have the obligation to rebuild its respective Parcel if the failure to rebuild its respective Parcel would have a material adverse impact on the

54

operation and/or value of one or more of the other Parcels.  In addition, the Owner of any such damaged space shall use commercially reasonable efforts to market and re-let such space as soon as practicable following the restoration of such space.

(b)   If at any time any Project Owner so obligated to repair and restore such damage shall not proceed diligently with any repair or restoration obligation hereunder, and such failure adversely and materially affects an Easement in favor of the other Owner or Owners or services to be furnished to the other Owner or Owners under **ARTICLE 7** hereof, then (i) the Creditor Owners may give written notice to the Defaulting Owner specifying the respect or respects in which such repair or restoration is not proceeding diligently and, if, upon expiration of thirty (30) days after the receipt of such notice, any such work of repair or restoration is still not proceeding diligently, then the Creditor Owners may perform such repair and restoration and may take all appropriate steps to carry out the same; or (ii) in an Emergency Situation, the Creditor Owners may immediately perform such repair or restoration and may take all appropriate steps to carry out the same.  The Creditor Owners in so performing such repair and restoration shall, subject to the rights of the Defaulting Owner's Mortgagee, if any, and in accordance with **ARTICLE 19** hereof, be entitled to withdraw any insurance proceeds and any other monies held by the Depositary as a result of any such damage for application to the cost and expense of any such repair or restoration, and shall also be entitled to reimbursement upon demand from Defaulting Owner for all reasonable costs and expenses incurred by Creditor Owners in excess of said insurance proceeds.

(c)   Repair and restoration under this **Section 11.2** shall constitute Alterations, except that the Project Owner performing the repair and restoration shall not be required to obtain the other Owners' consent if such consent would not otherwise be required under **ARTICLE 16**.  Any such repair and restoration under this Section 11.2 shall be performed in a manner so that the damaged Improvements are rebuilt in a manner such that they are equivalent to the condition of said Improvements prior to the casualty, unless prohibited by law or unless all Owners (and their Mortgagees, if and to the extent required by such Mortgagee's Mortgage) otherwise agree.

11.3   **Joint Damage**.

(a)   If any Parcel of the Project is damaged by fire or other casualty and such damage occurs within the Improvements (including without limitation any Structural Supports) of more than one Parcel of the Project or which affects more than one Parcel of the Project or the Improvements on more than one Parcel of the Project, then the repair and restoration of such damage shall be the joint responsibility of the Project Owners in whose Parcels the damage occurs or whose Improvements or Facilities are damaged (the "*Affected Owners*").  Said repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable and shall be performed on behalf of the Affected Owners by a contractor or contractors jointly selected by the Affected Owners, from contractors who are licensed to do business in the State of Illinois and who have substantial experience in the construction and renovation of properties of similar age and type of construction; provided, however, if the damage to one Parcel is substantial and

55

the damage to and impact upon another Parcel is insubstantial or minor, the Owner of the Parcel who has suffered substantial damage shall be entitled to select the contractor and control the restoration. Participation by an Affected Owner in selecting an Architect or contractor shall be limited to the selection of the Architect preparing plans and specifications for, and the contractor performing repair or restoration of, its Improvements or Facilities so damaged. The term "substantial" as used in this Section 11.3(a) shall mean damage costing $200,000 (in 2006 Equivalent Dollars) or more to repair. If required by any Mortgage, the Mortgagee shall also be required to approve any Contractor or Architect required to be approved by any Owner whose Parcel is subject to any such Mortgage.

(b)     In the event the Affected Owners (and, if applicable, their respective Mortgagees, if and to the extent required under any such Mortgagee's Mortgage) fail to agree upon the selection of a contractor or contractors, the Affected Owners shall request the advice of the Architect.

(c)     The plans and specifications for such repair and restoration shall be prepared by the Architect, unless the Affected Owners otherwise agree upon another person or entity to prepare them in accordance with instructions given by all Affected Owners. Such plans and specifications shall provide for the damaged Improvements to be rebuilt as nearly identical as commercially practicable to the Improvements as constructed prior to the damage, unless prohibited by law. Notwithstanding anything to the contrary contained herein, (i) if there is damage to more than one Owner's Property as a result of fire or other casualty, and if damage to the Hotel Property is equal to or greater than Two Million Dollars ($2,000,000) (or the total damage to the Hotel constitutes at least fifty percent (50%) of the total damage to the Property) as a result of any such fire or event of casualty, the Hotel Owner shall have the right to coordinate the repair and restoration of the shared portions of the Project and shall have the right to select the Architect and contractor for the performance of any such work relating to shared systems or structural elements serving more than one Parcel; and (ii) with respect to any joint damage, each Owner shall have the right to perform and control all work solely affecting such Owner's Parcel (as well as selecting the architect and contractors in connection with the performance of such work) except for work which affects base building systems. All such work relating to the shared Building systems shall be performed promptly and in a good and workmanlike fashion to restore the project to as near as possible the condition that existed immediately prior to such fire or other event of casualty.   In the event that the Hotel Owner fails to promptly perform such work, each of the other Owners shall have the self-help rights set forth in **Section 12.9** below in connection with the performance of any such work.

(d)     The Architect (or other architect or engineer preparing the plans and specifications) shall furnish to each of the Affected Owners a set of the plans and specifications which it has prepared or caused to be prepared. Unless the Affected Owners otherwise agree, any contractor or contractors shall work under the supervision of the Architect (or other architect or engineer preparing the plans and specifications), and the Architect (or other architect or engineer preparing the plans and specifications) is

56

CHGO2\40126644.12

hereby authorized and directed to instruct the Depositary, from time to time, but only with the prior approval of the Affected Owners, as such repair and restoration progresses, to disburse in accordance with **ARTICLE 19** hereof, the insurance proceeds (including deductible and self-insured amounts) held by the Depositary and any other monies deposited with the Depositary, pursuant to **Section 11.5** hereof for application against the cost and expense of any such repair and restoration.

(e)     Notwithstanding anything to the contrary contained in this Agreement, in the event that the Depositary receives proceeds of insurance or any condemnation Award, the Depositary shall cause to be made a determination of the portion of such proceeds attributable to each Parcel, and upon such determination Depositary shall pay to the Owner of each such Parcel its allocable share (the "**Applicable Project Owner's Share**") of such proceeds. The Depositary shall be entitled to rely exclusively on the determination of an insurance adjuster (the "**Adjuster**") in making any determinations under this Agreement regarding the Applicable Project Owner's Share of such proceeds. The Adjuster shall be selected by the Owners, subject to the approval of their respective Mortgagees. The determination as to the allocation of insurance proceeds as between the affected Parcels shall be made by the Adjuster in its sole but reasonable discretion, and shall be based on the extent of the damage suffered by each affected Parcel in proportion to the total damage suffered by the Property.

11.4     **Cost of Repairs**. If the cost and expense of performing any repair and restoration provided for in **Section 11.3** hereof shall exceed the amount of available insurance proceeds paid by reason of the damage, including deductible, then such excess cost and expense (or the entire amount of such cost and expense, if there be no insurance proceeds) shall be borne by the Project Owners:

(a)     In proportion to the Approved Division.

(b)     Notwithstanding the foregoing, if a Project Owner (not entitled to self-insure) has not carried the insurance required under **ARTICLE 10** and, therefore, is a Defaulting Owner, then such Defaulting Owner shall pay the costs and expenses not covered by insurance which another Project Owner is obligated to pay which would not have been payable by such Project Owner if proper insurance had been carried by the Defaulting Owner to the extent of the amount which would have been available as insurance proceeds had such Defaulting Owner carried the required insurance.

11.5     **Deposit of Costs**.

(a)     In any instance of repair or restoration pursuant to **Section 11.3** hereof, any Project Owner may require that an estimate of the cost or expense of performing such repair or restoration be made by a reputable independent professional construction cost-estimating firm, unless a construction contract providing for the performance of such repair and restoration at a stipulated sum or a guaranteed maximum price has theretofore been executed. If said estimate, stipulated sum guaranteed maximum price or actual amount incurred in performing repair or restoration exceeds the amount of insurance

CHGO2\40126644.12

proceeds, if any, paid or payable by reason of the damage, then any Project Owner may at any time give notice to the other Project Owners demanding that each Project Owner deposit with the Depositary the amount of such excess cost and expense attributable to each Project Owner pursuant to **Section 11.4**. Any Project Owner maintaining deductible amounts shall deposit the deductible amounts.

(b)     In lieu of depositing its share of such excess amount or such self-insured or deductible amount based upon said estimate or stipulated sum, or actual cost and expense of performing such repair or restoration, a Project Owner may deliver to the Depositary security for payment of its share reasonably acceptable to the other Project Owners, the Depositary and any Mortgagees of the Project Owners. Such security may be in the form of, but shall not be limited to, an irrevocable and unconditional letter of credit in favor of the Depositary in the face amount of the share owed, or an irrevocable, unconditional loan commitment, satisfactory to the other Project Owners and their respective Mortgagees, issued by a responsible lending institution, to disburse an amount equal to such Project Owner's share of such excess, self-insured or deductible amount to the Depositary to pay the cost and expense of any such repair or restoration as the work progresses, in proportion to such Project Owner's share of the cost and expense of any such repair or restoration. If the amount of the security required is based on an estimate of the cost and expense of repair and restoration, then the amount of security required to be deposited or available shall be readjusted upward or downward as the work progresses based on actual cost and expenses of the work.

(c)     If a Project Owner shall fail to pay, or, as the case may be, deposit, such Project Owner's share of the cost and expense (or estimated cost and expense) of performing any repair or restoration in accordance with this **Section 11.5**, or fails to deliver the security provided for above within thirty (30) days after receipt of the other Project Owners' written demand therefor, then the Creditor Owners may pay the Defaulting Owner's share and the Defaulting Owner shall, upon written demand, reimburse the Creditor Owners for such payment and the Creditor Owners' reasonable costs and expenses incurred in connection with such payment.

11.6     **Excess Insurance Proceeds**. Upon completion of the repair and restoration of any damage to the Project any remaining insurance proceeds paid by reason of such damage shall, subject to the provisions of **Section 22.12**, be refunded to each Project Owner in proportion to the ratio that the insurance proceeds contributed by such Project Owner or by such Project Owner's insurance company bears to the total insurance proceeds made available by the insurer for the repair and restoration. For purposes of this **Section 11.6**, insurance proceeds include deductible amounts, amounts contributed by a self-insured Project Owner, and other amounts contributed by a Project Owner pursuant to **Section 11.5**.

11.7     **Agreement Not to Repair**. If the Improvements on each Parcel of the Project are destroyed or substantially damaged, and all of the Project Owners (in compliance with the requirements of the Act, if all of the Hotel Parcel, the Retail Parcel or the Office/Annex Parcel, as the case may be, has been submitted to the Act) agree in writing not to rebuild, repair or restore the Project, subject to the written approval of the Mortgagees, it is the intent of the

58

CHGO2\40126644.12

Project Owners that the insurance proceeds shall be shared (but only to the extent specified herein below in this **Section 11.7**). Upon agreement not to rebuild, the Project shall be demolished. In such event, the available insurance proceeds, other than insurance proceeds used to cause said demolition to be performed, shall be refunded to each Project Owner in the same ratio of insurance proceeds contributed by such Project Owner or by such Project Owner's insurance company to the total insurance proceeds paid by reason of such damage. If the Project Owners agree not to rebuild, repair or restore the Project, subject to the written approval of the Mortgagees, the rights of each of the Project Owners to receive its Applicable Project Owner's Share of available insurance proceeds, if any, shall be subject to the rights of its respective Mortgagee. Such demolition shall be deemed to be a "repair or restoration" to which the provisions of **Section 11.3**, **Section 11.4**, **Section 11.5** and **Section 11.8** are applicable except that demolition, and not construction, shall be performed. Any proceeds due to the Project Owner of any Parcel of the Project or portion thereof submitted to the Act shall be divided among all Unit Owners based on their Unit Ownership or as otherwise provided in any Condominium Declaration or in the Act. For purposes of this **Section 11.7**, insurance proceeds include amounts contributed by a self-insured Project Owner.

11.8    **Cost Defined**. For purposes of this ARTICLE 11, architects' and engineers' fees, attorneys' fee, consultants' fees, title insurance premiums and other similar costs and expenses relating to repair or restoration shall be included in the costs and expenses of any such repair or restoration.

11.9    **Restoration of Improvements on a Parcel Submitted to the Act**. If and to the extent any of the Parcels is subject to the Act:

(a)    To the fullest extent permitted by law, the provisions of ARTICLE 11 of this Agreement shall be controlling over the provisions of the Act or Condominium Declaration insofar as the provisions of the Act or Condominium Declaration limit (i) the obligation of the Unit Owners to repair or restore a Parcel or any portion thereof submitted to the Act (as to Unit Owners thereof) or (ii) the use of insurance proceeds for repair and restoration of such Parcel.

(b)    In the event of fire or other "disaster" (such term being used in the Act) causing damage to a Parcel or any portion thereof which would entitle the Condominium Owner of such Parcel or portion thereof under the Act or Condominium Declaration, not to repair and restore such Parcel as required by this Agreement or not to use insurance proceeds for repair and restore of such Parcel, then, subject to Subsection (c) below, prior to disbursement of any insurance or other proceeds to such Unit Owners and no later than ninety (90) days after occurrence of the fire or other disaster in any event, if affirmative action and provision has not otherwise been taken by such date by such Condominium Owner, the Condominium Owner shall pay to any other Project Owner hereunder adversely affected by such Condominium Owner's decision not to repair and restore an amount necessary (but such amount shall be limited to a maximum amount equal to the amount of insurance proceeds applicable to such casualty or, if no insurance was maintained, the amount of self insurance equal to the amount of proceeds that would have been available is such insurance had been maintained), so that such adversely affected

59

CHGO2\40126644.12

Project Owner shall have sufficient proceeds to repair and restore its Parcel to a condition so as adequately to assure:

        (i)     the structural integrity and safety, and weathertight enclosure of the Parcel;

        (ii)    the continuous and efficient operation of the Facilities affecting the Parcel and all electrical, utility, mechanical, plumbing and other systems and Facilities serving the Parcel;

        (iii)   compliance with all zoning, building and other laws, rules, orders, ordinances, regulations and requirements of any governmental body or municipality or agency thereof having jurisdiction of the Property; and

        (iv)   the architectural unity and aesthetic appearance of the restored Parcel as first-class property, to be as identical as commercially practicable to the Improvements as constructed prior to such damage.

        (c)     If the Retail Property is submitted to the Act, and the Retail Owner (or Condominium Owner) elects not to repair or restore the Retail Parcel Improvements pursuant to Subsection (b) above, the Retail Owner (or Condominium Owner) shall undertake such minimal exterior cleanup as shall be required in order to prevent the condition of the Retail Property from materially adversely affecting the Hotel Property. Notwithstanding anything to the contrary set forth in this Agreement, the foregoing provision of this Subsection (c) shall not be deemed to obligate the Retail Owner in any respect to make Alterations or to re-tenant or re-occupy the Retail Parcel, in whole or in part.

        (d)     If the Hotel Property is submitted to the Act, and the Hotel Owner (or Condominium Owner) elects not to repair or restore the Hotel Parcel Improvements pursuant to Subsection (b) above, the Hotel Owner (or Condominium Owner) shall promptly provide written notice to the other Project Owners of its intention not to repair or restore (the "Non-Restoration Notice"). If (1) the Hotel Owner or the Condominium Owner delivers the Non-Restoration Notice, (2) within nine (9) months after the occurrence of the damage requiring repair or restoration as contemplated herein such repair or restoration work has not been commenced or (3) the Hotel Owner (or Condominium Owner) offers for sale, solicits offers for sale or enters into any agreement to sell, ground lease, transfer or otherwise convey title to or possessory interests in the Hotel Parcel or any beneficial interest therein to a purchaser other than the Retail Owner, the Retail Owner shall have the right and option to purchase (the "Purchase Option") the Hotel Parcel and Hotel Parcel Improvements, together with all other rights and benefits appertaining thereto (collectively, the "Hotel Property"), upon written notice from the Retail Owner to the Hotel Owner (the "Purchase Notice") for a purchase price (the "Purchase Price") to be mutually agreed upon between the Retail Owner and the Hotel Owner pursuant to good faith negotiations during the thirty (30) day period following the Hotel Owner's receipt of the Purchase Notice (the "Purchase Price Negotiation Period")

CHGO2\40126644.12

based on the fair market value of the Hotel Property at the time of the exercise of such Purchase Option; provided, however, that if the Hotel Owner has received an offer, has solicited offers or has entered into an agreement as contemplated in subparagraph (3) above, the Purchase Price shall be based on the lesser of (A) the fair market value of the Hotel Property at the time of the exercise of such Purchase Option and (B) the price being offered or agreed upon pursuant to any such offer or agreement. If the Retail Owner and the Hotel Owner are unable to agree on the Purchase Price during the Purchase Price Negotiation Period, then each of the Retail Owner and the Hotel Owner shall designate by written notice to the other within fourteen (14) days after the expiration of the Purchase Price Negotiation Period a real estate appraiser to represent each of the Retail Owner and the Hotel Owner, respectively, in connection with the negotiation of the Purchase Price. Each of the appraiser selected by the Hotel Owner ("**Hotel Owner's Appraiser**") and the appraiser selected by the Retail Owner ("**Retail Owner's Appraiser**") shall within fourteen (14) days after having been designated by the Hotel Owner and the Retail Owner, respectively, mutually appoint a third, independent appraiser (the "**Panel Appraiser**"; the Hotel Owner's Appraiser, the Retail Owner's Appraiser and the Panel Appraiser shall collectively comprise the "**Panel**"). All appraisers on the Panel shall be licensed in the jurisdiction where the Property is located and shall have at least fifteen (15) years of experience as licensed appraisers in the jurisdiction where the Property is located. The fees and other costs of each of the Hotel Owner's Appraiser and the Retail Owner's Appraiser shall be borne by the Hotel Owner and the Retail Owner, respectively, and the fees and costs of the Panel Appraiser shall be divided equally between the Hotel Owner and the Retail Owner. Within thirty (30) days after the appointment of the Panel Appraiser, the Panel shall render its decision and shall determine the Purchase Price. If the Panel is unable to agree unanimously as to the Purchase Price, then the majority decision of the Panel shall determine the amount of the Purchase Price. In the event of a deadlock, then the Panel Attorney shall determine the amount of the Purchase Price. The decision of the Panel shall be final, binding upon both the Hotel Owner and the Retail Owner and unappealable. Failure to comply with the decision of the Panel shall be deemed a default under this Agreement. If the Retail Owner exercises any right under this Agreement to purchase the Property, then real estate taxes and assessments on the Property shall be prorated as of the date that the Hotel Owner conveys the Property to the Retail Owner and, upon receipt of the Purchase Price from the Retail Owner, the Hotel Owner shall convey to the Retail Owner, by special warranty deed, good and marketable title to the Hotel Property, free and clear of any liens or encumbrances which did not exist as of the date of this Agreement. The Hotel Owner shall be responsible for paying the costs of all State of Illinois and Cook County transfer taxes associated with the conveyance of the Hotel Property to the Retail Owner pursuant to the Purchase Option granted hereunder. The Retail Owner shall be responsible for paying the costs of all City of Chicago transfer taxes and recording fees associated with the conveyance of the Hotel Property to the Retail Owner pursuant to the Purchase Option granted hereunder. The purchase rights granted to the Retail Owner under this Agreement shall be specifically enforceable against the Hotel Owner and shall be in addition to, and not in lieu of, any other rights and remedies that are available to the Retail Owner, at law or in equity, by virtue of the occurrence of any of the actions or

61

CHGO2\40126644.12

omissions set forth herein.  The purchase option rights set forth in this **Section 11.9(d)** shall be subordinate to any Mortgage encumbering the Hotel Parcel.

(e)    If any Parcel is encumbered by a Mortgage, the Owner of such Parcel shall not submit its Parcel to the Act without the prior written consent of the Mortgagee under such Mortgage.

11.10  **Easements for Repair and Reconstruction**.  The Owners hereby agree to grant to each other any necessary temporary easements for the repair and reconstruction of the Building following any damage or casualty contemplated in this ARTICLE 11, including, without limitation, easements for ingress and egress for purposes of performing necessary repairs and reconstruction, easements for installation and maintenance of scaffolding, cranes and any other construction equipment or facilities necessary for the performance of any such repair or reconstruction work, easements for staging of construction equipment and materials, easements for crane arm swings, etc.  The easement rights granted pursuant to this Section 11.10 shall be construed in accordance with Section 2.1 (as it relates to easement rights burdening the Retail Parcel), Section 3.1 (as it relates to easement rights burdening the Hotel Parcel) and Section 5.1 (as it relates to easement rights burdening the Office/Annex Parcel).  In granting and exercising any such easement rights, the grantee of any such easement rights shall (A) use best efforts to minimize the disturbance to the Improvements and personalty located on, and the operations and use of, the Parcel burdened by any such easement rights, (B) use best efforts to minimize the duration of the exercise of any such easement rights and (C) if and to the extent that the Improvements or personalty of the Owner whose Parcel is burdened by such easement rights are damaged, the Owner who caused any damage (or through which such damage was caused) shall promptly repair any such damage and shall indemnify, defend and hold harmless the Owner whose Improvements or personalty were damaged for any costs and expenses in connection with the repair and restoration of such Improvements or personalty so damaged.

11.11  **Mortgagee Rights to Proceeds**.  Notwithstanding anything in this Agreement to the contrary, if the total loss arising from damage to the Hotel Property is greater than fifteen percent (15%) of the unpaid principal under the Mortgage, if any, then encumbering the Hotel Property, then the disbursement of the Hotel Owner's share of any such available insurance proceeds shall be paid to the Mortgagee of the Hotel Property at such Mortgagee's request.

## ARTICLE 12

## LIENS, DEBTS, INTEREST AND REMEDIES

12.1  **Failure to Perform**.

(a)    If, at any time, any Owner fails within ten (10) business days after notice or demand to pay any sum of money due to a Creditor Owner under or pursuant to the provisions of this Agreement or any other time period expressly provided for such payment to be made (thereby becoming a Defaulting Owner) then, in addition to any other rights or remedies the Creditor Owner may have, the Creditor Owner shall have

62

CHGO2\40126644.12

Order: 18000031623                                      Page 69 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

(i)     a lien against the Parcel owned by the Defaulting Owner; and,

(ii)    for a default under **ARTICLE 11**, a lien also against any insurance proceeds payable to the Defaulting Owner for loss or damage to such Parcel or otherwise under insurance policies carried pursuant to **ARTICLE 10** hereof to secure the repayment of such sum of money, all interest on such sum accruing pursuant to the provisions of this **ARTICLE 12** and attorneys fees incurred in connection with such failure to pay and efforts by the Creditor Owner to collect.

(b)     Such liens shall arise immediately upon the recording of a notice by the Creditor Owner with the Recorder and may be enforced by a proceeding in equity to foreclose such lien through a judicial foreclosure in like manner as a mortgage of real property in the State of Illinois. Such liens shall continue in full force and effect until such sum of money and any accrued interest thereon (*"Default Amount"*) shall have been paid in full.

(c)     A Creditor Owner shall release its lien upon payment in full. Notwithstanding the foregoing, a Creditor Owner's lien shall be subordinate to any Mortgage, trust deed or other encumbrance constituting a lien on such Parcel owned by the Defaulting Owner, which Mortgage lien shall be superior to any Creditor Owner's lien.

## 12.2    No Diminution of Lien.

(a)     No conveyance or other divestiture of title (except foreclosure of a Prior Lien which is superior to a lien arising under **ARTICLE 12**) shall in any way affect or diminish any lien perfected pursuant to this **ARTICLE 12**. A "Prior Lien" means a Mortgage which has been recorded against the Building or Property prior to the time of recording of the Creditor Owner's notice of lien, including a mortgage or trust deed against a Unit.

(b)     If at any time any Owner as a Creditor Owner has recorded a notice of lien under **Section 12.1** of this Agreement against any other Parcel, which lien has not been foreclosed, released, or satisfied in full, and if such Parcel or any part or interest therein is thereafter sold, the Creditor Owner shall be entitled to receive from the proceeds of sale of such portion of the Property or part or interest the lesser of:

(i)     an amount sufficient to satisfy the unpaid Default Amount, and

(ii)    the entire proceeds from the sale, minus any amount paid to satisfy all Prior Liens.

(c)     If any portion of the Default Amount remains unpaid following any such sale, the Creditor Owner shall continue to have: (i) a lien on such Parcel, and (ii) the rights with respect to the proceeds of any subsequent sales of such Parcel to secure repayment of any remaining portion of the Default Amount secured by the lien that applies to such Parcel. If the amount secured by such lien is being contested in a judicial

63

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 70 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

action, then the proceeds which a Creditor Owner could apply to satisfy its lien shall be deposited by the Defaulting Owner with the Depositary or other escrowee acceptable to both the Defaulting Owner and the Creditor Owner and held for disbursement at the joint order of the applicable Owners or as directed by court order, and the Creditor Owner shall release its lien of record.

12.3    **Mortgagee's Subrogation**.  The holder of a mortgage or trust deed on all or any portion of a Parcel shall have the right to be subrogated to the position of the holder of any lien arising pursuant to this **ARTICLE 12** affecting the property secured by its mortgage upon payment of the amount secured by such lien.

12.4    **Interest Rate**.  Interest shall accrue on sums owed by a Defaulting Owner to a Creditor Owner and shall be payable from the date any such sum first became due hereunder until paid in full, at a rate of interest equal to the floating rate which is equal to five percent (5%) per annum in excess of the annual rate of interest from time to time announced by Bank One at Chicago, Illinois or any successor thereto, as its base or prime or reference rate of interest, or if a base or reference rate is not announced or available, then interest shall accrue at the annual rate of eighteen percent (18%).

12.5    **Cumulative Remedies**.  The rights and remedies of an Owner provided for in this **ARTICLE 12** or elsewhere in this Agreement are cumulative and not intended to be exclusive of any other remedies to which such Owner may be entitled at law or in equity or by statute. An Owner may enforce, by a proceeding in equity for mandatory injunction, another Owner's obligation to execute or record any document which such other Owner is required to execute under or pursuant to this Agreement. The exercise by such Owner of any right or remedy to which it is entitled hereunder shall not preclude or restrict the exercise of any other right or remedy provided hereunder or at law and equity.

12.6    **No Set-Off**.  Each claim of any Owner arising under this Agreement shall be separate and distinct, and no defense, set-off, offset or counterclaim arising against the enforcement of any lien or other claim of any Owner shall thereby be or become a defense, set-off, offset or counterclaim against the enforcement of any other lien or claim.

12.7    **Period of Limitation**.  Actions to enforce any right, claim or lien under this Agreement shall be commenced within three (3) years immediately following the date the cause of action accrued, or such other shorter period as may be provided by law or statute.

12.8    **Attorneys' Fees**.  The non prevailing party in any action brought by a Creditor Owner shall pay the reasonable attorneys' fees and court costs (including appeals of any judgment or order) paid or incurred. In the case of an appeal, attorneys' fees shall be payable after the decision in such appeal.

12.9    **Self-Help**.  Without limiting any other rights or remedies of an Owner, including any other self-help provision of this Agreement which grants an Owner the right to perform an obligation which the other Owner has failed to perform, a Creditor Owner shall have the right, in an Emergency Situation, upon reasonable advance notice, if possible under the circumstances

64

CHGO2\40126644.12

Order: 18000031623                                    Page 71 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

and which may be oral, to perform the obligation which the Defaulting Owner has failed to perform until the Defaulting Owner cures such default. The Creditor Owner shall be entitled to payment from the Defaulting Owner for all costs and expenses (including reasonable attorneys' fees, including appeals from judgments or orders) paid or incurred by the Owner in performing such obligation which the Defaulting Owner has failed to perform. Where a specific self-help right is granted elsewhere under this Agreement for non-performance of an obligation, such provision shall control the provisions of this **Section 12.9**.

12.10 **Subordination**. Notwithstanding anything to the contrary contained in this Agreement, any lien arising pursuant to this **Article 12** is and shall be subordinate in all respects to the lien of any Mortgage encumbering the Property to the full extent of any and all amounts secured by such Mortgage. The rights of the holder of any lien arising pursuant to this **Article 12** to foreclose upon or otherwise exercise any remedies with respect to any such lien shall be subject to the first Mortgage lien of any such Mortgagee.

## ARTICLE 13

## [INTENTIONALLY OMITTED]

## ARTICLE 14

## CONSTRUCTION OBLIGATIONS; INDEMNITY; UNAVOIDABLE DELAYS

14.1 **Construction Obligations**. Hotel Owner and Retail Owner shall perform all Renovations in accordance with the Renovation Plans and pursuant to the easement rights granted in Articles 2 and 3.

14.2 **Indemnity.** Hotel Owner shall indemnify, defend and hold harmless the Retail Owner from and against any and all loss, liability, claims, judgments, costs and expenses (including reasonable attorney's fees, including appeals of any judgment or order) arising out of the Hotel Owner's performance of any such construction work as contemplated in the Hotel Renovation Plans. Retail Owner shall indemnify, defend and hold harmless the Hotel Owner from and against any and all loss, liability, claims, judgments, costs and expenses (including reasonable attorney's fees, including appeals of any judgment or order) arising out of the Retail Owner's performance of any such construction work as contemplated in the Retail Renovation Plans.

14.3 **Cooperation.** If after the completion of the construction activities contemplated in the Renovation Plans it becomes necessary to amend this Agreement to modify easement or other rights, obligations of any party hereto, factual matters or to make any other change to this Agreement that becomes necessary following the completion of such construction activities, the Owners shall reasonably cooperate with each other to in good faith enter into any necessary amendments to this Agreement to reflect any such modifications or any modifications; provided,

65

however, that in no event shall any Owner be obligated to modify the Approved Division or any other revenue or cost sharing percentage or allocation provided for in this Agreement.

14.4    **Unavoidable Delay.**  No Owner shall be deemed to be in default in the performance of any obligation created under or pursuant to this Agreement, other than an obligation requiring the payment of a sum of money, if and so long as non-performance of such obligation shall be directly caused by fire or other casualty, national emergency, enemy action, flood, severe weather conditions, civil unrest, strikes, lockouts, unavailability of labor or materials to projects generally in the Chicago metropolitan area, war or national defense preemptions, acts of God, energy shortages or similar causes beyond the reasonable control of such Owner applicable to projects generally in the Chicago metropolitan area (other than inability to make payment of money) (an "*Unavoidable Delay*") and the time limit for such performance shall be extended for a period equal to the period of any such Unavoidable Delay.

14.5    **Notification.**  The Owner unable to perform (the "*Non-Performing Owner*") shall notify the other Owner in writing of the existence and nature of any Unavoidable Delay within a reasonable time after the onset of any such Unavoidable Delay. The Non-Performing Owner shall, from time to time upon written request of the other Owner, keep such other Owner fully informed, in writing, of all further developments concerning any such Unavoidable Delay. If non-performance is due to an Unavoidable Delay affecting the Non-Performing Owner which does not affect the other Owner's self-help remedy provided for elsewhere in this Agreement and which is otherwise exercisable for such non-performance, then notwithstanding such Unavoidable Delay, the other Owner shall still be entitled to the self-help remedy exercisable only under reasonable circumstances with respect to those obligations to have been performed by the Non-Performing Owner which are the subject of Unavoidable Delay.

## ARTICLE 15

## CONDEMNATION

15.1    **In General**.  In the event of a taking by the exercise of the power of eminent domain or deed in lieu of condemnation of all or any part of the Project by any competent authority for any public or quasi-public use, the award, damages or just compensation (the "*Award*") resulting from any such taking shall be allocated and disbursed, and any repair and restoration of the Project shall be performed, in accordance with the requirements of this **ARTICLE** 15. The Project Owners shall cooperate with one another to maximize the amount of the Award.

15.2    **Payment of Award to Depositary; Temporary Taking Awards**.  All Awards resulting from the taking of all or any part of a Parcel of the Project, other than damages resulting from a taking for the temporary use of space as hereinafter described, shall be paid to the Depositary by the Project Owners, regardless of the Project Owner who received the Award, except as otherwise provided in **Section 15.3**, and the Depositary shall disburse the Award as hereinafter provided.  In the event of a taking of temporary use of any space, each Project Owner shall be entitled to receive directly from the taking authority any Award resulting from such temporary taking within its respective Parcel.

66

15.3    **Taking of Only One Parcel of the Project.**

(a)    In the event of a taking (other than a temporary taking) of all or any portion of a Parcel of the Project which taking does not affect any other Parcel (or Owned Facilities of another Owner) of the Project, then, subject to the provisions of **Section 15.6** hereof, the Project Owner of the Parcel, Improvements or Facilities affected by such taking shall repair and restore the remainder of Improvements or Facilities to form an architectural and functional whole, if the failure to do so would adversely and materially affect an Easement in favor of another Owner reasonably necessary to such other Owner's operations or the services to be furnished to such other Owner under **ARTICLE 7.**

(b)    Such repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable under the circumstances and shall be at the sole cost and expense of the Project Owner of the Parcel of the Project in which the taking occurred. Such Project Owner shall be entitled to withdraw any Award paid to the Depositary by reason of such taking for application to the cost of said repair and restoration in accordance with and subject to the provisions of **ARTICLE 19** hereof and to retain any excess not required for such repair and restoration. If the cost of repair or restoration is estimated to be less than $100,000, then the Award need not be paid to the Depositary.

(c)    If at any time any Project Owner so obligated to repair and restore such damage shall not proceed diligently with any repair or restoration which adversely and materially affects an Easement reasonably necessary to another Owner's operations in favor of another Owner or the services to be furnished the other Owners under **ARTICLE 7** hereof, then:

(i)    a Creditor Owner may give written notice to the Defaulting Owner specifying the respect or respects in which such repair or restoration is not proceeding diligently and, if, upon expiration of thirty (30) business days after the receipt of such notice, any such work of repair or restoration is still not proceeding diligently, then a Creditor Owner may perform such repair and restoration and may take all appropriate steps to carry out the same; or

(ii)    in an Emergency Situation (other than an Emergency Situation involving solely an economic loss) a Creditor Owner may immediately perform such repair or restoration and may take all appropriate steps to carry out the same. The Creditor Owner in so performing such repair and restoration shall, in accordance with **ARTICLE 19** hereof, be entitled to withdraw any Award and any other monies held by the Depositary as a result of any such taking, for application to the cost and expense of any such repair or restoration and shall also be entitled to reimbursement upon demand from Defaulting Owner for all costs and expenses incurred by Creditor Owner in excess of the Award and other monies. Repair and restoration under this **Section 15.3** constitute Alterations, except that the Owner

67

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 74 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM

performing repair and restoration shall not be required to obtain the other Owner's consent if it would not otherwise be required under **ARTICLE 16**.

15.4    **Repair and Restoration by All Project Owners**.

(a)    In the event of a taking (other than a temporary taking) affecting more than one Parcel of the Project (or affecting more than one Owner's Improvements or Facilities), then, subject to the provisions of **Section 15.6** hereof, the Project Owners shall cooperate to repair and restore the remainder of the Improvements and Facilities of the Project in accordance with plans and specifications (hereinafter described) approved by all Project Owners and all Mortgagees (if and to the extent required by any such Mortgagee's Mortgage). Such repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable under the circumstances and shall be performed on behalf of the Project Owners by a contractor or contractors jointly selected by the Project Owners. In the event the Project Owners fail to agree upon the selection of a contractor or contractors, the Project Owners shall request the advice of the Architect.

(b)    The plans and specifications for such repair and restoration shall be prepared by the Architect, unless the Project Owners shall otherwise agree. Such plans and specification shall provide for repair and restoration of the remainder of the Improvements of the Project, as applicable, to form an architectural and functional whole, with such changes as shall be required by reason of such taking. If, as a result of such taking, any Easements or covenants under this Agreement are extinguished or materially impaired, then changes shall be made to provide for Easements and for furnishing of services comparable, to the extent commercially practicable, to Easements created under this Agreement and for the furnishing of services under **ARTICLE 7** hereof. The Architect will furnish to each of the Project Owners (but only if and to the extent such Project Owner's approval is required) a set of such plans and specifications for their approval. Unless the Project Owners otherwise agree (subject to the approval of their Mortgagees), the contractor or contractors shall work under the supervision of the Architect, and the Architect is hereby authorized and directed to instruct the Depositary, from time to time, but only with the prior approval of the Project Owner or Project Owners in whose portion of the Parcel such repair and restoration is being performed, as such repair and restoration processes, to disburse, in accordance with **ARTICLE 19** hereof, any Award paid to the Depositary for application to the cost and expense of such repair and restoration.

15.5    **Excess Award**. The Award for any taking described in **Section 15.4** shall first be used to pay for the repair and restoration (including any demolition, repair or restoration under **Section 15.6** hereof). Any excess of the Award over the cost of repair and restoration shall then be allocated to a Project Owner in the same ratio that the apportionment of the Award to such Project Owner (including other parties with an interest in such Project Owner's portion of the Project) bears to the apportionment of the Award to the other Project Owner (including parties with an interest in the other Project Owners' portion of the Project); provided, however, that the right of a Project Owner to receive its share of any such excess shall be subject to the provisions of **Section 22.12**. If there is no apportionment in any judicial or administrative proceeding, the Project Owners shall petition for such apportionment, if possible. Otherwise, the Project Owners

68

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 75 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

shall negotiate with one another in good faith to arrive at an allocation to each of such excess based upon the same general criteria that would have been used in such proceedings to apportion the Award.

15.6    **Demolition**.  If, as a result of a taking (other than a temporary taking), any Project Owner reasonably determines that its Improvements on the Project can no longer can be repaired or restored or operated on an economically feasible basis, then such Project Owner shall notify the other Project Owners of its determination within sixty (60) days after such taking and shall not be obligated to repair or restore its Improvements on the Project as may be required by **Section 15.3** and **Section 15.4** hereof.  However, such Project Owner not repairing or restoring shall demolish, repair or restore its Improvements on the Project, to the extent, if any, as may be necessary, to provide essential services set forth in this Agreement or Easements reasonably necessary to the operations of the other Project Owners. Such demolition, repair or restoration shall be deemed to be a repair or restoration to which the provisions of **Section 15.4** hereof are applicable.

15.7    **Allocation of Award**.  In the event of a taking of all or substantially all of more than one Parcel of the Project, the Award for such taking shall be allocated to the Project Owners in accordance with the apportionment made in any final judicial or administrative proceedings in connection with the taking and paid to the Project Owners, in accordance with said apportionment; provided, however, that the right of a Project Owner to receive its share of any award and payment shall be subject to the provisions of **Section 22.12**.

15.8    **Condominium**.  If at any time any portion of a Parcel is submitted to the Act, then to the fullest extent permitted by law, the provisions of this **ARTICLE 15** shall be controlling over the provisions of the Act and Condominium Declaration insofar as the provisions of the Act or Condominium Declaration limit (a) the obligation of the Unit Owners to repair or restore such portion of the Parcel as has been submitted to the Act in the event of a taking or (b) the use of the Award as provided in this **ARTICLE 15**.

15.9    **Consent of Mortgagee**.  Whenever in this **ARTICLE 15** the consent of an Owner is required, the consent of such Owner's Mortgagee shall also be required to the extent required under such Mortgagee's Mortgage.

## ARTICLE 16

## ALTERATIONS; ZONING

16.1    **Permitted Alterations**.

(a)    An Owner (hereinafter in this **ARTICLE 16**, "*Altering Owner*") may, at any time, at such Altering Owner's sole cost and expense, make additions, improvements or alterations (hereinafter in this **ARTICLE 16**, "*Alterations*") to the Improvements within such Altering Owner's Parcel, provided such Alterations comply with all of the provisions of this **ARTICLE 16** applicable to the Parcel owned by such Owner. Alterations shall also include relocation of Facilities, which shall be permitted, subject to

69

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 76 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

compliance with the conditions set forth in this **ARTICLE 16**. Replacement of Facilities may be made by an Altering Owner without consent of other affected Project Owners. The provisions of this **ARTICLE 16** governing Alterations do not negate or diminish other provisions of this Agreement having to do with additions, improvements or alterations expressly required or permitted in **ARTICLE 7** (Services), **ARTICLE 8** (Compliance with Laws), **ARTICLE 11** (Maintenance and Repair) and **ARTICLE 15** (Condemnation) hereof, which are governed by such provisions only and not this **ARTICLE 16** unless also designated in such Articles as "Alterations" to be governed by this **ARTICLE 16**. Notwithstanding any provision to the contrary, the provisions of this **ARTICLE 16** shall not apply to (A) any Project Owner until its portion of the Project is substantially complete and ready for occupancy and (B) any right to exercise self-help remedies as provided in **Section 12.9** or elsewhere in this Agreement.

(b)    Alterations to the Project shall not be made without the prior written consent of the other Owners affected by such Alterations unless otherwise expressly permitted by this Agreement if such Alterations will:

(i)    during their performance or upon their completion, unreasonably diminish the benefits afforded to another Owner by an Easement or unreasonably interrupt such other Owner's use or enjoyment of any Easement;

(ii)    during their performance or upon their completion, degrade or diminish services to another Owner under **ARTICLE 7**;

(iii)    materially increase the costs or expenses for which such other Owner is or would be responsible pursuant to **ARTICLE 7** hereof;

(iv)    with respect to the Project materially alter the Façade of the Improvements;

(v)    consist of drilling, coring, chopping, cutting or otherwise making any opening or hole into any Structural Supports other than minor work which will not affect the structural soundness of the Building or which in the opinion of a structural engineer would not materially affect the structural soundness of the Building;

(vi)    consist of or results in discharge, release, emission, deposit, treatment, transport, production, incorporation, disposal, leakage, transfer of escape of Hazardous Material or odorous gases, in a manner which fails to comply with any applicable law if the other Owner could be adversely affected by such Alterations;

(vii)    unless required by Law, without the consent of the Retail Owner, materially and adversely affect the Retail Parcel (including, without limitation, entrances thereto and exits therefrom, scaffolding in front of or affixed to any portion of the Retail Parcel, or otherwise affecting pedestrian or vehicular traffic

70

Order: 18000031623
Doc: 634644078 EAS 12-12-2006
Page 77 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

for the Retail Parcel or the business operations within the Retail Parcel) or the loading docks or garbage dumpster area or pathways thereto;

(viii)   unless required by Law, without the consent of the Hotel Owner, materially and adversely affect the Hotel Parcel (including, without limitation, entrances thereto and exits therefrom, scaffolding in front of or affixed to any portion of the Hotel Parcel, or otherwise affecting pedestrian or vehicular traffic for the Hotel Parcel) or the loading docks or garbage dumpster area or pathways thereto;

(ix)   unless required by Law, without the consent of the Office/Annex Owner, materially and adversely affect the Office/Annex Parcel (including, without limitation, entrances thereto and exits therefrom, scaffolding in front of or affixed to any portion of the Office/Annex Parcel, or otherwise affecting pedestrian traffic for the Office/Annex Parcel or the business operations within the Office/Annex Parcel) or the loading docks or garbage dumpster area or pathways thereto.

Notwithstanding anything to the contrary contained in this Agreement, except as expressly permitted in this Agreement no Owner shall be permitted to perform any alteration that affects the Façade or appearance of the Building (beyond the scope of the Renovation Plans) without first obtaining the consent of the other Owners, which consent shall not be unreasonably withheld, conditioned or delayed.

16.2   **Notification**.

(a)   If, at any time, the Altering Owner proposes to make any Alterations which require or could possibly require (in the Altering Owner's reasonable opinion or the reasonable opinion of any other Owner) the consent of the other Owners, then before commencing or proceeding with such Alterations, the Altering Owner, at its own cost, shall deliver to such other Owners a copy of the plans and specifications showing the proposed Alterations and a reference to this **Section 16.2**.

(b)   An Altering Owner may also at any time request confirmation from the other Owners that its consent is not required with respect to proposed Alterations, if such Alterations do not require its consent, and such confirmation shall be given within ten (10) business days after the request is made. Failure to respond during such ten (10) business day period shall be deemed confirmation that no consent is required.

(c)   The Owners from whom consent is requested will not unreasonably delay their respective responses, having in mind the scope and complexity, of the proposed Alterations.  If such other Owners consent to such Alterations or, in any case where consent is required, do not respond (with approval, disapproval, request for additional information or time or statement of conditions for approval or disapproval) within thirty (30) days (as hereinafter extended) after receipt of plans and specifications, the Altering Owner may proceed to make its Alterations substantially in accordance with said plans

71

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 78 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

and specifications. Within the thirty (30) day response period the other Owners may request:

        (i)     additional information with respect to the proposed Alterations, in which case the other Owners will be granted an additional thirty (30) days to respond from the date the other Owners receive such additional information, or

        (ii)     an extension of the time to respond, which extension of time shall not exceed thirty (30) days from the date of the request.

    (d)     If, in the good faith opinion of any of the other Owners, the Altering Owner has violated or will violate the provisions of **Section 16.1(a)** or **Section 16.1(b)** then such Owner (the "***Objecting Party***") believing a violation exists shall notify the Altering Owner of its opinion that the Alterations or proposed Alterations violate or will violate the provisions of **Section 16.1(a)** or **Section 16.1(b)** hereof, and shall specify the respect or respects in which its provisions are or will be violated.

    (e)     If an Objecting Party in good faith asserts a violation of **Section 16.1(a)** or **Section 16.1(b)**, then the Altering Owner shall not commence with the Alterations or proceed with the Alterations, if already commenced, until the matter has been resolved (except in an Emergency Situation). In addition to the rights or remedies to which the Objecting Party may be entitled by reason of an Altering Owner's violation or likely violation of the provisions of **Section 16.1**, the Objecting Party shall be entitled to seek and obtain injunctive relief to enjoin any such violation.

    (f)     Each Project Owner making Alterations shall:

        (i)     perform all work in a good and workmanlike manner and in accordance with good construction practices,

        (ii)     comply with all Laws, including, without limitation, the City of Chicago Building Code,

        (iii)     comply with all of the applicable provisions of this Agreement, and

        (iv)     carry or cause its contractors to carry "all risk" builder's risk insurance (including loss of income and "soft costs") for not less than the completed value of the work being performed by such Project Owner for any Alterations which require another Owner's consent under **Section 16.1**. Loss of rental income or use and "soft costs" occurring during the period covered by builder's risk insurance shall be insured in such amounts as may be carried by prudent owners of first-class mixed use buildings in the City of Chicago.

    (g)     Each Owner shall, to the extent reasonably practicable, make Alterations within its portion of the Improvements in such a manner and at times so as to minimize any noise, vibrations, particulates and dust infiltration or other disturbance which would

CHGO2\40126644.12

disturb an occupant or occupants of the other portion of the Improvements, as applicable, but such Owner shall not be liable in any event for damages as a result of any such disturbance (as opposed to physical damage to property or harm to persons) normally incidental to construction. The foregoing restriction on damages shall not restrict an Owner's right to seek and obtain injunctive relief from unreasonable disturbances.

(h)     An Altering Owner may perform work during any hours permitted by applicable Law.  However, if requested by an Owner who would otherwise suffer unreasonable disturbance, the Altering Owner shall not unreasonably refuse to perform work outside normal business hours and shall pay all costs associated with work at times other than normal business hours, including overtime and delay costs.

16.3     **Building Permits**. Applications for building permits to make Alterations shall be filed and processed by the Altering Owner without the joinder of any other Owner in such application, unless the City of Chicago or other government agency having jurisdiction thereof requires joinder of such other Owner. An Altering Owner shall send copies of any building permits to another Owner at such other Owner's request.  If joinder by such other Owner not making Alterations is so required, such other Owner shall cooperate in executing such application or other instruments as may be necessary to obtain the building permit; provided, however, the Altering Owner shall indemnify, and hold harmless such other Owner from and against any and all loss, liability, claims, judgments, costs and expenses (including reasonable attorney's fees, including appeals of any judgment or order) arising out of such other Owner's execution of the application, permit or other instrument.  If an Owner fails to execute said application or instruments when required hereunder to do so, and there is no dispute between the Owners concerning the affected Alterations, the Altering Owner is hereby irrevocably appointed attorney-in-fact of the other Owner (such power of attorney being coupled with an interest and hence, irrevocable) to execute said application or instruments on behalf of such other Owner; provided, however, the Altering Owner shall indemnify, and hold harmless such other Owner from and against any and all loss, liability, claims, judgments, costs and expenses (including reasonable attorney's fees, including appeals of any judgment or order) arising out of the Altering Owner's execution of the application, permit or other instrument as attorney-in-fact of the other Owner.

16.4     **No Liens**. A Project Owner performing any work required or provided for under this Agreement shall include in any construction contract a provision pursuant to which the contractor:

(a)     recognizes the separate ownership of the Hotel Parcel, the Office/Annex Parcel, and the Retail Parcel, and agrees that any lien rights which the contractor or subcontractors have under the Mechanics' Liens Act set forth in 770 ILCS 60/0.01 et seq. (said Act and any successors thereto, the *"Mechanics' Lien Act"*) shall only be enforceable against the portion of the Project owned by the Altering Owner, or

(b)     agrees that, to the extent permitted by Law, no lien or claim may be filed or maintained by such contractor or any subcontractors and agrees to comply with the

73

provisions of **Section 21** of the Mechanics' Lien Act in connection with giving notice of such "no lien" provision.

16.5    **Alterations Affecting Improvements**.

(a)    The Hotel Owner shall perform the work shown on the Hotel Renovation Plans, as amended from time to time. Minor changes shall not require the consent of the Retail Owner or the Office/Annex Owner. No Owner shall unreasonably withhold or delay its consent to other requested changes. Although not currently included in the existing Hotel Renovation Plans, the Hotel Owner may construct additional interior improvements and interior Alterations within the Hotel Parcel, without the consent of any other Project Owner, in connection with the preparation of the Hotel Parcel for Occupants.

(b)    The Retail Owner shall perform the work shown on the Retail Renovation Plans, as amended from time to time. Minor changes shall not require the consent of the Hotel Owner or the Office/Annex Owner. No Owner shall unreasonably withhold or delay its consent to other requested changes; provided, however, that the Hotel Owner (and its Mortgagee) shall not have to be reasonable in its consent to material changes to the Retail Renovation Plans if such changes affect either base building systems affecting the Hotel or the Hotel Property. Although not currently included in the existing Retail Renovation Plans, the Retail Owner may construct additional interior improvements and interior Alterations within the Retail Parcel, without the consent of any other Project Owner, in connection with the preparation of the Retail Parcel for Occupants.

(c)    Although not currently included in the existing Renovation Plans, the Office/Annex Owner may construct additional interior improvements and interior Alterations within the Office/Annex Parcel, without the consent of any other Project Owner, in connection with the preparation of the Office/Annex Parcel for Occupants.

16.6    **Zoning**.    (a)    Any Owner may seek to amend the zoning from time to time applicable to such Owner's Parcel; provided, however, that no Owner may seek a zoning change to its Parcel that will adversely affect the rights that another Owner has under the zoning for its respective Parcel or an Owner's ability to continue to operate its Parcel Improvements or any replacement thereof in accordance with such Owner's then current practices or which will otherwise have a material adverse impact on the Parcel Improvements or the use and enjoyment thereof (including, without limitation, the ability of the Retail Owner or Office/Annex Owner to lease space within the Retail Parcel or Office/Annex Parcel, respectively, to tenants, or the Hotel Owner's ability to sell or lease apartments or Condominium Units).

(b)    The Owners agree that the Hotel Owner shall be the "zoning control party" for the Property and the each Owner shall cooperate in every reasonable respect with any Owner seeking to amend the zoning in a manner not inconsistent with this Agreement.

74

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 81 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

## ARTICLE 17

## ESTOPPEL CERTIFICATES

17.1 **Estoppel Certificates**. Each Owner shall, from time to time but not more than twice in a twelve month period, within ten (10) business days after written request from any other Owner, any prospective transferee of such Owner or any Mortgagee or prospective Mortgagee which has complied with the notice provisions of **Section 22.12(b)** hereof, execute, acknowledge and deliver to the requesting party, a certificate ( "*Estoppel Certificate*") stating:

(a) That the terms and provisions of this Agreement are unmodified and are in full force and effect or, if modified, identifying such modifications;

(b) Whether, to the actual knowledge of the Owner executing the Estoppel Certificate, there is any existing default under this Agreement (or grounds therefor after giving the requisite notice hereunder) by the Requesting Owner and, if so, specifying the nature and extent thereof;

(c) Whether there are any sums (other than payments for Operating Expenses owed under **EXHIBIT 7.6** which in the aggregate are less than $10,000 and are not overdue) which the Owner executing such Estoppel Certificate is entitled to receive or demand from the Requesting Owner, and if there is any such sum, specifying the nature and amounts thereof;

(d) Whether the Owner executing the Estoppel Certificate has performed or is performing work other than services pursuant to **ARTICLE 7** hereof the cost of which such Owner is or will be entitled to charge in whole or in part to the Requesting Owner under the provisions hereof but has not yet charged to such Requesting Owner, and if there be any such work, specifying the nature and extent thereof and the projected amount to be paid by the Requesting Owner;

(e) The nature and extent of any setoffs, claims, counterclaims or defenses then being asserted or capable of being asserted (after giving the requisite notice, if any, required hereunder), or otherwise known by the Owner to its actual knowledge, against the enforcement of the Requesting Owner's rights hereunder;

(f) The total amount of all liens being asserted or capable of being asserted (after giving the requisite notice, if any, required hereunder) by the Owner executing the Estoppel Certificate to its actual knowledge under the provisions of this Agreement describing the applicable provision or provisions and the details of any such lien claim;

(g) [Intentionally Omitted];

(h) [Intentionally Omitted];

CHGO2\40126644.12

(i)    The current address or addresses to which notices given to the Owner executing such Estoppel Certificate are required to be mailed under **ARTICLE 21** hereof; and

(j)    Such other facts or conclusions as may be reasonably requested.

At any time that a Parcel or any portion thereof has been submitted to and remains subject to the Act, Estoppel Certificates may only be requested by the Condominium Association and not a Unit Owner with respect to such portion of such Parcel as has been submitted to the Act (and the Condominium Association shall not request any Estoppel Certificates in connection with a sale or financing of a Unit or other transaction involving a Unit). Estoppel Certificates requested of the Owner of any Parcel or portion thereof as has been submitted to the Act shall be given by the Condominium Association for such Parcel or portion thereof and shall bind all Unit Owners. If the requesting party is a Mortgagee or prospective Mortgagee, the Owner on whose property it holds or intends to hold a Mortgage will be deemed the "***Requesting Owner***." If the requesting party is a prospective transferee of an Owner, such Owner will be deemed the "***Requesting Owner***."

## ARTICLE 18

## DEPOSITARY

18.1   **Appointment of Depositary**.

(a)    A depositary (the "***Depositary***") shall be appointed at or before such time as the duties of Depositary are to be performed, in the manner hereinafter provided to receive insurance proceeds and condemnation Awards, to disburse such monies and to act otherwise in accordance with the terms and provisions of this Agreement. The Depositary shall be appointed by the Project Owners jointly (with the approval of their respective Mortgagees, if required by any such Mortgagee's Mortgage), and the initial Depositary shall be Chicago Title and Trust Company, 171 N. Clark Street, Chicago, IL 60601. Any other Depositary selected by the Project Owners shall be one of the then five (5) largest banks or trust companies (measured in terms of capital funds) with principal offices in Chicago, Illinois or other bank or trust company agreed to by the Project Owners. Any Project Owner may at any time propose a Depositary.

(b)    The Depositary shall be entitled to receive from each of the Project Owners said Project Owner's equitable share of the Depositary's reasonable fees and expenses for acting as Depositary, in accordance with the Approved Division, and may retain said fees and expenses, free of trust, from monies held by it.

(c)    Any Depositary appointed to act hereunder shall execute an agreement with the Project Owners accepting said appointment in substantially the form attached hereto as **EXHIBIT 18.1** and made part hereof.

CHGO2\40126644.12

18.2  **Liability of Depositary**.  The Depositary shall not be liable or accountable for any action taken or disbursement made in good faith by the Depositary, except that arising from its own negligence. The Depositary's reliance upon advice of independent competent counsel shall be conclusive evidence of good faith, but shall not be the only manner in which good faith may be shown. The Depositary shall have no affirmative obligation to prosecute a determination of the amount of, or to effect the collection of, any insurance proceeds or condemnation Award or Awards unless the Depositary shall have been given an express written authorization from the Project Owners; provided that if only one Project Owner is entitled to said insurance proceeds or condemnation Award or Awards, then said Project Owner may authorize the Depositary to so proceed. In addition, the Depositary may rely conclusively on any certificate furnished by the Architect to the Depositary in accordance with the provisions of **Section 19.1** hereof and shall not be liable or accountable for any disbursement of funds made by it in reliance upon such certificate or authorization.

18.3  **Interest on Deposited Funds**.  The Depositary shall have no obligation to pay interest on any monies held by it, unless the Depositary shall have given an express written undertaking to do so, or unless all of the Project Owners for whose benefit monies are being held have requested, and the Mortgagees of said Project Owners have concurred, in connection with a specified deposit of funds with the Depositary, that the Depositary undertake to do so. However, if the monies on deposit are not held in an interest-bearing account pursuant to an agreement among the Depositary and the Project Owners, then the Depositary, within thirty (30) days after request from any Project Owner given to the Depositary and to the other Project Owners, shall purchase with such monies, to the extent feasible, negotiable United States Government securities payable to bearer and maturing within ninety (90) days from the date of purchase thereof, except insofar as it would, in the good faith judgment of the Depositary, be impracticable to invest in such securities by reason of any disbursement of such monies which the Depositary expects to make shortly thereafter, and the Depositary shall hold such securities in trust in accordance with the terms and provisions of this Agreement.  Any interest paid or received by the Depositary on monies or securities held in trust, and any gain on the redemption or sale of any securities, shall be added to the monies or securities so held in trust by the Depositary.  Unless the Depositary shall have undertaken to pay interest thereon, monies received by the Depositary pursuant to any of the provisions of this Agreement shall not be mingled with the Depositary's own funds and shall be held by the Depositary in trust for the uses and purposes herein provided.

18.4  **Indemnification of Depositary**.  In consideration of the services rendered by Depositary, the Project Owners jointly and severally hereby agree to indemnify and hold harmless the Depositary from any and all damage, liability or expense of any kind whatsoever (including, but not limited to, reasonable attorneys' fees and expenses) incurred in the course of Depositary's duties hereunder or in the defense of any claim or claims made against Depositary by reason of its appointment hereunder, except where due to the negligence of the Depositary or actions not taken in good faith by the Depositary.  Where the Depositary is only disbursing funds for one Project Owner, and the other Project Owners are not involved in the deposit or overseeing of disbursement of funds, such other Project Owners shall not be obligated to indemnify and hold harmless the Depositary in connection with such duties of the Depositary.

77

18.5    **Resignation of Depositary**. The Depositary may resign by serving not less than sixty (60) days' prior written notice on all of the Project Owners and their Mortgagees. Within thirty (30) days after receipt of such notice, the Project Owners jointly (and their respective Mortgagees, if and to the extent required by any such Mortgagee's Mortgage) shall, in the manner set forth in **Section 18.1**, appoint a substitute who qualifies under **Section 18.1** hereof (if there are duties to be performed at such time by a Depositary or funds are held by the resigning Depositary), and the Depositary shall prepare a final accounting of all funds received, held and disbursed by it and shall transfer all funds, together with copies of all records, held by it as Depositary, to such substitute, at which time its duties as Depositary shall cease. If the Project Owners shall fail to appoint a substitute within said thirty (30) days, and there are funds held by the resigning Depositary, the Depositary may deposit such funds with either a court of competent jurisdiction or with a bank or trust company in Chicago, Illinois, which qualifies under **Section 18.1** hereof.

## ARTICLE 19

## DISBURSEMENTS OF FUNDS BY DEPOSITARY

19.1    **Disbursement Requests**.

(a)    Each request by the Architect acting pursuant to the provisions of this Agreement for disbursement of insurance proceeds, any Award or other funds for application to the cost of repair, restoration or demolition (the *"Work"*) shall be accompanied by a certificate of the Architect or another Person having knowledge of the facts reasonably acceptable to the Project Owners, dated not more than ten (10) days prior to the date of the request for any such disbursement, stating the following in its professional judgment based on periodic observations of the Work:

(i)    That the sum requested:

(A)    has been or will be paid by or on behalf of a Project Owner (in which event the certificate shall name such Project Owner) or by or on behalf of more than one (1) Project Owner (in which event the certificate shall specify the amount paid by each respective Project Owner), or

(B)    is justly due to contractors, subcontractors, materialmen, engineers, architects or other persons (whose names and addresses shall be stated) who have rendered or furnished services or materials for the Work, in which event the certificate shall also give a brief description of such services and materials and the principal subdivisions or categories thereof the respective amounts so paid or due to each of said persons in respect thereof and the amount of any retentions, and shall state the process of the Work up to the date of said certificate and any other information required by the Mechanics' Liens Act and any title insurer affording coverage against mechanics' liens;

78

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 85 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

(ii)    That the sum requested, plus all sums previously disbursed, less retentions, does not exceed the cost of the Work actually in place up to the date of such certificate plus the cost of materials supplied and actually stored on site;

(iii)    That no part of the cost of the services and materials described in the certificate has been the basis of the withdrawal of any funds pursuant to any previous request or is the basis of any other pending request for funds; and

(iv)    Other information which may from time to time be agreed to by the Project Owners or reasonably required by a Mortgagee (if and to the extent required by any such Mortgagee's Mortgage).

(b)    Upon:

(i)    compliance with the provisions of **Section 19.1(a)**, and

(ii)    receipt of contractors' and subcontractors' sworn statements required under the Mechanics' Liens Act accompanied by partial or final waivers of lien, as appropriate, and any other information required by the title insurer affording coverage against mechanics' liens from the persons named in the sworn statement, and

(iii)    approval by the title insurer, the Project Owners and the Mortgagees of the lien waivers and other documentation (and Depositary shall provide to Mortgagees any other information reasonably requested by any such Mortgagees), and the willingness of such title insurer to issue an endorsement (satisfactory to the Project Owners and the Mortgagees) insuring over possible mechanics' lien claims relating to Work in place and the continued priority of the liens in favor of the Mortgagees,

the Depositary shall out of the monies so held by the Depositary, pay or cause to be paid to the Project Owners, contractors, subcontractors, materialmen, engineers, architects and other persons named in the Architect's certificate and contractors' and subcontractors' sworn statements the respective amounts stated in said certificate and statements due them. Notwithstanding the foregoing, any Project Owner, Mortgagee or the Depositary may require that disbursements be made through the customary form of construction escrow then in use in Chicago, Illinois, with such changes as may be required to conform to the requirements or provisions of this Agreement.

(c)    The Depositary may rely conclusively, with respect to the information contained therein, on any certificate furnished by the Architect to the Depositary in accordance with the provisions of this **Section 19.1** and shall not be liable or accountable for any disbursement of funds made by it in reliance upon such certificate or authorization.

19.2    **No Lien or Consent by Contractor**.    No contractor, subcontractor, materialman, engineer, architect or any other person whatsoever, other than the Project Owners and the

79

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 86 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

Mortgagees, shall have any interest in or right to or lien upon any funds held by the Depositary. The Project Owners, with the consent of their respective Mortgagees as to the Applicable Project Owner's Share, may jointly at any time provide in writing for a different disposition of funds than that provided for in this Agreement, without the necessity of obtaining the consent of any contractor, subcontractor, materialman, engineer, architect or any other person whatsoever. If at any time the Project Owners with the consent of their respective Mortgagees as to the applicable Project Owner's Share, shall jointly instruct the Depositary in writing with regard to the disbursement of any funds held by the Depositary, then the Depositary shall disburse such funds in accordance with said instructions, and the Depositary shall have no liability to anyone by reason of having so disbursed said funds in accordance with said instructions.

## ARTICLE 20

## ARCHITECT

20.1    **Appointment of Architect.**

(a)    Any Project Owner or Project Owners jointly requiring the services of an architect pursuant to this Agreement shall appoint a firm consisting of both architects and engineers (or a firm of architects and a firm of engineers agreeing to act jointly hereunder) experienced in the design and operation of structures similar to the Project to serve under and pursuant to the terms and provisions of this Agreement (the "*Architect*").

(b)    The Architect shall, upon its appointment, execute an agreement with the Project Owner(s) in the form required by the Project Owner(s), which agreement shall also incorporate those services necessary to implement the provisions of this Agreement and shall provide that the Project Owner(s) may cause the then serving Architect to be replaced without cause upon thirty (30) days' prior written notice. The Project Owner or Project Owners responsible for appointing the Architect may replace the Architect for any reason.

(c)    If all Project Owners do not jointly desire to replace the Architect, then the Project Owner desiring replacement of the Architect shall serve notice upon the other Project Owners requesting the removal of the then-serving Architect, which notice shall set forth with specificity the respect or respects in which such Architect shall have failed to perform fairly, diligently or competently. If, in the opinion of the Project Owners receiving such notice, the Project Owner desiring to replace the Architect is not entitled to require the appointment of a new Architect pursuant to this **Section 20.1**, a Project Owner receiving such notice and objecting to the appointment of a new Architect shall notify the other Project Owners of its objection in writing within ten (10) business days after receipt of such notice from the Requesting Owner. Any Architect acting hereunder shall have the right to resign at any time upon not less than ninety (90) days' prior written notice to the Project Owners.

20.2    **Notice of Submission of Dispute to Architect.**    In any instance when the Architect serving pursuant to **Section 20.1** hereof is authorized by this Agreement to advise the

80

Project Owners concerning any dispute or matter, any Project Owner involved in such dispute or matter may submit the same to the Architect. The Project Owner submitting such dispute or matter shall simultaneously give written notice of the submission of such dispute or matter to the other Project Owners involved in such dispute. The Architect shall, except in an Emergency Situation, afford each Project Owner involved in any dispute or matter, and any attorney or other representative designated by such Project Owners, an opportunity to furnish information or data or to present such party's views. No advice given by the Architect under this Agreement shall be binding on the Project Owners, and a Project Owner may accept or reject such advice.

20.3    **Replacement of Architect**. If any new Architect is appointed hereunder, and if the Architect being replaced is then engaged in the resolution of any dispute or matter theretofore submitted hereunder, or if the Architect being replaced is then engaged in the preparation of any plans and specifications or in the supervision of any work required hereunder or pursuant hereto, then, if the Project Owners so choose, the Architect being replaced shall continue to act as Architect with respect, and only with respect, to such pending dispute or matter or the completion of such preparation of plans and specifications or supervision of any such work.

20.4    **Architect's Fees**. The Architect shall be paid a reasonable fee for any services rendered hereunder and shall be reimbursed for reasonable and necessary expenses incurred in connection therewith, and each Project Owner involved in the work shall pay its equitable share of such fees. In this regard, in any instance when the Architect shall, in accordance with any of the provisions of this Agreement, render services in connection with the preparation of plans and specifications or the supervision of repair, restoration or demolition of the Improvements, or any part thereof, the fees and expenses of the Architect shall be considered as costs and expenses of such repair, restoration or demolition as the case may be, and shall be paid in the same manner as other costs and expenses of repair, restoration and demolition under the provisions of this Agreement pursuant to which the Architect is performing such services. If not otherwise provided in this Agreement, the Project Owners shall agree on the equitable share owed by each Project Owner. If any Project Owner shall fail to pay its allocable share of any fees or expenses of the Architect within ten (10) business days after receipt of any invoice therefor from the Architect, then any other Project Owner may pay the same and the Project Owner failing to pay shall, within ten (10) business days after written demand for reimbursement, reimburse the other Project Owner for any such payment.

## ARTICLE 21

## NOTICES AND APPROVALS

21.1    **Notice to Parties**.

(a)    Each notice, demand, request, consent, approval, disapproval, designation or other communication (all of the foregoing are herein referred to as a "*notice*") that an Owner is required, permitted or desires to give or make or communicate to any other Owner shall be in writing and shall be deemed to have been given (i) if and when personally delivered (including messenger service), or (ii) on the third business day after being deposited in United States registered or certified mail, postage prepaid, or (iii) on

81

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 88 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

the first business day after being deposited with a commercially recognized national overnight delivery service, and addressed to a party at its address set forth below or to such other address the Owner to receive such notice may have designated to all other Owners by notice in accordance herewith:

[Remainder of page deliberately left blank.]

82

| | |
|---|---|
| If to the Hotel Owner: | Thor Palmer House Hotel & Shops LLC<br>c/o Thor Equities, LLC<br>139 Fifth Avenue<br>New York, New York  10010<br>Attention:      Joseph J. Sitt |
| With a copy to: | Morris Missry, Esq.<br>Wachtel & Masyr, LLP<br>110 East 59th Street<br>New York, New York 10022 |
| If to the Office/Annex Owner: | Thor Palmer House Office LLC<br>c/o Thor Equities, LLC<br>139 Fifth Avenue<br>New York, New York  10010<br>Attention:      Joseph J. Sitt |
| With a copy to: | Morris Missry, Esq.<br>Wachtel & Masyr, LLP<br>110 East 59th Street<br>New York, New York 10022 |
| If to the Retail Owner: | Thor Palmer House Retail LLC<br>c/o Thor Equities, LLC<br>139 Fifth Avenue<br>New York, New York  10010<br>Attention:      Joseph J. Sitt |
| With a copy to: | Morris Missry, Esq.<br>Wachtel & Masyr, LLP<br>110 East 59th Street<br>New York, New York 10022 |

and to any Mortgagee which has complied with the notice provisions of **Section 22.12** hereof.

(b)      Any Owner may designate a different address from time to time, provided however it has given at least ten (10) business days' advance notice of such change of address.  Failure to give notices to any Owner's or Mortgagee's counsel whom such Owner or Mortgagee has requested that copies be delivered to shall not render notice to an Owner or Mortgagee invalid or ineffective. If any of the aforesaid Owners shall cease to be the "Owner" of its respective portion of the Improvements, and the succeeding Owner of that portion of the Improvements shall fail to give a notice of change of address, then notices may be sent to any one of the following: (i) to the last Owner of

83

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 90 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM

record disclosed to the Owner giving notice, (ii) to "Owner of Record" at the street address for that Owner's portion of the Improvements as designated by the U.S. Postal Service (or by the successor of the U.S. Postal Service) or City of Chicago department or agency having jurisdiction over City of Chicago addresses, or (iii) to the grantee at the address shown in that last recorded conveyance of the portion of the Improvements in question.

21.2    **Multiple Owners.**

(a)    If at any time the interest or estate of any of the Owners in their respective Parcels shall be owned by more than one Person (hereinafter collectively referred to as "*multiple owners*"), the multiple owners shall give to each of the other Owners a written notice, executed and acknowledged by all of the multiple owners, in form proper for recording, which shall

(i)    designate one Person, having an address in the State of Illinois to whom shall be given, as agent for all of the multiple owners, all notices thereafter given to the multiple owners, and

(ii)    designate such Person as agent for the service of process in any action or proceeding, whether before a court, involving the determination or enforcement of any rights or obligations hereunder.

(b)    Until any such designation is revoked by written notice given by all of their multiple owners or their successors in interest, any notice, and any summons, complaint or other legal process (which such summonses, complaints and legal processes are hereafter in this **ARTICLE 21** collectively referred to as "*legal process*"), given to, or served upon, such agent shall be deemed to have been given to, or served upon, each and every one of the multiple owners at the same time that such notice or legal process is given to, or served upon, such agent.

(c)    If the multiple owners shall fail so to designate in writing one such agent to whom all notices are to be given and upon whom all legal process is to be served, or if such designation shall be revoked as aforesaid and a new agent is not designated, then any notice or legal process may be given to, or served upon, any one of the multiple owners as agent for all of the multiple owners and such notice or legal process shall be deemed to have been given to, or served upon, each and every one of the multiple owners at the same time that such notice or legal process is given to, or served upon, any one of them, and each of the multiple owners shall be deemed to have appointed each of the other multiple owners as agent for the receipt of notices and the service of legal process as stated above.

(d)    The term "multiple owners" as used in this **Section 21.2** shall not include Unit Owners; provided, however that notice to or from Unit Owners shall be governed by **Section 22.6** of this Agreement.

84

CHGO2\40126644.12

Order: 18000031623                                    Page 91 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM
Doc: 634644078 EAS 12-12-2006

## ARTICLE 22

## GENERAL

22.1   **Cooperation of Owners**. In fulfilling obligations and exercising rights under this Agreement, each Owner shall cooperate with the other Owners to promote the efficient operation of each respective portion of the Improvements and the harmonious relationship among the Owners and to protect the value of each Owner's respective portion, estate or interest in the Land and Improvements. To that end, each Owner shall share information which it possesses relating to matters which are the subject of this Agreement, except such information as an Owner may reasonably deem confidential or privileged or which may be the subject of litigation or which such Owner is prohibited from revealing pursuant to court order. From time to time after the date hereof, each Owner shall furnish, execute and acknowledge, without charge (except where elsewhere provided herein) such other instruments, documents, materials and information as another Owner may reasonably request in order to confirm to such Requesting Owner the benefits contemplated hereby, but only so long as any such request does not restrict or abridge the benefits granted the other Owners hereunder.

22.2   **Severability**.   The illegality, invalidity or unenforceability under law of any covenant, restriction or condition or any other provision of this Agreement shall not impair or affect in any manner the validity, enforceability or effect of the remaining provisions of this Agreement.

22.3   **Headings**.   The headings of Articles and Sections in this Agreement are for convenience of reference only and shall not in any way limit or define the content, substance or effect of the Articles or Sections.

22.4   **Amendments to Agreement**.   This Agreement may be amended or terminated only by a duly recorded instrument signed by all of the then Owners of the Parcels and consented to by all Mortgagees (if and to the extent required by any such Mortgagee's Mortgage). So long as any portion of the Property is submitted to the Act, the Condominium Association for such portion shall, by its authorized officers, execute all amendments to or any termination of this Agreement on behalf of all Unit Owners (as the successor to the Hotel Owner), which amendments or termination shall be binding on all Unit Owners (as the successor to the Hotel Owner).   Any amendment to or termination of this Agreement shall be recorded with the Recorder. To the extent the any Owner's Mortgagee (including, without limitation, Hotel Owner's construction lenders or mezzanine lenders) require reasonable changes be made to this Agreement as a condition to financing such Owner's portion of the project, the other Owners agree that neither shall unreasonably withhold or delay its consent and will cooperate with the requesting Owner to execute any such necessary amendment, provided such change will not have an adverse effect upon the non-requesting Owner and the costs of any such amendment shall be borne exclusively by the requesting Owner; and further provided that no party shall be required to agree to a change in any percentage specified herein for the sharing of expenses.

22.5   **Perpetuities and Other Invalidity**.   The covenants, conditions and restrictions contained in this Agreement shall be enforceable by the Owners and their respective successors

85

and assigns for the term of this Agreement, which shall be perpetual to coincide with the perpetual Easements provided for under this Agreement (or if the law (including any rule against perpetuities or other statutory or common law rule) prescribes a shorter period, then upon expiration of such period). If the law prescribes such shorter period, then upon expiration of such shorter period, said covenants, conditions and restrictions shall be automatically extended without further act or deed of the Owners, except as may be required by law, for successive periods of twenty (20) years), subject to amendment or termination as set forth in **Section 22.4**. If any of the options, privileges, covenants or rights created by this Agreement would otherwise be unlawful or void for violation of (i) the rule against perpetuities or some analogous statutory provisions, (ii) the rule restricting restraints on alienation, or (iii) any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the survivor of the now living lawful descendants of George Herbert Walker Bush, former President and Vice President of the United States of America.

22.6    **Condominium Association Acting for Unit Owners.**

(a)    Upon submission of any portion, but less than all of any Parcel, to the Act, all rights, approvals, Easements and benefits under this Agreement or appurtenant to such portion shall be exercised, to the extent of such portion submitted to the Act, by any Condominium Association and all Unit Owners, except for Easements which by their nature are exercisable only by Unit Owners individually.

(b)    Following submission of all of a Parcel to the Act, any action to enforce rights, approvals, obligations, Easements, burdens and benefits under this Agreement on behalf of Unit Owners or a Condominium Association shall be taken on behalf of all Unit Owners and the Condominium Association for such Parcel by the respective Condominium Association by its duly authorized officers acting pursuant to authority granted by law, the Condominium Declaration or resolution of the board of managers of the Condominium Association.

(c)    All obligations of an Owner under this Agreement shall be the obligations jointly and severally of the Condominium Association and the Unit Owners, collectively with respect to any portion of the Property as has been submitted and remains subject to the Act; provided, however, that no individual Unit Owner (or the holder of any mortgage on such owner's Unit) shall be liable for any obligation of an Owner in excess of a percentage of such liability equal to the percentage interest in the common elements in the respective Property attributable to such Unit as shown in the Condominium Declaration. In any case, such liability of a Unit Owner shall be subject to the provisions of **Section 23.1**. Upon payment of such amount for which a Unit Owner may be liable, (i) any lien arising against such Unit Owner's Unit on account of such claim shall be deemed released against such Unit Owner's Unit without further act or deed by any such Unit Owner, and (ii) upon the written request of such Unit Owner and at the expense of such Unit Owner, the Creditor Owner who has recorded notice of such lien shall deliver to such Unit Owner an instrument evidencing the release of such lien, but only with respect to said Unit Owner's Unit. When a Unit is owned by more than one "person" (as

86

defined in the Act) the liability of each such person for any claim against the Unit shall be joint and several.

(d)    Notices under **Section 21.1** to a Unit Owner or Unit Owners shall be effective if given either to the Condominium Association or to Unit Owners, and notices from a Unit Owner or Unit Owners shall be given by the Condominium Association.

22.7    **Abandonment of Easements**.    Easements created hereunder shall not be presumed abandoned by non-use or the occurrence of damage or destruction of a portion of the Improvements subject to an Easement, unless the Owner benefited by such Easement states in writing its intention to abandon the Easement.

22.8    **Applicable Laws**.    The parties hereto acknowledge that this Agreement and all other instruments in connection herewith have been negotiated, executed and delivered in the City of Chicago, County of Cook and State of Illinois. This Agreement and said other instruments shall, in all respects, be governed, construed, applied and enforced in accordance with the laws of the State of Illinois, including without limitation, matters affecting title to all real property, described herein.

22.9    **Naming Rights**.    Each of the Hotel Owner and the Retail Owner shall have the exclusive right to the use of the name "Palmer House" as it relates to the Hotel Parcel and the Retail Parcel. Such name may not be changed without the written consent of the Hotel Owner, as it relates solely to the Hotel Parcel naming rights, and the Retail Owner, as it relates solely to the Retail Parcel naming rights.

22.10    **No Third-Party Beneficiary**.    This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity, as a third party beneficiary (except the Mortgagees) under any Laws or otherwise.

22.11    **Incorporation**.    Each provision of the Recitals to this Agreement and each Exhibit and Appendix attached hereto is hereby incorporated in this Agreement and is an integral part hereof.

22.12    **Notice to Mortgagees; Rights of Mortgagee**.

(a)    The term **"Mortgage"** as used herein shall mean any mortgage (or any trust deed) of an interest in the Property given primarily to secure the repayment of money owed by the mortgagor. The term **"Mortgagee"** as used herein shall mean the Mortgagee from time to time under any such Mortgage (or the beneficiary under any such trust deed and their respective successors and assigns); provided, however, that if a portion of the Project is submitted to the Act, no mortgage or trust deed on an individual Unit (other than a mortgage initially placed on the entire Hotel Parcel or all Units) shall be included within the definition of **"Mortgage"** nor shall the holder thereof be included within the definition of **"Mortgagee"** thereby granting such Mortgagee rights to consent to or approve matters arising under this Agreement unless explicitly and specifically stated in this Agreement to the contrary.

87

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 94 of 203 Requested By: Milena Gueorguieva , Printed: 4/10/2018 10:53 AM

(b)     If a Mortgagee shall have signed the Consent of Mortgagee attached hereto or served on the Owners, by personal delivery, or by registered or certified mail return receipt requested, a written notice specifying the name and address of such Mortgagee, such Mortgagee shall be given a copy of each and every notice required to be given by one party to the others at the same time as and whenever such notice shall thereafter be given by one party to the others, at the address last furnished by such Mortgagee. The address of any existing Mortgagee shall be as set forth in its Consent of Mortgagee attached hereto. After receipt of such notice from a Mortgagee, no notice thereafter given by either party shall be deemed to have been given unless and until a copy thereof shall have been so given to the Mortgagee. Notwithstanding the foregoing, any mezzanine lender that provides to each of the Owners, by personal delivery, or by registered or certified mail return receipt requested, a written notice specifying the name and address of such mezzanine lender, such mezzanine lender shall be given a copy of each and every notice required to be given by one party to the others at the same time as and whenever such notice shall thereafter be given by one party to the others, at the address last furnished by such mezzanine lender (including copies of any notice any Mortgagee is entitled to receive under this Agreement requesting consent of such Mortgagee pursuant to and in accordance with the terms and conditions of this Agreement).

(c)     A Mortgagee shall have the absolute right, but no duty or obligation, to cure or correct a breach of this Agreement by the Owner whose property is secured by the Mortgagee's Mortgage within any applicable cure period provided for such breach to such mortgagor Owner. The right set forth in this subparagraph (c) shall also inure to the benefit to any mezzanine lender entitled to notice as and in the manner set forth in subparagraph (b) above.

(d)     The parties hereby acknowledge and agree that the Mortgagee, as holder of the mortgage loan on the Property, has executed the Consent of Mortgagee instrument attached hereto as **EXHIBIT 22.12** to make its Mortgage and the terms and provisions of its Mortgage and any loan documents secured by the Mortgage subject to terms and conditions of this Agreement, as provided herein. Except as provided in the foregoing sentence, the Owners further expressly acknowledge and agree that said Mortgagee(s), by their execution of such Consent of Mortgagee, have not otherwise waived, released, or relinquished any other rights or remedies or any covenants, agreements, duties, obligations or liabilities of the mortgagor under its Mortgage or under any of the other relevant loan documents securing such Mortgagee's indebtedness.

(e)     This Agreement may not be amended or modified to without the written consent of the Mortgagees then secured by a Mortgage on the Property or any portion thereof (except for individual Unit Mortgagees, if and to the extent applicable); provided, however, that if this Agreement provides for a reasonableness standard with respect to particular consent matters set forth herein, the standard for Mortgagees with respect to such particular consent matters shall also be a reasonableness standard with respect to such particular consent matters. In addition, any mezzanine lender that provides to each of the Owners, by personal delivery, or by registered or certified mail return receipt

88

CHGO2\40126644.12

requested, a written notice specifying the name and address of such mezzanine lender, shall also receive copies of any request to amend, modify or terminate this Agreement.

(f)     Notwithstanding anything to the contrary contained herein, in the event that a Depositary is to be engaged pursuant to the terms of this Agreement, the Mortgagee of the Hotel Parcel shall have the right to select such Depositary as long as such Depositary is an institutional lender and provided such Depositary is not the Hotel Parcel Mortgagee or an Affiliate of the Hotel Parcel Mortgagee.

22.13   **Coordination with Tenants**. Unless an Owner otherwise agrees in writing in each case, and except in an Emergency Situation, each Owner shall coordinate all requests and contacts between Occupants of its portion of the Improvements and the other Owners relating to the enjoyment of any Easements or the exercise of any rights or benefits granted under this Agreement or with respect to any other matters arising under or pursuant to this Agreement; provided, however, and any such coordination shall not render such Owner liable either to such tenants or the other Owners for acts of such tenants or other Owners.

22.14   **Waiver of Mechanic's Liens by Owners**. The Owners do hereby fully and completely waive and release, for themselves, their successors and assigns, any and all claim of or right to liens which such Owners may have under the Illinois Mechanic's Lien Act against, or with respect to the Property or improvements owned by any other Owner or any part thereof or with respect to the estate or interest of any person whatsoever in the Property or improvements owned by any other Owner, or any part thereof, or with respect to any material, fixtures, apparatus, or machinery, furnished or to be furnished thereto pursuant to this Agreement, by the Owners, their successors, assigns, materialmen, contractors, subcontractors, or subsubcontractors, of any labor, services, material, fixtures, apparatus, machinery, improvements, repairs or alterations in connection with the Property or the improvements thereon, other than with respect to any of the foregoing furnished pursuant to **ARTICLE 7** of this Agreement. The parties agree that, to the extent permitted by law, the legal effect of this Agreement is that no mechanic's lien or claim may be filed or maintained by any Owner under the Mechanic's Lien Act with respect to that portion of the Property or improvements owned by any other Owner, except as set forth above with regard to **ARTICLE 7** of this Agreement. The provisions of this **Section 22.14** are not intended to waive any lien created under **ARTICLE 11**.

22.15   **Binding Effect**. The Easements, covenants and restrictions created under this Agreement shall be irrevocable and perpetual in nature, and shall be binding upon and inure to the benefit of all parties having or acquiring any right, title or interest in or to any portion of, or interest or estate in, the Property, and each of the foregoing shall run with the land.

22.16   **Counterparts**. This Agreement may be executed in counterparts, all such executed counterparts shall constitute the same agreement, and the signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

22.17   **Default Shall Not Permit Termination of Agreement; No Rescission Without Unanimous Consent**. No default under this Agreement shall entitle any party hereto to terminate, cancel or otherwise rescind this Agreement or any of the easements, terms or

CHGO2\40126644.12

conditions set forth herein; provided, however, that this limitation shall not affect any other rights or remedies the parties hereto may have by reason of any default under this Agreement or any written amendment or supplement hereto. No party hereto may rescind this Agreement without the written consent of all of the Owners.

22.17 **No Partnership, Joint Venture or Principal-Agent Relationship**. Neither anything in this Agreement contained nor any acts of the parties hereto shall be deemed or construed by the parties hereto, or any of them, or by any third person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the parties to this Agreement.

## ARTICLE 23

## LIMITATION OF LIABILITY

23.1 **Limitation of Liability**. The liability under this Agreement of an Owner shall be limited to and enforceable solely against the assets of such Owner constituting an interest in the Property or Facilities (including (a) insurance and condemnation proceeds attributable to the Property and Facilities, (b) where the Owner is a trustee of a land trust, the subject matter of the trust and (c) where any portion of an Owner's Property has been sold, to the extent of any liability accruing prior thereto, the net proceeds of such sale) and any security, such as a letter of credit or bond provided pursuant to this Agreement, and no other assets of such Owner. Assets of an Owner which is a partnership, corporation or limited liability company do not include the assets of the partners, shareholders or members of such partnership, corporation or limited liability company Owner, and the negative capital account of a partner in a partnership, or a member in a limited liability company, which is an Owner and an obligation of a partner to contribute capital to the partnership, or a member to contribute capital to the limited liability company which is an Owner shall not be deemed to be assets of the partnership or limited liability company which is an Owner. At any time during which an Owner is trustee of a land trust, all of the covenants and conditions to be performed by it hereunder are undertaken solely as trustee, as aforesaid, and not individually, and no personal liability, shall be asserted or be enforceable against it or any of the beneficiaries under said trust Agreement by reason of any of the covenants or conditions contained herein.

23.2 **Transfer of Ownership**. If an Owner shall sell, assign, transfer, convey or otherwise dispose of all or any portion of its Parcel (other than as security for a loan to such Owner), then:

(a) to the extent of such assignment, transfer, conveyance or other disposition of its Parcel, such Owner shall be freed and relieved of any and all covenants and obligations arising under this Agreement which accrue under this Agreement from and after the date such Owner shall make such sale, assignment, transfer, conveyance or other disposition, and

(b) The Person who succeeds to Owner's interest in such Parcel shall be deemed to have assumed any and all of the covenants and obligations arising under this

90

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Agreement of such Owner to the extent of such Person's interest in the Parcel which accrue under this Agreement from and after the date such Owner shall so sell, assign, transfer, convey or otherwise dispose of its interest in such Parcel.

## ARTICLE 24

## STRUCTURAL SUPPORT

24.1    **Structural Safety and Integrity**.  No Owner shall do or permit any act which would impair, undermine or adversely affect the structural safety or integrity of any portion of the Building.

24.2    **Construction of Support**.

(a)    The Owner responsible for any adverse effect on the structural safety or integrity of any portion of the Building shall commence the construction of all necessary remedial structural support within a reasonable time under the circumstances and shall diligently complete or cause completion of such construction in accordance with plans and specifications detailing necessary remedial structural support prepared by or approved by Architect and the other Owner(s), which such approvals shall not be unreasonably withheld or delayed.  The responsible Owner shall pay all costs and expenses, including all architectural and engineering fees in connection with construction of the remedial structural support, including any ongoing Maintenance costs.  The provisions of Article 11, and not this Article 24, shall apply if the adverse effect of the structural safety or integrity of the Building results from a fire or other casualty.

(b)    The construction of such necessary remedial structural support shall be performed by a contractor or contractors jointly selected by the Owners (with the advice of the Architect).  For purposes of this Article 24, provision or construction of necessary remedial structural support shall also include any Maintenance required to remedy or prevent any adverse effect on the structural integrity or safety of the Building.

24.3    **Effect of Delay**.  If delay in constructing necessary remedial structural support would endanger the structural safety or integrity of any portion of the Building, or responsibility for providing structural support cannot readily be determined or is disputed, and it is not likely that such work will be commenced in time to avoid a reduction in structural integrity or safety, then the Owner of the portion of the Building in which the reduction occurred or is occurring shall, upon not less than ten (10) business days' advance written notice to the other Owner (except that such advance written notice shall not be required in an Emergency Situation), provide necessary remedial structural support as and wherever required, or the Owners shall jointly undertake to provide substitute or additional structural support; provided, however, the responsible Owner shall be liable for and pay all costs and expenses incurred as a result of the other Owner's provision of any necessary remedial structural support.

91

Order: 18000031623
Doc: 634644078 EAS 12-12-2006

Page 98 of 203 Requested By: Milena Gueorguieva  , Printed: 4/10/2018 10:53 AM

**IN WITNESS WHEREOF**, Thor Hotel, Thor Office and Thor Retail have caused this Agreement to be executed the day and year first above written.

**THOR HOTEL:**

**THOR PALMER HOUSE HOTEL & SHOPS LLC**, a Delaware limited liability company

By: _____
Name: MORRIS MISSRY
Its: Authorized Signatory

**THOR OFFICE:**

**THOR PALMER HOUSE OFFICE LLC**, a Delaware limited liability company

By: _____
Name: MORRIS MISSRY
Its: Authorized Signatory

**THOR RETAIL:**

**THOR PALMER HOUSE RETAIL LLC**, a Delaware limited liability company

By: _____
Name: MORRIS MISSRY
Its: Authorized Signatory

STATE OF New York )
                  ) SS
COUNTY OF New York )

I, Mia Stevens-Haynes a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that **Morris Missry**, the authorized signatory of THOR PALMER HOUSE HOTEL & SHOPS LLC, a Delaware limited company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said companies, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this ___8___ day of December, 2006.

_____
Notary Public

My Commission expires _7/26/08_

MIA STEVENS HAYNES
Notary Public, State of New York
No. 02ST6113352
Qualified in New York County
Commission Expires 7/26/08

STATE OF New York )
                  ) SS
COUNTY OF New York )

I, Mia Stevens-Haynes a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that **Morris Missry**, the authorized signatory of THOR PALMER HOUSE OFFICE LLC, a Delaware limited company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said companies, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this ___8___ day of December, 2006.

_____
Notary Public

My Commission expires _7/26/08_

MIA STEVENS HAYNES
Notary Public, State of New York
No. 02ST6113352
Qualified in New York County
Commission Expires 7/26/08

STATE OF _New York_            )
                               ) SS
COUNTY OF _New York_           )

     I, _Mia Stevens-Haynes_ , a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that **Morris Missry**, the authorized signatory of THOR PALMER HOUSE RETAIL LLC, a Delaware limited company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said companies, for the uses and purposes therein set forth.

     GIVEN under my hand and Notarial Seal this _8_ day of _December_ , 2006.

Notary Public

My Commission expires _7/26/08_

MIA STEVENS HAYNES
Notary Public, State of New York
No. 02ST6113352
Qualified in New York County
Commission Expires 7/26/08

**EXHIBIT 1.1(B)**

## LEGAL DESCRIPTION OF HOTEL PARCEL

SEE ATTACHED

PIN:      Part of: 17-15-102-005; 17-15-102-006;
                  17-15-102-010; 17-15-102-011

Address:    17 East Monroe Street, Chicago, Illinois 60603

1.1(B)-1

BASEMENT 3
HOTEL PARCEL A
UPPER LIMIT -9.67 FEET NO LOWER LIMIT
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET;  THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT; SAID PARCEL LYING BELOW THE HORIZONTAL PLANE HAVING AN
ELEVATION OF -9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE
ENTIRE HORIZONTAL BOUNDARY OF SAID TRACT PROJECTED VERTICALLY, IN
SAID COOK COUNTY, ILLINOIS.

BASEMENT 2
HOTEL PARCEL B
UPPER LIMIT 1.15 FEET LOWER LIMIT -9.67 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);

RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET;  THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID PARCEL; SAID PARCEL LYING BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET CHICAGO CITY DATUM AND LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF  -9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE ENTIRE  HORIZONTAL BOUNDARY OF SAID TRACT PROJECTED VERTICALLY, EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 136.85 FEET TO THE POINT OF BEGINNING: THENCE NORTH 90°00'00" EAST, 34.33 FEET; THENCE SOUTH 00°00'00" EAST, 18.19 FEET; THENCE NORTH 90°00'00" WEST, 34.35 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE, 18.19 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART LYING WITHIN SAID TRACT LYING BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET CHICAGO CITY DATUM AND LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF  -9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 128.41 FEET; THENCE SOUTH 89° 55' 57" EAST 91.25 FEET TO THE POINT OF BEGINNING: THENCE NORTH 90°00'00" EAST, 7.27 FEET; THENCE SOUTH 00°00'00" EAST, 17.11 FEET; THENCE NORTH 90°00'00" WEST, 7.27 FEET TO THE; THENCE NORTH 00°00'00" EAST  17.11 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1

HOTEL PARCEL C
UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY
DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED
VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST
CORNER OF SAID TRACT, THENCE NORTH 00°04'03" WEST ALONG THE WEST
LINE OF SAID TRACT, 89.81 FEET, THENCE SOUTH 89°55'57" EAST, 110.73 FEET
TO THE POINT OF BEGINNING: THENCE NORTH 00°03'51" EAST, 9.08 FEET;
THENCE SOUTH 89°56'10" EAST, 3.91 FEET; THENCE SOUTH 00°03'51" WEST,
9.08 FEET;  THENCE NORTH 89°56'06" WEST, 3.91 FEET TO THE POINT OF
BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL D
UPPER LIMIT 14.68 LOWER LIMIT 1.15

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM,  THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 97.90 FEET,  THENCE SOUTH 00°17'29" EAST, 39.99 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 89°56'10" EAST, 12.16 FEET; THENCE SOUTH 00°03'50" WEST, 5.91 FEET; THENCE SOUTH 89°56'10" EAST, 2.75 FEET; THENCE SOUTH 00°03'50" WEST, 4.15 FEET; THENCE NORTH 89°56'10" WEST, 2.75 FEET; THENCE SOUTH 00°03'50" WEST, 11.16 FEET; THENCE NORTH 89°56'10" WEST, 9.31 FEET; THENCE NORTH 00°03'50" EAST, 9.40 FEET; THENCE NORTH 89°56'10" WEST, 4.68 FEET; THENCE NORTH 00°03'50" EAST, 7.03 FEET; THENCE SOUTH 89°56'10" EAST, 1.83 FEET; THENCE NORTH 00°03'50" EAST, 4.79 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL E
UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 151.73 FEET,  THENCE SOUTH 00°17'29" EAST, 54.62 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 89°56'10" EAST, 5.67 FEET; THENCE SOUTH 00°03'50" WEST, 21.12 FEET; THENCE SOUTH 89°56'10" EAST, 11.99 FEET; THENCE SOUTH 00°03'50" WEST, 6.81 FEET; THENCE NORTH 89°56'10" WEST, 17.66 FEET; THENCE NORTH 00°03'50" EAST, 27.93 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL F

UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET;  THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY
DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED
VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST
CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH
LINE OF SAID TRACT, 190.01 FEET, THENCE SOUTH 00°17'29" EAST, 76.94 FEET
TO THE POINT OF BEGINNING, THENCE SOUTH 89°56'10" EAST, 10.96 FEET;
THENCE SOUTH 00°03'50" WEST, 8.38 FEET; THENCE NORTH 81°01'51" WEST,
11.10 FEET; THENCE NORTH 00°03'50" EAST, 6.66 FEET TO THE POINT OF
BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL G
UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION

15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST  85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 249.17 FEET,  THENCE SOUTH 00°00'27" WEST, 20.40 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 00°00'27" EAST, 12.27 FEET; THENCE NORTH 89°59'53" WEST, 10.54 FEET; THENCE NORTH 00°03'50" EAST, 12.77 FEET; THENCE SOUTH 89°59'33" EAST, 10.53 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL H
 UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE

STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 232.49 FEET,  THENCE SOUTH 00°17'29" EAST, 78.15 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 00°03'50" WEST, 4.19 FEET; THENCE NORTH 89°56'10" WEST, 1.18 FEET; THENCE SOUTH 00°03'50" WEST, 21.16 FEET; THENCE NORTH 89°56'10" WEST, 2.71 FEET; THENCE SOUTH 00°03'50" WEST, 1.06 FEET; THENCE NORTH 89°56'10" WEST, 4.38 FEET; THENCE NORTH 00°03'50" EAST, 1.06 FEET; THENCE NORTH 89°56'10" WEST, 6.08 FEET; THENCE NORTH 00°03'50" EAST, 10.33 FEET; THENCE SOUTH 89°56'10" EAST, 3.78 FEET; THENCE NORTH 00°03'50" EAST, 13.85 FEET; THENCE SOUTH 89°56'10" EAST, 3.70 FEET; THENCE NORTH 00°03'50" EAST, 1.17 FEET; THENCE SOUTH 89°56'10" EAST, 6.87 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL I
UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION

15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00°00'27" EAST ALONG THE EAST LINE OF SAID TRACT, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 74.48 FEET; THENCE SOUTH 00°00'27" WEST, 16.03 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89°56'10" EAST, 4.09 FEET; THENCE SOUTH 00°03'50" WEST, 5.39 FEET; THENCE NORTH 89°56'10" WEST, 4.09 FEET; THENCE NORTH 00°03'50" EAST, 5.39 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
HOTEL PARCEL J
UPPER LIMIT 14.68 LOWER LIMIT 1.15
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89°35'47" WEST ALONG THE SOUTHERN MOST SOUTH LINE OF SAID TRACT, 174.81 FEET; THENCE NORTH 00°01'23" EAST, 9.90 FEET; THENCE SOUTH 89°32'49" WEST, 64.91 FEET; THENCE NORTH 00°04'03" EAST, 18.54 FEET; THENCE SOUTH 89°55'57" EAST, 22.96 FEET; THENCE NORTH 00°04'03" EAST, 9.36 FEET; THENCE NORTH 89°55'57" WEST, 23.08 FEET; THENCE NORTH 00°04'03" EAST, 8.78 FEET; THENCE SOUTH 89°55'57" EAST, 7.31 FEET; THENCE NORTH 00°04'03" EAST, 18.50 FEET; THENCE SOUTH 89°55'57" EAST, 33.90 FEET; THENCE NORTH 00°04'03" EAST, 7.27 FEET; THENCE SOUTH 89°55'57" EAST, 99.58 FEET; THENCE NORTH 45°03'50" EAST, 6.82 FEET; THENCE NORTH 00°03'50" EAST, 8.91 FEET; THENCE SOUTH 89°56'10" EAST, 7.88 FEET; THENCE SOUTH 00°03'50" WEST, 11.68 FEET; THENCE SOUTH 44°56'10" EAST, 12.20 FEET; THENCE SOUTH 00°03'50" WEST, 1.87 FEET; THENCE SOUTH 89°55'57" EAST, 42.35 FEET; THENCE SOUTH 00°04'03" WEST, 18.44 FEET; THENCE SOUTH 89°55'57" EAST, 35.34 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID TRACT, 43.43 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS .

STREET LEVEL
HOTEL PARCEL K
UPPER LIMIT 26.12 LOWER LIMIT 14.68
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY
DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED
VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST
CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST
LINE OF SAID TRACT, 18.59 FEET; THENCE SOUTH 89°55'57" EAST, 30.54 FEET;
THENCE SOUTH 00°27'11" EAST, 18.32 FEET TO THE SOUTH LINE SAID TRACT;
THENCE SOUTH 89°32'49" WEST ALONG THE SOUTH LINE OF SAID TRACT, 30.71
FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.


STREET LEVEL
HOTEL PARCEL L
UPPER LIMIT 26.12 LOWER LIMIT 14.68

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM,  THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 178.17 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'53" EAST, 33.92 FEET; THENCE NORTH 00°04'07" EAST, 0.75 FEET; THENCE SOUTH 89°55'53" EAST, 10.74 FEET; THENCE SOUTH 00°04'07" WEST, 0.75 FEET; THENCE SOUTH 89°55'53" EAST, 107.73 FEET; THENCE NORTH 00°04'07" EAST, 96.12 FEET; THENCE SOUTH 89°55'53" EAST, 3.64 FEET; THENCE NORTH 00°04'07" EAST, 26.73 FEET; THENCE NORTH 89°55'53" WEST, 3.64 FEET; THENCE NORTH 00°04'07" EAST, 56.27 FEET TO THE NORTH LINE OF SAID TRACT; THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 53.86 FEET; THENCE SOUTH 00°04'07" WEST, 58.91 FEET; THENCE SOUTH 89°55'53" EAST, 35.16 FEET; THENCE SOUTH 45°00'00" EAST, 11.07 FEET; THENCE SOUTH 00°00'27" WEST, 53.03 FEET; THENCE NORTH 89°55'53" WEST, 15.39 FEET; THENCE NORTH 00°04'07" EAST, 16.17 FEET; THENCE NORTH

89°55'53" WEST, 12.26 FEET; THENCE NORTH 00°04'07" EAST, 21.74 FEET; THENCE NORTH 89°55'53" WEST, 15.39 FEET; THENCE SOUTH 00°04'07" WEST, 23.51 FEET; THENCE SOUTH 89°55'53" EAST, 2.60 FEET; THENCE SOUTH 00°04'07" WEST, 7.58 FEET; THENCE NORTH 89°55'53" WEST, 2.60 FEET; THENCE SOUTH 00°04'07" WEST, 66.46 FEET; THENCE SOUTH 89°53'12" EAST, 128.31 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID TRACT, 20.50 FEET; THENCE NORTH 89°53'12" WEST, 36.87 FEET; THENCE SOUTH 00°00'27" WEST, 63.14 FEET TO THE SOUTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°35'37" WEST ALONG THE SOUTH LINE, 137.94 FEET; THENCE NORTH 00°01'23" EAST, 9.90 FEET; THENCE SOUTH 89°32'49" WEST, 64.41 FEET; THENCE NORTH 00°04'07" EAST, 18.05 FEET; THENCE SOUTH 89°55'53" EAST, 21.91 FEET; THENCE NORTH 00°04'07" EAST, 17.47 FEET; THENCE NORTH 89°55'53" WEST, 7.14 FEET; THENCE NORTH 00°04'07" EAST, 0.71 FEET; THENCE NORTH 89°55'53" WEST, 7.92 FEET; THENCE NORTH 00°04'07" EAST, 18.74 FEET; THENCE NORTH 89°55'53" WEST, 77.15 FEET; THENCE NORTH 00°00'00" WEST, 0.50 FEET; THENCE NORTH 89°55'53" WEST, 25.12 FEET TO THE WEST LINE SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 20.00 FEET TO THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 167.71 FEET; THENCE SOUTH 00°17'29" EAST, 83.14 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°53'12" EAST, 5.10 FEET; THENCE NORTH 00°06'48" EAST, 1.25 FEET; THENCE SOUTH 89°53'12" EAST, 11.50 FEET; THENCE SOUTH 00°06'48" WEST, 1.25 FEET; THENCE SOUTH 89°53'12" EAST, 5.72 FEET; THENCE SOUTH 00°06'48" WEST, 21.71 FEET; THENCE NORTH 89°53'12" WEST, 0.36 FEET; THENCE SOUTH 00°06'48" WEST, 36.17 FEET; THENCE SOUTH 89°53'12" EAST, 4.42 FEET; THENCE SOUTH 00°06'48" WEST, 11.61 FEET; THENCE NORTH 89°53'12" WEST, 4.97 FEET; THENCE SOUTH 00°06'48" WEST, 26.64 FEET; THENCE NORTH 89°53'12" WEST, 20.24 FEET; THENCE NORTH 00°06'48" EAST, 26.45 FEET; THENCE NORTH 89°53'12" WEST, 4.93 FEET; THENCE NORTH 00°06'48" EAST, 11.56 FEET; THENCE SOUTH 89°53'12" EAST, 3.55 FEET; THENCE NORTH 00°06'48" EAST, 4.92 FEET; THENCE SOUTH 89°53'12" EAST, 2.99 FEET; THENCE NORTH 00°06'48" EAST, 4.79 FEET; THENCE NORTH 89°53'12" WEST, 2.29 FEET; THENCE NORTH 00°06'48" EAST, 26.55 FEET; THENCE NORTH 89°53'12" WEST, 0.50 FEET; THENCE NORTH 00°06'48" EAST, 21.88 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

STREET LEVEL
HOTEL PARCEL M
UPPER LIMIT 26.12 LOWER LIMIT 14.68
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING

144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG WEST LINE OF SAID TRACT, 135.54 FEET; THENCE SOUTH 89°55'57" EAST, 100.70 FEET; TO THE POINT OF BEGINNING; THENCE NORTH 90°00'00" EAST, 12.50 FEET; THENCE SOUTH 00°00'00" EAST, 5.50 FEET; THENCE NORTH 90°00'00" WEST, 3.09 FEET; THENCE SOUTH 00°00'00" WEST, 10.80 FEET; THENCE NORTH 90°00'00" WEST, 9.42 FEET; THENCE NORTH 00°00'00" EAST, 16.30 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

STREET LEVEL
HOTEL PARCEL N
UPPER LIMIT 26.12 LOWER LIMIT 14.68
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"

EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE SOUTH 00°04'03" WEST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 16.21 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

STREET LEVEL
HOTEL PARCEL O
UPPER LIMIT 26.12 LOWER LIMIT 14.68
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.

OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 100.76 FEET, THENCE SOUTH 00°17'29" EAST, 40.24 FEET TO THE POINT OF BEGINNING, THENCE NORTH 90°00'00" EAST, 11.10 FEET; THENCE SOUTH 00°00'00" WEST, 23.42 FEET; THENCE SOUTH 90°00'00" WEST, 11.10 FEET; THENCE NORTH 00°00'00" EAST, 23.42 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.


STREET LEVEL
HOTEL PARCEL P
UPPER LIMIT 26.12 LOWER LIMIT 14.68
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE

IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 239.92 FEET TO THE POINT OF BEGINNING, THENCE CONTINUING ALONG SAID NORTH LINE NORTH 89°42'31" EAST, 9.25 FEET; THENCE SOUTH 00°00'27" WEST, 32.00 FEET; THENCE SOUTH 89°42'31" WEST, 9.25 FEET; THENCE NORTH 00°00'27" EAST, 32.00 FEET TO THE INTERSECTION WITH THE NORTH LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

STREET LEVEL
HOTEL PARCEL Q
UPPER LIMIT 26.12 LOWER LIMIT 14.68
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING

NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00°00'27" EAST ALONG THE EAST LINE OF SAID TRACT, 152.35 FEET; TO THE POINT OF BEGINNING; THENCE NORTH 89°55'53" WEST, 9.33 FEET; THENCE SOUTH 00°04'07" WEST, 3.00 FEET; THENCE NORTH 89°55'53" WEST, 8.57 FEET; THENCE SOUTH 00°00'27" WEST, 7.94 FEET; THENCE NORTH 89°59'33" WEST, 19.24 FEET; THENCE NORTH 00°00'27" EAST, 21.61 FEET; THENCE SOUTH 89°59'33" EAST, 37.14 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 10.69 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL R
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING

NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET; THENCE SOUTH 89°55'57" EAST, 30.54 FEET; THENCE SOUTH 00°04'03" WEST, 18.31 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°32'49" WEST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT, 30.54 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL S
UPPER LIMIT 32.40 LOWER LIMIT 26.12
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8

IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE SOUTH 00°04'03" WEST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 16.21 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL T
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8

INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 55.86 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°04'03" EAST, 20.71 FEET; THENCE SOUTH 89°55'57" EAST, 76.80 FEET; THENCE NORTH 00°04'03" EAST, 8.92 FEET; THENCE SOUTH 89°55'57" EAST, 25.66 FEET; THENCE NORTH 00°00'00" EAST, 31.10 FEET; THENCE NORTH 89°55'57" WEST, 1.67 FEET; THENCE NORTH 00°04'03" EAST, 18.17 FEET; THENCE SOUTH 90°00'00" WEST, 5.31 FEET; THENCE NORTH 00°04'03" EAST, 41.20 FEET; THENCE SOUTH 90°00'00" EAST, 5.59 FEET; THENCE NORTH 00°00'00" EAST, 33.80 FEET; THENCE NORTH 90°00'00" EAST, 9.15 FEET; THENCE SOUTH 00°00'00" WEST, 11.43 FEET; THENCE SOUTH 89°55'53" EAST, 42.23 FEET; THENCE NORTH 00°04'07" EAST, 57.12 FEET TO THE NORTH LINE OF SAID TRACT; THENCE NORTH 89°42'31" EAST ALONG SAID NORTH LINE OF SAID TRACT, 53.86 FEET; THENCE SOUTH 00°04'07" WEST, 57.46 FEET; THENCE SOUTH 89°55'53" EAST, 42.98 FEET; THENCE SOUTH 00°00'27" WEST, 42.39 FEET; THENCE SOUTH 89°59'33" EAST, 85.20 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 26.00 FEET; THENCE NORTH 89°59'33" WEST, 37.25 FEET; THENCE SOUTH 00°00'27" WEST, 53.67 FEET; THENCE SOUTH 89°53'12" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 20.50 FEET; THENCE NORTH 89°53'12" WEST, 37.25 FEET; THENCE SOUTH 00°00'27" WEST, 63.14 FEET TO THE SOUTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°35'37" WEST ALONG THE SOUTHERN MOST SOUTH LINE OF SAID TRACT, 137.56 FEET; THENCE NORTH 00°01'23" EAST, 9.90 FEET; THENCE SOUTH 89°32'49" WEST, 80.70 FEET; THENCE NORTH 00°04'03" EAST, 36.01 FEET; THENCE NORTH 89°55'57" WEST, 11.63 FEET; THENCE NORTH 00°04'03" EAST, 19.13 FEET; THENCE NORTH 89°55'57" WEST, 67.50 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" EAST, 5.40 FEET; THENCE SOUTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" WEST, 5.40 FEET TO THE POINT OF BEGINNING;

ALSO EXCEPT THEREFROM THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH

89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" WEST, 1.90 FEET; THENCE NORTH 90°00'00" EAST, 3.85 FEET; THENCE SOUTH 00°00'00" EAST, 1.90 FEET; THENCE NORTH 90°00'00" WEST, 3.85 FEET TO THE POINT OF BEGINNING), IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL U
UPPER LIMIT 32.40 LOWER LIMIT 26.12
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 239.92 FEET TO THE POINT OF BEGINNING, THENCE CONTINUING ALONG SAID NORTH LINE NORTH 89°42'31" EAST, 9.25 FEET;

THENCE SOUTH 00°00'27" WEST, 32.00 FEET; THENCE SOUTH 89°42'31" WEST, 9.25 FEET; THENCE NORTH 00°00'27" EAST, 32.00 FEET TO THE INTERSECTION WITH THE NORTH LINE OF SAID TRACT TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL V
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET; THENCE SOUTH 89°55'57" EAST, 30.54 FEET; THENCE SOUTH 00°04'03" WEST, 18.31 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°32'49" WEST ALONG

THE NORTHERN MOST SOUTH LINE OF SAID TRACT, 30.54 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL W
UPPER LIMIT 33.66 LOWER LIMIT 32.40
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE SOUTH 00°04'03" WEST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 16.21 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL X
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 55.86 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID WEST LINE NORTH 00°04'03" EAST, 20.71 FEET; THENCE SOUTH 89°55'57" EAST, 76.80 FEET; THENCE NORTH 00°04'03" EAST, 8.92 FEET; THENCE SOUTH 89°55'57" EAST, 25.66 FEET; THENCE NORTH 00°00'00" EAST, 31.10 FEET; THENCE NORTH 89°55'57" WEST, 1.67 FEET; THENCE NORTH 00°04'03" EAST, 18.17 FEET; THENCE SOUTH 90°00'00" WEST, 5.31 FEET; THENCE NORTH 00°04'03" EAST, 41.20 FEET; THENCE SOUTH 90°00'00" EAST, 5.59 FEET; THENCE NORTH 00°00'00" EAST, 33.80 FEET; THENCE NORTH 90°00'00" EAST, 9.15 FEET; THENCE NORTH 00°00'00" EAST, 45.43 FEET

TO THE NORTH LINE OF SAID TRACT; THENCE NORTH 89°42'31" EAST ALONG SAID NORTH LINE OF SAID TRACT, 139.08 FEET; THENCE SOUTH 00°00'27" WEST, 100.12 FEET; THENCE SOUTH 89°59'33" EAST, 85.20 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 26.00 FEET; THENCE NORTH 89°59'33" WEST, 37.25 FEET; THENCE SOUTH 00°00'27" WEST, 53.67 FEET; THENCE SOUTH 89°53'12" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 20.50 FEET; THENCE NORTH 89°53'12" WEST, 37.25 FEET; THENCE SOUTH 00°00'27" WEST, 63.14 FEET TO THE SOUTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°35'37" WEST ALONG THE SOUTHERN MOST SOUTH LINE OF SAID TRACT, 137.56 FEET; THENCE NORTH 00°01'23" EAST, 9.90 FEET; THENCE SOUTH 89°32'49" WEST, 80.70 FEET; THENCE NORTH 00°04'03" EAST, 36.01 FEET; THENCE NORTH 89°55'57" WEST, 11.63 FEET; THENCE NORTH 00°04'03" EAST, 19.13 FEET; THENCE NORTH 89°55'57" WEST, 67.50 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" EAST, 5.40 FEET; THENCE SOUTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" WEST, 5.40 FEET TO THE POINT OF BEGINNING,

LOBBY LEVEL
HOTEL PARCEL Y
UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8

INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET; THENCE SOUTH 89°55'57" EAST, 30.54 FEET; THENCE SOUTH 00°04'03" WEST, 18.31 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°32'49" WEST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT, 30.54 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL Z
UPPER LIMIT 36.00 LOWER LIMIT 33.66
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF

AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE SOUTH 00°04'03" WEST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 16.21 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
HOTEL PARCEL AA
UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"

WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 55.86 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID WEST LINE NORTH 00°04'03" EAST, 20.71 FEET; THENCE SOUTH 89°55'57" EAST, 76.80 FEET; THENCE NORTH 00°04'03" EAST, 8.92 FEET; THENCE SOUTH 89°55'57" EAST, 25.66 FEET; THENCE NORTH 00°00'00" EAST, 31.10 FEET; THENCE NORTH 89°55'57" WEST, 1.67 FEET; THENCE NORTH 00°04'03" EAST, 18.17 FEET; THENCE SOUTH 90°00'00" WEST, 5.31 FEET; THENCE NORTH 00°04'03" EAST, 41.20 FEET; THENCE SOUTH 90°00'00" EAST, 5.59 FEET; THENCE NORTH 00°00'00" EAST, 33.80 FEET; THENCE NORTH 90°00'00" EAST, 9.15 FEET; THENCE NORTH 00°00'00" EAST, 45.43 FEET; TO THE NORTH LINE OF SAID TRACT; THENCE NORTH 89°42'31" EAST ALONG SAID NORTH LINE OF SAID TRACT, 139.08 FEET; THENCE SOUTH 00°00'27" WEST, 100.12 FEET; THENCE SOUTH 89°59'33" EAST, 85.20 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 163.04 FEET TO SOUTHEAST CORNER OF SAID TRACT; THENCE SOUTH 89°35'37" WEST ALONG THE SOUTHERN MOST SOUTH LINE OF SAID TRACT, 174.81 FEET; THENCE NORTH 00°01'23" EAST, 9.90 FEET; THENCE SOUTH 89°32'49" WEST, 80.70 FEET; THENCE NORTH 00°04'03" EAST, 36.01 FEET; THENCE NORTH 89°55'57" WEST, 11.63 FEET; THENCE NORTH 00°04'03" EAST, 19.13 FEET; THENCE NORTH 89°55'57" WEST, 67.50 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" EAST, 5.40 FEET; THENCE SOUTH 00°00'00" WEST, 3.49 FEET; THENCE SOUTH 90°00'00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 1.90 FEET; THENCE NORTH 90°00'00" EAST, 3.85 FEET; THENCE SOUTH 00°00'00" WEST, 1.90 FEET; THENCE SOUTH 90°00'00" WEST, 3.85 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

SECOND LEVEL
HOTEL PARCEL AB
UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.56 FEET; THENCE SOUTH 89°55'57" EAST, 32.56 FEET; THENCE SOUTH 00°04'03" WEST, 11.44 FEET; THENCE SOUTH 89°55'57" EAST, 57.10 FEET; THENCE NORTH 00°04'03" EAST, 25.05 FEET; THENCE SOUTH 89°55'57" EAST, 12.58 FEET; THENCE NORTH 00°04'03" EAST, 23.23 FEET; THENCE SOUTH 89°55'57" EAST, 2.65 FEET; THENCE NORTH 00°04'03" EAST, 5.66 FEET; THENCE SOUTH 89°55'57" EAST, 12.79 FEET; THENCE NORTH 00°04'03" EAST, 17.31 FEET; THENCE NORTH 89°48'52" WEST, 3.18 FEET; THENCE NORTH 00°11'08" EAST, 9.40 FEET; THENCE NORTH 89°48'52" WEST, 9.62 FEET; THENCE NORTH 00°04'03" EAST, 32.90 FEET; THENCE NORTH 89°55'57" WEST, 4.14 FEET; THENCE NORTH 00°04'03" EAST, 21.52 FEET; THENCE SOUTH 89°55'57" EAST, 13.74 FEET; THENCE NORTH 00°04'03" EAST, 10.16 FEET; THENCE SOUTH 89°55'57" EAST, 3.17 FEET; THENCE NORTH

00°04'03" EAST, 22.15 FEET; THENCE NORTH 89°48'52" WEST, 5.73 FEET; THENCE NORTH 00°11'08" EAST, 16.85 FEET; THENCE NORTH 89°48'52" WEST, 11.00 FEET; THENCE NORTH 00°11'08" EAST, 24.18 FEET; THENCE SOUTH 89°48'52" EAST, 9.39 FEET; THENCE NORTH 00°04'03" EAST, 39.61 FEET TO THE NORTH LINE OF SAID TRACT; THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 138.78 FEET; THENCE SOUTH 00°00'27" WEST, 100.12 FEET; THENCE SOUTH 89°59'33" EAST, 85.20 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE OF SAID TRACT, 163.04 FEET TO THE SOUTHEAST CORNER OF SAID TRACT; THENCE SOUTH 89°35'37" WEST ALONG THE SOUTH LINE OF SAID TRACT, 174.81 FEET; THENCE NORTH 00°01'23" EAST, 9.90 FEET; THENCE SOUTH 89°32'49" WEST, 159.83 FEET TO THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 94.60 FEET; THENCE NORTH 00° 00' 00" EAST 18.47 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°04'03" EAST, 5.35 FEET; THENCE SOUTH 89°55'57" EAST, 8.04 FEET; THENCE NORTH 00°04'03" EAST, 2.99 FEET; THENCE SOUTH 89°55'57" EAST, 14.12 FEET; THENCE SOUTH 00°04'03" WEST, 8.34 FEET; THENCE NORTH 89°55'57" WEST, 22.16 FEET TO THE POINT OF BEGINNING), IN COOK, COUNTY, ILLINOIS.

SECOND LEVEL
HOTEL PARCEL AC
UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF

AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 42.63 FEET; THENCE SOUTH 89° 55' 57" EAST 67.71 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°11'08" EAST, 18.23 FEET; THENCE NORTH 89°48'52" WEST, 4.70 FEET; THENCE NORTH 00°11'08" EAST, 3.73 FEET; THENCE SOUTH 89°48'52" EAST, 6.78 FEET; THENCE SOUTH 00°11'08" WEST, 21.96 FEET; THENCE NORTH 89°48'52" WEST, 2.08 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

SECOND LEVEL
HOTEL PARCEL AD
UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST

LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 52.20; THENCE SOUTH 89° 55' 57" EAST 41.14 TO THE POINT OF BEGINNING; THENCE NORTH 00°11'08" EAST, 3.62 FEET; THENCE SOUTH 89°48'52" EAST, 7.20 FEET; THENCE SOUTH 00°11'08" WEST, 3.62 FEET; THENCE NORTH 89°48'52" WEST, 7.20 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

SECOND LEVEL
HOTEL PARCEL AE
UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"

WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 151.07; THENCE SOUTH 89° 55' 57" EAST 40.44 TO THE POINT OF BEGINNING; THENCE NORTH 00°11'08" EAST, 3.15 FEET; THENCE SOUTH 89°48'52" EAST, 5.20 FEET; THENCE SOUTH 00°11'08" WEST, 3.15 FEET; THENCE NORTH 89°48'52" WEST, 5.20 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

SECOND LEVEL
HOTEL PARCEL AF
UPPER LIMIT 49.30 LOWER LIMIT 36.00
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT;  SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET AND BELOW THE

HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM, THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE SOUTH 00°04'03" WEST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 16.21 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

THIRD LEVEL
HOTEL PARCEL AG
LOWER LIMIT 49.30
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM IN COOK, COUNTY, ILLINOIS

EXHIBIT 1.1(C)

## LEGAL DESCRIPTION OF OFFICE/ANNEX PARCEL

THAT PART OF LOTS 1 AND 4 OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO, BOUNDED IN FRACTIONAL SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON A LINE PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF LOT 8 IN BLOCK 3 AFORESAID, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, AND THE WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET TO THE POINT OF BEGINNING; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE NORTH 89°42'31" EAST ALONG SAID SOUTH LINE 85.20 FEET TO THE WEST LINE OF SOUTH WABASH AVENUE; THENCE SOUTH 00° 00'27" WEST ALONG SAID WEST LINE 100.56 FEET TO THE PLACE OF BEGINNING; IN COOK COUNTY, ILLINOIS

PIN:        Part of: 17-15-102-005; 17-15-102-006;
            17-15-102-010; 17-15-102-011

Address:    27 East Monroe Street and 124 South Wabash Avenue, Chicago, Illinois 60603

1.1(C)-1

CHGO2\40126644.12

## EXHIBIT 1.1(D)

### LEGAL DESCRIPTION OF RETAIL PARCEL

### SEE ATTACHED

PIN:          Part of:  17-15-102-005; 17-15-102-006;
                        17-15-102-010; 17-15-102-011

Address:      101-119 South State Street, 21 East Monroe Street, 106-122 South
              Wabash Avenue and 130-132 South Wabash Avenue, Chicago, Illinois
              60603

1.1(D)-1

BASEMENT 2
RETAIL PARCEL A
UPPER LIMIT 1.15 FEET LOWER LIMIT -9.67 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT LYING BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET CHICAGO CITY DATUM AND LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF -9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 136.85 FEET TO THE POINT OF BEGINNING: THENCE NORTH 90°00'00" EAST, 34.33 FEET; THENCE SOUTH 00°00'00" EAST, 18.19 FEET; THENCE NORTH 90°00'00" WEST, 34.35 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE, 18.19 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 2
RETAIL PARCEL B

UPPER LIMIT 1.15 FEET LOWER LIMIT -9.67 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT LYING BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET CHICAGO CITY DATUM AND LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF -9.67 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 128.41 FEET; THENCE SOUTH 89° 55' 57" EAST 91.25 FEET TO THE POINT OF BEGINNING: THENCE NORTH 90°00'00" EAST, 7.27 FEET; THENCE SOUTH 00°00'00" EAST, 17.11 FEET; THENCE NORTH 90°00'00" WEST, 7.27 FEET TO THE; THENCE NORTH 00°00'00" EAST 17.11 FEET TO THE POINT OF BEGINNING, IN SAID COOK COUNTY, ILLINOIS.

BASEMENT 1
RETAIL PARCEL C
UPPER LIMIT 14.68 FEET LOWER LIMIT 1.15 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 1.15 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 254.51 FEET TO THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 89°32'49" EAST ALONG THE SOUTH LINE OF SAID TRACT, 94.92 FEET; THENCE NORTH 00°04'03" EAST, 18.54 FEET; THENCE SOUTH 89°55'57" EAST, 22.96 FEET; THENCE NORTH 00°04'03" EAST, 9.36 FEET; THENCE NORTH 89°55'57" WEST, 23.08 FEET; THENCE NORTH 00°04'03" EAST, 8.78 FEET; THENCE SOUTH 89°55'57" EAST, 7.31 FEET; THENCE NORTH 00°04'03" EAST, 18.50 FEET; THENCE SOUTH 89°55'57" EAST, 33.90 FEET; THENCE NORTH 00°04'03" EAST, 7.27 FEET; THENCE SOUTH 89°55'57" EAST, 99.58 FEET; THENCE NORTH 45°03'50" EAST, 6.82 FEET; THENCE NORTH 00°03'50" EAST, 8.91 FEET; THENCE SOUTH 89°56'10" EAST, 7.88 FEET; THENCE SOUTH 00°03'50" WEST, 11.68 FEET; THENCE SOUTH 44°56'10" EAST, 12.20 FEET; THENCE SOUTH 00°03'50" WEST, 1.87 FEET; THENCE SOUTH 89°55'57" EAST, 42.35 FEET; THENCE

SOUTH 00°04'03" WEST, 18.44 FEET; THENCE SOUTH 89°55'57" EAST, 35.34 FEET TO THE EAST LINE OF SAID TRACT; THENCE NORTH 00°00'27" EAST, ALONG SAID EAST LINE 119.61 FEET; THENCE SOUTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE NORTH LINE OF SAID TRACT; THENCE SOUTH 89°42'31" WEST ALONG THE NORTH LINE OF SAID TRACT, 249.17 FEET TO THE POINT BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00°04'03" WEST ALONG THE WEST LINE OF SAID TRACT, 89.81 FEET, THENCE SOUTH 89°55'57" EAST, 110.73 FEET TO THE POINT OF BEGINNING: THENCE NORTH 00°03'51" EAST, 9.08 FEET; THENCE SOUTH 89°56'10" EAST, 3.91 FEET; THENCE SOUTH 00°03'51" WEST, 9.08 FEET; THENCE NORTH 89°56'06" WEST, 3.91 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 97.90 FEET,   THENCE SOUTH 00°17'29" EAST, 39.99 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 89°56'10" EAST, 12.16 FEET;   THENCE SOUTH 00°03'50" WEST, 5.91 FEET; THENCE SOUTH 89°56'10" EAST, 2.75 FEET; THENCE SOUTH 00°03'50" WEST, 4.15 FEET; THENCE NORTH 89°56'10" WEST, 2.75 FEET; THENCE SOUTH 00°03'50" WEST, 11.16 FEET; THENCE NORTH 89°56'10" WEST, 9.31 FEET; THENCE NORTH 00°03'50" EAST, 9.40 FEET; THENCE NORTH 89°56'10" WEST, 4.68 FEET; THENCE NORTH 00°03'50" EAST, 7.03 FEET; THENCE SOUTH 89°56'10" EAST, 1.83 FEET; THENCE NORTH 00°03'50" EAST, 4.79 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 151.73 FEET,  THENCE SOUTH 00°17'29" EAST, 54.62 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 89°56'10" EAST, 5.67 FEET;  THENCE SOUTH 00°03'50" WEST, 21.12 FEET; THENCE SOUTH 89°56'10" EAST, 11.99 FEET; THENCE SOUTH 00°03'50" WEST, 6.81 FEET; THENCE NORTH 89°56'10" WEST, 17.66 FEET; THENCE NORTH 00°03'50" EAST, 27.93 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 190.01 FEET,  THENCE SOUTH 00°17'29" EAST, 76.94 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 89°56'10" EAST, 10.96 FEET;  THENCE SOUTH 00°03'50" WEST, 8.38 FEET; THENCE NORTH 81°01'51" WEST, 11.10 FEET; THENCE NORTH 00°03'50" EAST, 6.66 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 249.17 FEET,   THENCE SOUTH 00°00'27" WEST, 20.40 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 00°00'27" EAST, 12.27 FEET;   THENCE NORTH 89°59'53" WEST, 10.54 FEET; THENCE NORTH 00°03'50" EAST, 12.77 FEET; THENCE SOUTH 89°59'33" EAST, 10.53 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 232.49 FEET,   THENCE SOUTH 00°17'29" EAST, 78.15 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 00°03'50" WEST, 4.19 FEET;   THENCE NORTH 89°56'10" WEST, 1.18 FEET; THENCE SOUTH 00°03'50" WEST, 21.16 FEET; THENCE NORTH 89°5610" WEST, 2.71 FEET; THENCE SOUTH 00°03'50" WEST, 1.06 FEET;  THENCE NORTH 89°56'10" WEST, 4.38 FEET; THENCE NORTH 00°03'50" EAST, 1.06 FEET; THENCE NORTH 89°56'10" WEST, 6.08 FEET; THENCE

NORTH 00°03'50" EAST, 10.33 FEET; THENCE SOUTH 89°56'10" EAST, 3.78 FEET; THENCE NORTH 00°03'50" EAST, 13.85 FEET; THENCE SOUTH 89°56'10" EAST, 3.70 FEET; THENCE NORTH 00°03'50" EAST, 1.17 FEET; THENCE SOUTH 89°56'10" EAST, 6.87 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00°00'27" EAST ALONG THE EAST LINE OF SAID TRACT, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 74.48 FEET; THENCE SOUTH 00°00'27" WEST, 16.03 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89°56'10" EAST, 4.09 FEET; THENCE SOUTH 00°03'50" WEST, 5.39 FEET; THENCE NORTH 89°56'10" WEST, 4.09 FEET; THENCE NORTH 00°03'50" EAST, 5.39 FEET TO THE POINT OF BEGINNING), IN SAID COOK COUNTY, ILLINOIS.

STREET LEVEL
RETAIL PARCEL D
UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY

DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST, 152.39 FEET ALONG THE NORTH LINE OF SAID TRACT; THENCE SOUTH 00°04'07" WEST, 56.27 FEET; THENCE SOUTH 89°55'53" EAST, 3.64 FEET; THENCE SOUTH 00°04'07" WEST, 26.73 FEET; THENCE NORTH 89°55'53" WEST, 3.64 FEET; THENCE SOUTH 00°04'07" WEST, 96.12 FEET; THENCE NORTH 89°55'53" WEST, 107.73 FEET; THENCE NORTH 00°04'07" EAST, 0.75 FEET; THENCE NORTH 89°55'53" WEST, 10.74 FEET; THENCE SOUTH 00°04'07" WEST, 0.75 FEET; THENCE NORTH 89°55'53" WEST, 33.92 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.31 FEET; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE NORTH 00°04'03" EAST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 39.65 FEET TO THE POINT OF BEGINNING,(EXCEPT THAT PART DESCRIBED AS FOLLOWS COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 100.76 FEET, THENCE SOUTH 00°17'29" EAST, 40.24 FEET TO THE POINT OF BEGINNING, THENCE NORTH 90°00'00" EAST, 11.10 FEET; THENCE SOUTH 00°00'00" WEST, 23.42 FEET; THENCE SOUTH 90°00'00" WEST, 11.10 FEET; THENCE NORTH 00°00'00" EAST, 23.42 FEET TO THE POINT OF BEGINNING, ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST, 118.97 FEET; THENCE SOUTH 89°55'57" EAST, 100.70 FEET; TO THE POINT OF BEGINNING; THENCE NORTH 90°00'00" EAST, 12.50 FEET; THENCE SOUTH 00°00'00" EAST, 5.50 FEET; THENCE NORTH 90°00'00" WEST, 3.09 FEET; THENCE SOUTH 00°00'00" WEST, 10.80 FEET; THENCE NORTH 90°00'00" WEST, 9.42 FEET; THENCE NORTH 00°00'00" EAST, 16.30 FEET TO THE POINT OF BEGINNING), IN SAID COUNTY, ILLINOIS.

STREET LEVEL
RETAIL PARCEL E
UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING

NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 167.71 FEET; THENCE SOUTH 00°17'29" EAST, 83.14 FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°53'12" EAST, 5.10 FEET; THENCE NORTH 00°06'48" EAST, 1.25 FEET; THENCE SOUTH 89°53'12" EAST, 11.50 FEET; THENCE SOUTH 00°06'48" WEST, 1.25 FEET; THENCE SOUTH 89°53'12" EAST, 5.72 FEET; THENCE SOUTH 00°06'48" WEST, 21.71 FEET; THENCE NORTH 89°53'12" WEST, 0.36 FEET; THENCE SOUTH 00°06'48" WEST, 36.17 FEET; THENCE SOUTH 89°53'12" EAST, 4.42 FEET; THENCE SOUTH 00°06'48" WEST, 11.61 FEET; THENCE NORTH 89°53'12" WEST, 4.97 FEET; THENCE SOUTH 00°06'48" WEST, 26.64 FEET; THENCE NORTH 89°53'12" WEST, 20.24 FEET; THENCE NORTH 00°06'48" EAST, 26.45 FEET; THENCE NORTH 89°53'12" WEST, 4.93 FEET; THENCE NORTH 00°06'48" EAST, 11.56 FEET; THENCE SOUTH 89°53'12" EAST, 3.55 FEET; THENCE NORTH 00°06'48" EAST, 4.92 FEET; THENCE SOUTH 89°53'12" EAST, 2.99 FEET; THENCE NORTH 00°06'48" EAST, 4.79 FEET; THENCE NORTH 89°53'12" WEST, 2.29 FEET; THENCE NORTH 00°06'48" EAST, 26.55 FEET; THENCE NORTH 89°53'12" WEST, 0.50 FEET; THENCE NORTH 00°06'48" EAST, 21.88 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

STREET LEVEL
RETAIL PARCEL F
UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES

NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 89°42'31" WEST ALONG THE NORTH LINE OF SAID TRACT, 206.25 FEET; TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID NORTH LINE AFORESAID NORTH 89°42'31" EAST, 33.67 FEET; THENCE SOUTH 00°00'27" WEST, 32.00 FEET; THENCE NORTH 89°42'31" EAST, 9.25 FEET; THENCE SOUTH 00°00'27" WEST, 35.00 FEET; THENCE NORTH 45°00'00" WEST, 11.07 FEET; THENCE NORTH 89°55'53" WEST, 35.16 FEET; THENCE NORTH 00°04'07" EAST, 58.91 FEET TO THE INTERSECTION WITH NORTH LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS

STREET LEVEL
RETAIL PARCEL G
UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES

NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00°00'27" EAST ALONG THE EAST LINE OF SAID TRACT, 83.30 FEET; TO THE POINT OF BEGINNING; THENCE NORTH 89°53'12" WEST, 128.31 FEET; THENCE NORTH 00°04'07" EAST, 66.46 FEET; THENCE SOUTH 89°55'53" EAST, 2.60 FEET; THENCE NORTH 00°04'07" EAST, 7.58 FEET; THENCE NORTH 89°55'53" WEST, 2.60 FEET; THENCE NORTH 00°04'07" EAST, 23.51 FEET; THENCE SOUTH 89°55'53" EAST, 15.39 FEET; THENCE SOUTH 00°04'07" WEST, 21.74 FEET; THENCE SOUTH 89°55'53" EAST, 12.26 FEET; THENCE SOUTH 00°04'07" WEST, 16.17 FEET; THENCE SOUTH 89°55'53" EAST, 15.39 FEET; THENCE NORTH 00°00'27" EAST, 19.91 FEET; THENCE SOUTH 89°59'33" EAST, 48.06 FEET; THENCE SOUTH 00°00'27" WEST, 21.61 FEET; THENCE SOUTH 89°59'33" EAST, 19.24 FEET; THENCE NORTH 00°00'27" EAST, 7.94 FEET; THENCE SOUTH 89°55'53" EAST, 8.57 FEET; THENCE NORTH 00°04'07" EAST, 3.00 FEET; THENCE SOUTH 89°55'53" EAST, 9.33 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG SAID EAST LINE, 69.05 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS

STREET LEVEL
RETAIL PARCEL H
UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION

15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89°35'37" WEST ALONG THE SOUTH LINE OF SAID TRACT, 36.87 FEET; THENCE NORTH 00°00'27" EAST, 63.14 FEET; THENCE SOUTH 89°53'12" EAST, 36.87 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID TRACT, 62.80 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

STREET LEVEL
RETAIL PARCEL I
UPPER LIMIT 26.12 FEET LOWER LIMIT 14.68 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A

LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 14.68 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET CHICAGO CITY
DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL
PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE
NORTHWEST CORNER OF SAID TRACT, THENCE SOUTH 00°04'03" WEST, 198.17
FEET; TO THE POINT OF BEGINNING; THENCE SOUTH 89°55'53" EAST, 25.12
FEET; THENCE SOUTH 00°00'00" EAST, 0.50 FEET; THENCE SOUTH 89°55'53"
EAST, 77.15 FEET; THENCE SOUTH 00°04'07" WEST, 18.74 FEET; THENCE SOUTH
89°55'53" EAST, 7.92 FEET; THENCE SOUTH 00°04'07" WEST, 0.71 FEET; THENCE
SOUTH 89°55'53" EAST, 7.14 FEET; THENCE SOUTH 00°04'07" WEST, 17.47 FEET;
THENCE NORTH 89°55'53" WEST, 21.91 FEET; THENCE SOUTH 00°04'07" WEST,
18.05 FEET TO THE SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°32'49"
WEST,  ALONG SAID SOUTH LINE 64.71 FEET; THENCE NORTH 00°27'11" WEST,
18.32 FEET; THENCE NORTH 89°55'57" WEST, 30.54 FEET TO THE WEST LINE OF
SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID
TRACT, 37.74 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL J
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14

EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST, ALONG THE NORTH LINE OF SAID TRACT 152.39 FEET; THENCE SOUTH 00°04'07" WEST, 57.12 FEET; THENCE NORTH 89°55'53" WEST, 42.23 FEET; THENCE NORTH 00°00'00" EAST, 11.43 FEET; THENCE NORTH 90°00'00" WEST, 9.15 FEET; THENCE SOUTH 00°00'00" WEST, 33.80 FEET; THENCE NORTH 90°00'00" WEST, 5.59 FEET; THENCE SOUTH 00°04'03" WEST, 41.20 FEET; THENCE NORTH 90°00'00" EAST, 5.31 FEET; THENCE SOUTH 00°04'03" WEST, 18.17 FEET; THENCE SOUTH 89°55'57" EAST, 1.67 FEET; THENCE SOUTH 00°00'00" WEST, 31.10 FEET; THENCE NORTH 89°55'57" WEST, 25.66 FEET; THENCE SOUTH 00°04'03" WEST, 8.92 FEET; THENCE NORTH 89°55'57" WEST, 76.80 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.07 FEET; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE NORTH 00°04'03" EAST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO A POINT ON THE WEST LINE OF SAID TRACT ; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 39.65 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL K
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY
DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL
PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE
NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST, ALONG
THE NORTH LINE OF SAID TRACT 206.25 FEET TO THE POINT OF BEGINNING;
THENCE   CONTINUING ALONG THE NORTH LINE OF SAID TRACT NORTH
89°42'31" EAST, 33.67 FEET; THENCE SOUTH 00°00'27" WEST, 32.00 FEET;
THENCE NORTH 89°42'31" EAST, 9.25 FEET; THENCE SOUTH 00°00'27" WEST,
25.73 FEET; THENCE NORTH 89°55'53" WEST, 42.98 FEET; THENCE NORTH
00°04'07" EAST, 57.46 FEET TO THE INTERSECTION WITH THE NORTH LINE OF
SAID TRACT TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL L
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY
DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL
PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE
SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00° 00' 27" EAST ALONG
THE EAST LINE OF SAID TRACT, 83.30 FEET, TO THE POINT OF BEGINNING;
THENCE NORTH 89°53'12" WEST, 37.25 FEET; THENCE NORTH 00°00'27" EAST,
53.67 FEET; THENCE SOUTH 89°59'33" EAST, 37.25 FEET TO THE EAST LINE OF
SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID
TRACT, 53.74 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL M
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89°35'37" WEST ALONG THE SOUTHERN MOST SOUTH LINE OF SAID TRACT, 37.25 FEET; THENCE NORTH 00°00'27" EAST, 63.14 FEET; THENCE SOUTH 89°53'12" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID TRACT, 62.80 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL N
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14

EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" EAST, 5.40 FEET; THENCE SOUTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL O
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A

LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING
144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED
ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"
EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY
DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL
PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE
SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG
THE NORTHERN MOST SOUTH LINE OF. SAID TRACT 90.97 FEET; THENCE
NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE
NORTH 00°00'00" WEST, 1.90 FEET; THENCE NORTH 90°00'00" EAST, 3.85 FEET;
THENCE SOUTH 00°00'00" EAST, 1.90 FEET; THENCE NORTH 90°00'00" WEST,
3.85 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL P
UPPER LIMIT 32.40 FEET LOWER LIMIT 26.12 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES

NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 26.12 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 37.27 FEET; THENCE SOUTH 89°55'57" EAST, 67.50 FEET; THENCE SOUTH 00°04'03" WEST, 19.13 FEET; THENCE SOUTH 89°55'57" EAST, 11.63 FEET; THENCE SOUTH 00°04'03" WEST, 36.01 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°32'49" WEST ALONG SAID SOUTH LINE OF SAID TRACT, 48.59 FEET; THENCE NORTH 00°04'03" EAST, 18.31 FEET; THENCE NORTH 89°55'57" WEST, 30.54 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL Q
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);

RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST, ALONG THE NORTH LINE OF SAID TRACT 110.09 FEET; THENCE SOUTH 00°00'00" WEST, 45.43 FEET; THENCE NORTH 90°00'00" WEST, 9.15 FEET; THENCE SOUTH 00°00'00" WEST, 33.80 FEET; THENCE SOUTH 90°00'00" WEST, 5.59 FEET; THENCE SOUTH 00°04'03" WEST, 41.20 FEET; THENCE NORTH 90°00'00" EAST, 5.31 FEET; THENCE SOUTH 00°04'03" WEST, 18.17 FEET; THENCE SOUTH 89°55'57" EAST, 1.67 FEET; THENCE SOUTH 00°00'00" WEST, 31.10 FEET; THENCE NORTH 89°55'57" WEST, 25.66 FEET; THENCE SOUTH 00°04'03" WEST, 8.92 FEET; THENCE NORTH 89°55'57" WEST, 76.80 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.07 FEET; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE NORTH 00°04'03" EAST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO A POINT ON THE WEST LINE OF SAID TRACT ; THENCE NORTH 00°04'03" EAST, 39.65 FEET ALONG SAID WEST LINE OF SAID TRACT TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL R
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET

THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE NORTH 00° 00' 27" EAST ALONG THE EAST LINE OF SAID TRACT,  83.30 FEET, TO THE POINT OF BEGINNING; THENCE NORTH 89°53'12" WEST, 37.25 FEET; THENCE NORTH 00°00'27" EAST, 53.67 FEET; THENCE SOUTH 89°59'33" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID TRACT, 53.74 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL S
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14

EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID TRACT, THENCE SOUTH 89°35'37" WEST ALONG THE SOUTHERN MOST SOUTH LINE, 37.25 FEET; THENCE NORTH 00°00'27" EAST, 63.14 FEET; THENCE SOUTH 89°53'12" EAST, 37.25 FEET TO THE EAST LINE OF SAID TRACT; THENCE SOUTH 00°00'27" WEST ALONG THE EAST LINE OF SAID TRACT, 62.80 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL T
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A

LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" EAST, 5.40 FEET; THENCE SOUTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL U
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES

NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" WEST, 1.90 FEET; THENCE NORTH 90°00'00" EAST, 3.85 FEET; THENCE SOUTH 00°00'00" EAST, 1.90 FEET; THENCE NORTH 90°00'00" WEST, 3.85 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL V
UPPER LIMIT 33.66 FEET LOWER LIMIT 32.40 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49"

EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE'
PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER
PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M.
OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE
IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340,
SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT
144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½
INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8
IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING
NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE
SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8
INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID
LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8
INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF
AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF
SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST
LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33"
WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE
PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31"
WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF
SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 32.40 FEET AND BELOW THE
HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET CHICAGO CITY
DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL
PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE
SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG
THE WEST LINE OF SAID TRACT, 18.59 FEET TO THE POINT OF BEGINNING;
THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 37.27
FEET; THENCE SOUTH 89°55'57" EAST, 67.50 FEET; THENCE SOUTH 00°04'03"
WEST, 19.13 FEET; THENCE SOUTH 89°55'57" EAST, 11.63 FEET; THENCE SOUTH
00°04'03" WEST, 36.01 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID
TRACT; THENCE SOUTH 89°32'49" WEST ALONG SAID SOUTH LINE OF SAID
TRACT, 48.59 FEET; THENCE NORTH 00°04'03" EAST, 18.31 FEET; THENCE
NORTH 89°55'57" WEST, 30.54 FEET TO THE INTERSECTION WITH THE WEST
LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK,
COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL W
UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID
TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION
15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14
EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:
BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE
STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A
LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3);
RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH
00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES
NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING

144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT, THENCE NORTH 89°42'31" EAST, ALONG THE NORTH LINE OF SAID TRACT 110.09 FEET; THENCE SOUTH 00°00'00" WEST, 45.43 FEET; THENCE NORTH 90°00'00" WEST, 9.15 FEET; THENCE SOUTH 00°00'00" WEST, 33.80 FEET; THENCE SOUTH 90°00'00" WEST, 5.59 FEET; THENCE SOUTH 00°04'03" WEST, 41.20 FEET; THENCE NORTH 90°00'00" EAST, 5.31 FEET; THENCE SOUTH 00°04'03" WEST, 18.17 FEET; THENCE SOUTH 89°55'57" EAST, 1.67 FEET; THENCE SOUTH 00°00'00" WEST, 31.10 FEET; THENCE NORTH 89°55'57" WEST, 25.66 FEET; THENCE SOUTH 00°04'03" WEST, 8.92 FEET; THENCE NORTH 89°55'57" WEST, 76.80 FEET TO A POINT ON THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG SAID WEST LINE OF SAID TRACT, 122.07 FEET; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE NORTH 00°04'03" EAST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO A POINT ON THE WEST LINE OF SAID TRACT ; THENCE NORTH 00°04'03" EAST, ALONG SAID WEST LINE OF SAID TRACT 39.65 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL X
UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 3600 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.59 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 37.27 FEET; THENCE SOUTH 89°55'57" EAST, 67.50 FEET; THENCE SOUTH 00°04'03" WEST, 19.13 FEET; THENCE SOUTH 89°55'57" EAST, 11.63 FEET; THENCE SOUTH 00°04'03" WEST, 36.01 FEET TO THE NORTHERN MOST SOUTH LINE OF SAID TRACT; THENCE SOUTH 89°32'49" WEST ALONG SAID SOUTH LINE OF SAID TRACT, 48.59 FEET; THENCE NORTH 00°04'03" EAST, 18.31 FEET; THENCE NORTH 89°55'57" WEST, 30.54 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL Y
UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION

15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 111.86 FEET; THENCE NORTH 00° 00' 00" EAST 18.70 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 3.49 FEET; THENCE NORTH 90°00'00" EAST, 5.40 FEET; THENCE SOUTH 00°00'00" WEST, 3.49 FEET; THENCE SOUTH 90°00'00" WEST, 5.40 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

LOBBY LEVEL
RETAIL PARCEL Z
UPPER LIMIT 36.00 FEET LOWER LIMIT 33.66 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE

STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 33.66 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 90.97 FEET; THENCE NORTH 00° 00' 00" EAST 18.37 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°00'00" EAST, 1.90 FEET; THENCE NORTH 90°00'00" EAST, 3.85 FEET; THENCE SOUTH 00°00'00" WEST, 1.90 FEET; THENCE SOUTH 90°00'00" WEST, 3.85 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.

SECOND LEVEL
RETAIL PARCEL AA
UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH

00°04'03" WEST, 254 FEET 5- 7/16 INCHES,  TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½ INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID PARCEL; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT, 18.56 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 180.08 FEET; THENCE SOUTH 89°55'57" EAST, 30.52 FEET; THENCE NORTH 00°04'03" EAST, 16.21 FEET; THENCE NORTH 89°55'57" WEST, 30.52 FEET TO THE WEST LINE OF SAID TRACT; THENCE NORTH 00°04'03" EAST ALONG THE WEST LINE OF SAID TRACT, 39.65 FEET TO THE NORTHWEST CORNER OF SAID TRACT; THENCE NORTH 89°42'31" EAST ALONG THE NORTH LINE OF SAID TRACT, 110.40 FEET; THENCE SOUTH 00°04'03" WEST, 39.61 FEET; THENCE NORTH 89°48'52" WEST, 9.39 FEET; THENCE SOUTH 00°11'08" WEST, 24.18 FEET; THENCE SOUTH 89°48'52" EAST, 11.00 FEET; THENCE SOUTH 00°11'08" WEST, 16.85 FEET; THENCE SOUTH 89°48'52" EAST, 5.73 FEET; THENCE SOUTH 00°04'03" WEST, 22.15 FEET; THENCE NORTH 89°55'57" WEST, 3.17 FEET; THENCE SOUTH 00°04'03" WEST, 10.16 FEET; THENCE NORTH 89°55'57" WEST, 13.74 FEET; THENCE SOUTH 00°04'03" WEST, 21.52 FEET; THENCE SOUTH 89°55'57" EAST, 4.14 FEET; THENCE SOUTH 00°04'03" WEST, 32.90 FEET; THENCE SOUTH 89°48'52" EAST, 9.62 FEET; THENCE SOUTH 00°11'08" WEST, 9.40 FEET; THENCE SOUTH 89°48'52" EAST, 3.18 FEET; THENCE SOUTH 00°04'03" WEST, 17.31 FEET; THENCE NORTH 89°55'57" WEST, 12.79 FEET; THENCE SOUTH 00°04'03" WEST, 5.66 FEET; THENCE NORTH 89°55'57" WEST, 2.65 FEET; THENCE SOUTH 00°04'03" WEST, 23.23 FEET; THENCE NORTH 89°55'57" WEST, 12.58

FEET; THENCE SOUTH 00°04'03" WEST, 25.05 FEET; THENCE NORTH 89°55'57" WEST, 57.10 FEET; THENCE NORTH 00°04'03" EAST, 11.44 FEET; THENCE NORTH 89°55'57" WEST, 32.56 FEET TO THE INTERSECTION WITH THE WEST LINE OF SAID TRACT ALSO BEING THE POINT OF BEGINNING, (EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 42.63 FEET; THENCE SOUTH 89° 55' 57" EAST 67.71 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°11'08" EAST, 18.23 FEET; THENCE NORTH 89°48'52" WEST, 4.70 FEET; THENCE NORTH 00°11'08" EAST, 3.73 FEET; THENCE SOUTH 89°48'52" EAST, 6.78 FEET; THENCE SOUTH 00°11'08" WEST, 21.96 FEET; THENCE NORTH 89°48'52" WEST, 2.08 FEET to THE POINT OF BEGINNING,

ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 52.20; THENCE SOUTH 89° 55' 57" EAST 41.14 TO THE POINT OF BEGINNING; THENCE NORTH 00°11'08" EAST, 3.62 FEET; THENCE SOUTH 89°48'52" EAST, 7.20 FEET; THENCE SOUTH 00°11'08" WEST, 3.62 FEET; THENCE NORTH 89°48'52" WEST, 7.20 FEET to THE POINT OF BEGINNING,

ALSO EXCEPT THAT PART DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT; THENCE NORTH 00° 04' 03" EAST ALONG THE WEST LINE OF SAID TRACT 151.07; THENCE SOUTH 89° 55' 57" EAST 40.44 TO THE POINT OF BEGINNING; THENCE NORTH 00°11'08" EAST, 3.15 FEET; THENCE SOUTH 89°48'52" EAST, 5.20 FEET; THENCE SOUTH 00°11'08" WEST, 3.15 FEET; THENCE NORTH 89°48'52" WEST, 5.20 FEET to THE POINT OF BEGINNING), IN COOK, COUNTY, ILLINOIS.

SECOND LEVEL
RETAIL PARCEL AB
UPPER LIMIT 49.30 FEET LOWER LIMIT 36.00 FEET
THAT PART OF A TRACT HEREINAFTER REFERRED TO AS THE PARCEL, SAID TRACT DESCRIBED AS FOLLOWS: PART OF BLOCK 3 IN FRACTIONAL SECTION 15 ADDITION TO CHICAGO IN SECTION 15, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF EAST MONROE STREET WITH THE PRESENT EAST LINE OF SOUTH STATE STREET (BEING A LINE 27 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID BLOCK 3); RUNNING THENCE WITH SAID EAST LINE OF SOUTH STATE STREET, SOUTH 00°04'03" WEST, 254 FEET 5- 7/16 INCHES, TO A POINT 210 FEET 3 INCHES NORTH OF THE NORTH FACE OF THE REPUBLIC BUILDING, SAID POINT BEING 144.75 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3 AS MEASURED ON THE WEST LINE OF PREMISES IN QUESTION; THENCE NORTH 89°32'49" EAST ALONG A ESTABLISHED BY AGREEMENT BETWEEN BERTHA HONORE' PALMER AND ANDREA C. HONORE', TRUSTEES OF THE ESTATE OF POTTER PALMER' DECEASED, ETHELBERT W. PEEK, LOUIS FRAZIN AND ABRAHAM M. OPENHEIM, DATED JANUARY 23, 1907, RECORDED IN THE RECORDER'S OFFICE IN COOK COUNTY, ILLINOIS, IN BOOK 19104, PAGE 86 AS DOCUMENT 8030340, SAID LINE INTERSECTING THE WEST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3 AT A POINT 144.52 FEET NORTH OF THE SOUTH LINE OF LOT 10 IN BLOCK 3, 159 FEET 10 ½

INCHES MORE OR LESS, TO A POINT 6 FEET EAST OF THE WEST LINE OF LOT 8 IN SAID BLOCK 3 AND IN THE EAST LINE OF THE 12 FOOT ALLEY RUNNING NORTH AND SOUTH THROUGH THE SOUTH PART OF SAID BLOCK 3; THENCE SOUTH 00°01'23" WEST WITH THE EAST LINE OF SAID ALLEY, 9 FEET 8-7/8 INCHES TO A POINT 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8; THENCE NORTH 89°35'37" EAST PARALLEL WITH AND 22 FEET 3-5/8 INCHES SOUTH OF THE NORTH LINE OF SAID LOT 8, BEING THE NORTH LINE OF AN 18 FOOT ALLEY, 174 FEET 10-5/8 INCHES TO THE PRESENT WEST LINE OF SOUTH WABASH AVENUE; THENCE NORTH 00°00'27" EAST WITH SAID WEST LINE OF SOUTH WABASH AVENUE, 163.04 FEET; THENCE NORTH 89°59'33" WEST, 85.20 FEET; THENCE NORTH 00°00'27" EAST, 100.12 FEET TO THE PRESENT SOUTH LINE OF EAST MONROE STREET; THENCE SOUTH 89°42'31" WEST WITH SAID SOUTH LINE, 249.17 FEET TO THE PLACE OF BEGINNING OF SAID TRACT; SAID PARCEL THAT LIES WITHIN SAID TRACT, LYING ABOVE THE HORIZONTAL PLANE HAVING AN ELEVATION OF 36.00 FEET AND BELOW THE HORIZONTAL PLANE HAVING AN ELEVATION OF 49.30 FEET CHICAGO CITY DATUM AND LYING WITHIN THE HORIZONTAL BOUNDARY OF SAID PARCEL PROJECTED VERTICALLY, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID TRACT, THENCE NORTH 89° 32' 49" EAST ALONG THE NORTHERN MOST SOUTH LINE OF SAID TRACT 94.60 FEET; THENCE NORTH 00° 00' 00" EAST 18.47 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°04'03" EAST, 5.35 FEET; THENCE SOUTH 89°55'57" EAST, 8.04 FEET; THENCE NORTH 00°04'03" EAST, 2.99 FEET; THENCE SOUTH 89°55'57" EAST, 14.12 FEET; THENCE SOUTH 00°04'03" WEST, 8.34 FEET; THENCE NORTH 89°55'57" WEST, 22.16 FEET TO THE POINT OF BEGINNING, IN COOK, COUNTY, ILLINOIS.





GREMLEY & BIEDERMANN

Plat of Survey

















# Palmer House Retail Development
## Signage Criteria
### September 7, 2006

## Introduction

The proposed Palmer House Signage Criteria provide a framework for the design of tenant signage throughout the property. They acknowledge the unique character of the streetscape on the three sides of the property by permitting adjustments to the scale, material and placement of signage depending on it's location.

The criteria allow for individual design expression while maintaining an overall consistent relationship to the building's architecture.

The criteria limit the area of individual tenant signage so that it complies with the State Street/Wabash Avenue Special Sign District Zoning Ordinance.

Graphic panels in and of them selves do not count as sign area, letters and logos incorporated into the design of graphic display panels are included into the sign area calculations.

Refer to the City of Chicago for criteria regarding area limitations of graphic display panels.

## General Signage Criteria

All signage design concepts must be approved by the landlord.

Signage may be installed anywhere within the areas indicated on the Storefront diagrams, where ever they occur.

Vinyl or other signage media indicating credit card acceptance or product lines offered for sale are not permitted on the storefront.

Sales notices, banners and temporary graphics over and above those described herein or on the signage diagrams are not permitted. Decals and stickers are prohibited from areas on or around the Storefront.

Any indirect lighting sources for letters, logos, graphic panels or other displays must be concealed from view.

Street address numbers on storefronts, if required will be designed and installed by the Landlord at tenant expense. The street address will not be included in any zoning based calculation of signage.

## Signage Locations:

All exterior mounted signage, signage letters and logos must be attached to the signage band of storefront system. See SD 1.01 thru .03 and figures SD2 thru 4 for additional information.

Length: varies according to building structural grid, no signage to be mounted closer than 1'-6" from neutral pier

On Wabash Avenue a blade type sign for basement parking facility is proposed 6'-6" high with a 6'-6" extension beyond façade.

A canopy is permitted on State Street between columns 12 and 13, for more information refer to SD 2.

Dimensional signage, consisting of logos and text may be suspended behind glass line, below the storefront sign band.

## Internal Fascias and Areas of Graphic Display

Internal fascias may be constructed parallel to the glass line to accommodate ceiling height transitions, these fascias may be used as surfaces for signage or graphics.

Glass or metal panels can be suspended parallel to the glass line independent of a ceiling height transition to create a zone for graphic panels. Refer to signage diagrams for permitted size and locations of signage and graphic display panels.

Panels incorporating graphics, images, logos or text, conventionally illuminated are permitted. Image changing graphic and or digital display media are permitted.

Internally illuminated back lit transparencies are not permitted.

## Signage Types Permitted:

### Hotel Building, on Wabash Avenue and Monroe Street

Internally illuminated individual letters with metal side returns and luminous faces.

Internally illuminated with opaque faces, and luminous sides

Non illuminated, metal faced individual letters, colored, polished, or matte finished, with metal side returns

Reverse channel letters with concealed light sources for halo effect

12" high luminous box fully recessed into sign band, luminous letters or logos are permitted, and non illuminated opaque backgrounds are required.

Layered metal cutout letters which incorporate concealed lighting elements

Neon and Fiber Optic letters / logos will be considered by the landlord.

**Hotel Building – State Street Elevation**

**Signage Types Permitted:**

Internally illuminated individual letters with metal or luminous side returns and opaque faces

Reverse channel type illuminated individual letters

Non illuminated, metal faced individual letters, colored, polished, or matte finished, with metal side returns

**Second Floor Windows**

Vinyl letters and graphics are permitted on the inside face or the glass, totaling no more than 8.5 s.f.

See SD1.01 for display panel location and size criteria.

Graphics on panels must be changed periodically.

**Landmarked Storefront**

No signage may be attached to the ornamental band between display and transom windows of the landmarked storefront on Monroe Street or State Street.

Signage cannot be attached to the granite piers of the storefront except as follows: bronze plaque type sign at eastern most granite clad pier on Monroe Street, corner pier at Monroe and State Street, and the southern most pier of storefront on State Street. Plaque area limited to 3.75 s.f. Signage is to be placed at the location of existing tenant bronze signage.

Illuminated signage attached to the storefront façade is allowed to project out from and over the existing storefront.

**Signage above original Peacock Jewelers storefront**

Image changing digital display media is not permitted.



SD 1.01

THE PALMER HOUSE RESTORATION AND DEVELOPMENT

September 7, 2008

STATE STREET ELEVATION - SIGN LOCATION DIAGRAM





FIGURE SD2 - STATE STREET CANOPY

THE PALMER HOUSE RESTORATION AND DEVELOPMENT

September 7, 2006



THICK DIMENSIONAL CAST
BRONZE LOGO ADHESIVE
MOUNTED TO BACKGROUND
PANEL

1/2" THICK X 1" TALL
DIMENSIONAL CAST BRONZE
LETTERS POLISHED FACE AND SIDES

INTERNALLY ILLUMINATED
SIGN BOX W/SIGN PANEL COPY
BY TENANT

10'-6"

FIGURE SD3 - WABASH AVENUE HOTEL ENTRANCE

THE PALMER HOUSE RESTORATION AND DEVELOPMENT

September 7, 2006



FIGURE SD4 - STATE STREET SIGN PANEL



THE PALMER HOUSE RESTORATION AND DEVELOPMENT

September 7, 2006

## EXHIBIT 7.1(A)

### CLOSED LOOP STEAM HEATING SYSTEM AND BOILERS

1.  **Description of Services**. The Hotel Owner shall provide steam heat and perform Maintenance of the Facilities located in the Hotel Property delivering steam heat to the Facilities located in the Building (including, without limitation, the closed loop four-pipe system and boilers serving all of the Parcels) so serving the Hotel Property, the Retail Property and the Office/Annex Property; provided, however, that the Retail Owner and the Office/Annex Parcel Owners shall bear the cost of Maintenance of the portions of the closed loop steam heat distribution Facilities located within such Owners' Parcels, respectively (including, without limitation, air handlers and fan coils, as well as any independent heating systems located within and serving exclusively such Owner's Property).

2.  **Operating Expenses and Net Capitalized Cost of Replacement**. The Operating Expenses and Net Capitalized Cost of Replacement of the boilers, the closed loop steam heat distribution Facilities and related Facilities and Equipment shall be allocated between the Owners as follows:

|                    |   |        |
|--------------------|---|--------|
| Hotel Owner        | - | 92.2%  |
| Retail Owner       | - | 5.6%   |
| Office/Annex Owner | - | 2.2%   |

7.1(A)-1

CHGO2\40126644.12

## Exhibit 7.1(d)

### Elevator Maintenance

1.  **Description of Services.**  For so long as elevator Maintenance for the Hotel Property and the Office/Annex Property is performed pursuant to a joint elevator service agreement covering elevators in both the Hotel Property and the Office/Annex Property, the Hotel Owner shall cause to be performed all Maintenance of the Elevators located within the Hotel Parcel Improvements and the Office/Annex Parcel Improvements pursuant to such joint elevator service agreement.

2.  **Operating Expenses**.  The Hotel Owner and Office/Annex Owner shall share Operating Expenses in connection with the services described in Paragraph 1 in accordance with the following percentages:

    | Hotel Owner | - | 87.2% |
    | Office/Annex Owner | - | 12.8% |

    The Office/Annex Owner shall reimburse the Hotel Owner for its share of such Operating Expenses in accordance with the terms and conditions of **Exhibit 7.6**.

3.  **Net Capitalized Cost of Replacement.**  Each of the Hotel Owner and the Office/Annex Owner shall bear one hundred percent (100%) of the Net Capitalized Cost of Replacement of the elevators and elevator equipment and related Facilities located within their respective Parcels.

7.1(d)-2

CHGO2\40126644.12

## EXHIBIT 7.1(E)

### GAS SERVICE

1.  **Description of Services**. The Hotel Owner shall perform Maintenance of the shared Facilities required to supply the gas requirements of the Hotel Parcel, the Retail Parcel and the Office/Annex Parcel. Each such Project Owner shall maintain the Facilities, including meters, if any, required to operate such systems which serve their Parcel exclusively wherever located.

2.  **Operating Expenses**. The Hotel Owner, the Retail Owner and the Office/Annex Owner shall share Operating Expenses in connection with the services described in the first sentence of Paragraph 1 in accordance with the following percentages:

    | | | |
    |---|---|---|
    | Hotel Owner | - | 92.2% |
    | Retail Owner | - | 5.6% |
    | Office/Annex Owner | - | 2.2% |

    The Retail Owner and Office/Annex Owner shall reimburse the Hotel Owner for its share of such Operating Expenses in accordance with the terms and conditions of **EXHIBIT 7.6**.

3.  **Net Capitalized Cost of Replacement**. Each of the Hotel Owner, the Retail Owner and the Office/Annex Owner shall bear 100% of the Net Capitalized Cost of Replacement of all other Facilities, systems and equipment providing for the gas service to the Property for their Parcel exclusively. Each of the Hotel Owner, the Retail Owner and the Office/Annex Owner shall bear a share of the Net Capitalized Cost of Replacement of the shared Facilities comprising the gas service to the Property in accordance with the percentages set forth in paragraph 2 above and in accordance with the terms and conditions of **EXHIBIT 7.6**.

7.1(E)-1

CHGO2\40126644.12